1

2

3

4

5

6                      UNITED STATES DISTRICT COURT

7                      EASTERN DISTRICT OF CALIFORNIA

8

9  JOHN LEE HOLT,                    ) Case No. CV F-97-6210-AWI
                                     )
10               Petitioner,         ) <u>DEATH</u> <u>PENALTY</u> <u>CASE</u>
                                     )
11      vs.                          ) ORDER DENYING WITHOUT PREJUDICE
                                     ) RESPONDENT'S    REQUEST    FOR    A
12 Robert Ayers, As Acting Warden of ) MENTAL EXAMINATION
   San Quentin State Prison,         )
13                                   )
                 Respondent.         )
14 _____ )

15      This matter is before the Court on the request of Respondent

16 Robert Ayers, as Acting Warden of San Quentin State Prison (the

17 "State") to conduct a mental examination on Petitioner John Lee Holt

18 ("Holt") pursuant to Federal Rule of Civil Procedure 35(a).  After

19 considering the moving and opposing papers, including supplemental

20 briefing, the Court denies the State's request without prejudice.[1]

21 The request may be renewed, if necessary and appropriate following

22 depositions of treating doctors who work for the California Department

23 of Corrections and Rehabilitation ("CDCR"), including Aubrey Dent,

24 M.D., Lois Williams, Ph.D., and Roderick D. Ponath, M.D.

25

26

27      [1] On August 28, 2006, the State filed a supplemental reply brief
   that was neither requested nor contemplated by the Court.  It does not
28 affect the Court's ruling.  The Court nonetheless has incorporated
   that reply brief into its analysis of the State's request.

   97dp6210.ODenyReq4MentalExam.Hlt.wpd       1

1  **I.    The State's Argument.**

2        The State originally requested that Holt submit to a mental

3  examination by designated expert, psychiatrist James R. Missett, M.D.,

4  Ph.D.   The State now additionally requests that Holt submit to

5  neurological testing by neuropsychologist, William J. Lynch, Ph.D. as

6  well.  The two-part examination is proposed to take place over a two-

7  day period, October 2 and 3, 2006 at the specified room available at

8  San Quentin State Prison.

9        The primary justification advanced for the requested mental

10  examination is that Holt has never been subjected to an independent

11  psychiatric examination for purpose of assessing his mental state at

12  the time of the offense (July 1989) and trial (April-May 1990).  No

13  expert or witness testified at trial that Holt did not or could not

14  harbor the required mens rea for premeditated or felony murder.  Nor

15  did any expert testify during trial proceedings that Holt was not

16  competent to assist in his defense.  In its reply, the State further

17  argues that Holt's competence at the time of trial has never been

18  evaluated by any one other than his own retained experts.  The State

19  also argues that according to Holt's trial counsel the experts

20  retained at trial refused to offer testimony Holt was incompetent or

21  insane at the time of trial.[2]  The State insists that good cause for

22  conducting the two-part mental examination is satisfied because Holt

23  has placed his mental condition in issue by asserting he was incapable

24  of forming the requisite mental state at the time of the crime and

25  that he was incompetent at the time of trial due to his alleged mental

26  defects.  In its reply, the State cites to *Turner v. Imperial Stores*,

27

28        [2] This is a misstatement of the state record and is addressed in
the analysis section, below.

97dp6210.ODenyReq4MentalExam.Hlt.wpd          2

1  161 F.R.D. 89, 95 (S.D. Cal. 1995) in support of the contention that
2  good cause is met when the party resisting a mental examination has
3  placed his or her mental condition at issue.

4      The State wants to explore the issue of Holt's mental state in
5  terms of whether he was malingering or actually impaired at the
6  relevant times (16 and 17 years ago).  Dr. Missett is to make a
7  determination on this issue based on his extensive training, face-to-
8  face examination of Holt, and neuropsychological test results supplied
9  by Dr. Lynch.  The State contends Dr. Missett will be able to
10 determine the etiology of any observed psychosis and whether it was
11 operative at the time of the offense or trial.  In making this
12 assessment, Dr. Missett will take into account Holt's current mental
13 state and treatment.

14      According to Dr. Missett's declaration, included with the State's
15 request, he has reviewed an extensive set of documents and records.[3]
16 The documents include trial transcripts, exhibits to the state habeas
17 petition, and limited reports by staff mental heath care professionals
18 employed or retained by the CDCR.  Dr. Missett summarizes his
19 impressions of Holt as a man with a troubled childhood marked by
20 abuse, learning disabilities, and mental problems.  Consistent with
21 what the State hopes to establish, Dr. Missett also reports that some
22 records support the notion that Holt was prone to fabrication,
23 manipulation, and deception in addition to having committed various
24 theft crimes and two assaults on elderly female victims as a juvenile.
25 Dr. Missett comments that the trial defense experts proffered no
26 neurological test data to support the contention Holt had organic
27

28      [3] The list of documents and records covers four pages of Dr.
   Missett's declaration.

1 brain damage, but, instead, relied exclusively on a PET scan and EEG

2 to provide empirical support.[4]  Records from the CDCR suggest to Dr.

3 Missett that Holt may have been suffering from a psychotic disorder

4 since his arrival at San Quentin.  It is unclear to Dr. Missett,

5 however, whether these presenting symptoms were feigned or genuine,

6 and if genuine, whether they already were in an active phase as of the

7 time of his trial.  Dr. Missett believes that a face-to-face meeting

8 should resolve these questions.

9     Dr. Misset reports that the proposed examination of Holt will

10 involve no invasive, dangerous, or painful physical procedures.  He

11 also describes neurological testing to be conducted by Dr. Lynch.

12 Drs. Missett and Lynch will direct their testing and examination

13 efforts to reveal information about Holt's intellectual abilities, his

14 neurocognitive functioning, and his emotional state.  A list of tests

15 for each of these sub-categories is provided as possible prospects

16 during the actual testing procedure.

17 **II.  Holt's Opposition.**

18     The opposition papers consist of a comprehensive argument and

19 supporting declaration by Assistant Federal Defender Jennifer Corey.

20     **A.   Ms. Corey's Declaration.**

21     Ms. Corey begins by giving a history of Holt's refusal to see his

22 attorneys, investigator, and retained experts.  From November 2003 to

23 March 2005, Holt refused all visits.  This self-imposed isolation was

24 interrupted by a three-month period during which Holt did receive

25

26

27

28     [4] Dr. Missett is mistaken about neurological testing performed
by trial experts, as discussed in the analysis section, below.

1  attorney visits from March to June 2005.[5]  After that June 2005 visit,

2  Holt's refusal of visits resumed and there have been no visits since.

3       The three-month period during which attorney visits resumed

4  followed efforts by Holt's attorneys to enlist the assistance of San

5  Quentin Prison staff.  Ms. Corey wrote the warden and asked permission

6  to visit Holt in his cell, since he would not come out to the attorney

7  visiting rooms.  The officer in charge of visiting informed Ms. Corey

8  that he personally persuaded Holt to visit her.  In March 2005, when

9  Ms. Corey traveled to the prison, this officer personally met her at

10 the gate and escorted her to the visiting area.  He informed her that

11 if Holt had refused a direct order from the warden to go for a visit,

12 he (Holt) could have received a disciplinary write-up and have been

13 put on "Grade B," resulting in a loss of privileges.  Ms. Corey

14 describes her encounter with Holt:

15        It was typical of the few visits I've had with John.  He
          rarely makes eye contact.   He rarely initiates
16        conversation.  He answers questions with one-word answers.
          He is anxious to leave the visit.  He was unkempt.  His
17        hair was long, his fingernails were long and dirty, and he
          was thin.  I bought a soda and some candy from the vending
18        machines and offered them to him, but he did not want them.
          John has never accepted food from me during visits, which
19        is quite different from my other clients, who view the food
          from the vending machines as quite a treat.

20

21 After four more visits with Ms. Corey, Holt refused visits in December

22 2005, January 2006, March 2006, and May 2006.  He refused all visits

23 with the investigator.  He doesn't communicate by mail and he has

24 never placed a telephone call to counsel.  Holt's family members live

25 in Colorado and Tennessee.  No family member has ever visited Holt

26 since he was remanded into the custody of San Quentin in 1990.

27 _____

28      [5] Even during the period that Holt consented to attorney visits,
    he still refused to receive visits from the investigator assigned to
    the case.

1     Ms. Corey his reviewed CDCR records from San Quentin and the

2 Department of Mental Health.   These records show that Holt's

3 incarcerated life is one of complete, social isolation.   He is

4 withdrawn, quiet, and unmotivated.   He has been noted to spend most

5 of his days in his bed with his head under the covers.   He was been

6 described as vegetative and lethargic, so much so that he will not get

7 up to use the toilet and then voids on himself and his bedding.   At

8 the May 22, 2006 administrative hearing, initiated by the State to

9 determine whether Holt would be compelled to continue to be medicated

10 involuntarily (with psychotropic medication), he refused to attend the

11 proceedings.  Ms. Corey and the Federal Defender investigator attended

12 the hearing as observers.   The CDCR psychiatrist, Dr. Ponath,

13 testified at the administrative hearing that Holt is incapable of

14 giving informed consent to refuse medication, does not convey any

15 comprehension that he has a serious mental disorder, would not take

16 medication without a court order, and without the medication, would

17 deteriorate to an even more severely disordered state.   From 2000 to

18 the present, various treating mental health professionals have

19 diagnosed Holt has having psychosis, schizophrenia, paranoid

20 schizophrenia, a psychotic disorder, and a major depressive disorder

21 with psychotic features.

22     **B.    Argument.**

23     Holt opposes the Rule 35(a) request on a number of fronts.

24 First, he complains that the State now seeks to subject him to two

25 examinations rather than one.  Second, as a matter of form, he objects

26 to Dr. Missett's declaration because the subscription does not aver

27 the contents of the declaration are true and correct as required under

28

1  28 U.S.C. § 1746.  It only states the declaration was "given" under

2  penalty of perjury.

3  On the merits, Holt forcefully maintains the examination is not

4  justified.  He disputes the notion that the State could credibly

5  maintain Holt is malingering.  If Holt were a malingerer, and the

6  State believed that to be the case, it would not have gone to (state)

7  court for four years running to have Holt involuntarily medicated.

8  He argues that Dr. Ponath necessarily ruled out malingering when he

9  diagnosed Holt as psychotic and schizophrenic.  Because Holt has been

10 thoroughly examined over the years by CDCR doctors and professionals,

11 he contends the State already has what it needs to evaluate his mental

12 state.  Since the purpose of Rule 35(a) is to "level the playing

13 field" between the parties, *see Stewart v. Burlington Northern*

14 *Railroad Co.*, 162 F.R.D. 349, 351 (D. Minn. 1995), additional testing

15 by the State is not justified.

16 Attacking the foundation for Dr. Missett's initial impressions,

17 Holt complains the records reported to have been reviewed do not

18 include CDCR mental evaluation records generated after 2003.  They

19 include only CDCR records generated over a 14-month period from 2002

20 through 2003.  Further, Dr. Missett did not review documentation of

21 Holt's serious mental deterioration in 1996, as described by Dr.

22 Ponath in his declaration supporting the State's involuntary

23 medication petition.

24 Finally Holt challenges the efficacy of both the proposed

25 psychiatric examination and the ill-defined neuropsychological

26 evaluation.  To the extent that Drs. Missett and Lynch will be

27 gathering information from Holt, himself, given his severely

28 deteriorated mental conduction, the results of the examination and

1 testing will be useless as lacking even a minimally credible

2 foundation.  Moreover, Holt vehemently challenges the notion that

3 either Dr. Missett's examination or any of the neurological tests that

4 might be administered by Dr. Lynch would reveal Holt's mental

5 condition at the time of the crime and trial, 16 and 17 years ago.

6 With respect to just the neurological testing, he advances an

7 additional challenge.  He complains that the moving papers do not

8 adequately explain which neurological tests will be conducted and that

9 without such a specification, he cannot evaluate whether they would

10 be appropriate.

11     If the Court does authorize the mental examination requested,

12 Holt asks that the State disclose the actual tests that will be

13 performed, so his retained experts can assist in the evaluation of

14 whether they could accomplish the desired results.  Before the actual

15 testing, Holt further requests that the Court order the warden of San

16 Quentin Prison to make Holt available to counsel for a confidential

17 legal visit, and that if Holt will not leave his cell, a visit at his

18 cell front.  He further requests that the warden accomplish this in

19 a non-physical, non-punitive way, specifically proscribing "cell-

20 extraction" to arrange the visit, and that if Holt does refuse the

21 visit, that he not be penalized by loss of privileges.  He asks for

22 the same considerations for the actual examination and testing, that

23 is proscribing the warden from using "cell-extraction" and not

24 punishing Holt for refusing to attend the mental examination, but

25 rather have the examination take place in Holt's cell.  Finally, Holt

26 requests that the entire examination be video-tape recorded to capture

27 Holt's verbal and non-verbal responses.

28

1 **III. Analysis.**

2      Neither of the two form objections advanced by Holt are

3 persuasive.  There is no prejudice arising from the present request

4 that the requested mental examination be conducted in two parts, by

5 two mental health professionals, rather than one.  The State does not

6 propose to have the doctors confront Holt together, and the procedures

7 to be followed for the actual examination and testing are represented

8 to be non-invasive, not dangerous, and not painful.  The problem with

9 Dr. Missett's declaration subscription also is easily remedied.  The

10 State would only need to submit a supplemental declaration with the

11 proper subscription.  For the sake of the ensuing analysis, Dr.

12 Missett's declaration is presumed to be in the proper form pursuant

13 to 28 U.S.C. § 1746.

14      On the merits, the analysis of the request begins with the

15 construction of Rule 35(a).  The rule states:

16      When the mental or physical condition (including the blood
        group) of a party or of a person in the custody or under
17      the legal control of a party, *is in controversy*, the court
        in which the action is pending may order the party to
18      submit to a physical or mental examination by a suitably
        licensed or certified examiner or to produce for
19      examination the person in the party's custody or legal
        control.  The order may be made only on motion *for good*
20      *cause shown* and upon notice to the person to be examined
        and to all parties and shall specify the time, place,
21      manner, conditions, and scope of the examination and the
        person or persons by whom it is to be made.

22

23 (Emphasis added.)

24      As a preliminary matter, based on the Court's review of the

25 curriculum vitae of both Dr. Missett and Dr. Lynch, they appear

26 qualified to conduct mental examinations.  Addressing proper

27 construction of the other requirements of Rule 35(a), *Schlagenhauf v.*

28 *Holder*, 379 U.S. 104 (1964), sets the standard.  Although discovery

1 rules under the Federal Rules are to be accorded a broad and liberal

2 treatment, *see id.*, at 114 (citation omitted), the "in controversy"

3 and "good cause" requirements in Rule 35(a) demand more than "mere

4 relevance to the case" as would normally be required under Rule 26.

5 Otherwise the "in controversy" and "good cause" requirements would be

6 meaningless surplusage.  *See id.* at 117-18.  To fulfill these extra

7 requirements of Rule 35(a), *Schlagenhauf* holds the movant must make

8 an  affirmative  showing  "that  each  condition  as  to  which  the

9 examination is sought is really and genuinely in controversy and that

10 good cause exists for ordering each particular examination."  *Id*. at

11 118.  To accomplish this, "discriminating application by the trial

12 judge" is necessary with the movant producing "sufficient information,

13 by whatever means, so that the district judge can fulfill his function

14 mandated by the Rule."  *Id*. 118, 119.

15    Addressing the "in controversy" component, the Court finds that

16 with the exception of the element of malingering, Holt's *current*

17 mental state is not at issue with respect to the pending evidentiary

18 hearing.[6]  Rather, as the State has explained in its moving papers,

19 the concern is with Holt's mental state in 1989 (the time of the

20 offense) and 1990 (the time of the trial).  Reported cases which have

21 addressed  the  "in  controversy"  issue  focus  on  employment

22 discrimination cases and emotional distress occasioned by employment

23 discrimination.[7]  Despite the obvious distinction between employment

24 discrimination and capital habeas,  the  analysis  in  those  cases  is

---

25

26 [6] The pending evidentiary hearing is slated to address several guilt phase claims, including the failure of trial counsel to develop a mental state defense and the matter of Holt's competence to have

27 stood trial.

28 [7] The case relied on by the State, *Turner, supra*, 161 F.R.D. 95, is no exception.

1 helpful in evaluating the matter or a party's past mental state.  The

2 trend in employment cases is to deny a mental examination for an

3 employment discrimination plaintiff who merely has alleged past

4 emotional distress associated with the claimed workplace

5 discrimination.  *Curtis v. Express, Inc.*, 868 F.Supp. 467, 469 (N.D.

6 N.Y. 1994) (quoting *Bridges v. Eastman Kodak Company*, 850 F.Supp. 216,

7 222 (S.D. N.Y. 1994)).   Only when the employment discrimination

8 plaintiffs have alleged a separate tort claim for emotional distress

9 or ongoing severe mental injury are mental examinations under Rule

10 35(a) customarily granted.  This suggests that the language of the

11 rule referring to a party's mental state being in controversy is

12 limited to a party's *current* mental state.  But the only aspect of

13 Holt's current mental condition relevant to these proceedings is

14 whether his is presently malingering.  As noted below, a far less

15 intrusive option, taking the depositions of Holt's CDCR treating

16 doctors, appears to be available to explore this limited issue.

17      Putting aside the Court's doubt that a mental examination is

18 warranted to uncover a past mental condition, the Court remains

19 uncertain of the ability of Drs. Missett and Lynch to fashion

20 examination questions and test procedures to accomplish the State's

21 stated goal.  Relevant to this uncertainty, the Court notes that the

22 party resisting a mental examination ordinarily is not entitled to

23 know in advance what tests the movant's examiner will choose to

24 administer.   This follows because "preference should be given to

25 allowing the examiner to exercise discretion in the manner and means

26 by which the examination is conducted."  *Ragge v. MCA/ Universal

27 Studios*, 165 F.D.R. 605, 609 (C.D. Cal. 1995).   In light of the

28 unusual circumstances in this case, in which a Rule 35(a) mental

1  examination is requested to reveal a past mental state, the Court

2  remains skeptical.

3      This skepticism follows, in part, from the fact that the Court

4  is unaware of any case, published or unpublished, in which a mental

5  examination under Rule 35(a) was authorized to uncover mental states

6  from the past.  The accepted practice has been for retained experts

7  to *review* data that existed at the relevant time and to determine from

8  that data the mental state of the individual under consideration.[8]

9  This is precisely the type of evidence relied on by the court in *Odle*

10 *v. Woodford*, 238 F.3d 1084 (9th Cir. 2001).  In remanding the matter

11 to state court for a competency examination, the Ninth Circuit noted

12 that the retrospective determination was appropriate since the record

13 contained "sufficient information upon which to base a reasonable

14 psychiatric judgment."  (Citation omitted.)  *Id*. at 1089.  The

15 evidence available included declarations of trial experts as well as

16 newly retained experts, defense counsel, and the defense investigator.

17 *Id*. at 1090.  The opinion recites that the newly retained experts as

18 well as the experts who testified at Odle's trial gave opinions as to

19 Odle's mental state at the time of trial.  The opinion makes clear

20 that even with respect to the newly retained experts who examined Odle

21 years after the state trial, their opinions were predicated on review

22 of extensive materials in the record, including medical records,

23 psychiatric reports and jail records.  *Id.*

24      The same type of mental condition analysis was presented in *Deere*

25 *v. Woodford*, 339 F.3d 1084 (9th Cir. 2003).  Deere, the petitioner,

26 submitted two declarations to the district court.  The first one was

27

28      [8] The examples in the following text all involve retrospective
   competency determinations made by experts who were retained by
   petitioners.  None involved experts retained by the State.

97dp6210.ODenyReq4MentalExam.Hlt.wpd          12

1   of a psychologist, originally retained during state trial proceedings,

2   who had evaluated Deere's mental state at the time of the offense for

3   purposes of advancing a mental state defense, but not his mental state

4   at the time of trial for a competence determination.  The second

5   declaration was of a psychiatrist who evaluated substantial evidence

6   in existence at the time of Deere's trial and who additionally

7   examined Deere for the first time in the course of federal habeas

8   proceedings 10 years after the state trial proceedings concluded.  *Id*.

9   at 1085-86.  The court held that based on the evidence that existed

10   and could have been accessed at the time of Deere's state trial

11   proceedings, his competence to stand trial was questionable.  *Id*. at

12   1086.

13      On the other hand, in *Williams v. Woodford*, 306 F.3d 665 (9th

14   Cir. 2002), the court rejected the proffer of declarations submitted

15   by Williams' friends and family combined with neurological testing

16   conducted over 10 years after the state trial.  *Id*. at 707.  The court

17   concluded that the paucity of contemporaneous mental state reports

18   rendered the retrospective competency determinations "not especially

19   probative of whether Williams actually was incompetent at the time of

20   his trial."  *Id*. at 707-08.

21      In light of these authorities, and recognizing the difference

22   between treating doctors and experts doctors who will testify, the

23   Court does not rule out the propriety of having the State's forensic

24   mental health experts examine Holt in conjunction with record review

25   to arrive at an opinion, if the State can persuade the Court that the

26   "in controversy" requirement of Rule 35(a) extends beyond a party's

27   current mental condition.  Nor does the Court find improper examining

28   Holt to determine if he is presently malingering.  However, in light

1  of the numerous and well-documented examinations that have already

2  been conducted by the State's treating mental health professionals,

3  it may very well be that the State would agree to limit scope of a

4  forensic examination after its treating professionals provide

5  deposition testimony.  Accordingly, the State may renew the request

6  following the completion of those depositions.  The conditions for

7  conducting the examination, as requested by Holt (and vehemently

8  resisted by the State in its reply) also may be revisited in

9  connection with any such renewed application.

10      Certain inaccuracies should also be corrected in a renewed

11  application.  First, the Court notes that Dr. Missett is misinformed

12  in his declaration testimony to the extent that he states the retained

13  trial defense experts did not put forth any neuropsychological test

14  data to support their contention of Holt's organic brain damage.  In

15  fact, during his testimony, psychologist William Pierce, Ph.D. spent

16  a considerable amount of time discussing his impressions of Holt based

17  tests he conducted.  Dr. Pierce specifically mentioned test results

18  concerning Holt's visual motor coordination, perception, and

19  organization.  RT-29: 3219.

20      In addition to Dr. Misset's misperception about earlier

21  psychological testing, the State's reply brief misstates the record

22  in another regard.  Contrary to the State's summary of the record,

23  Holt's trial experts did not *refuse* to offer testimony that he was

24  incompetent or insane at the time of trial.  To the contrary,

25  according to the post-conviction declaration of Dr. Pierce,[9] both he

26

27      [9] Dr. Pierce's post-conviction declaration, executed September
   18, 1997, was appended to Holt's state habeas corpus petition as
28  Exhibit 3.  The declaration is referred to by the Court in the March
   30, 2004 Memorandum Order granting a limited evidentiary hearing.

97dp6210.ODenyReq4MentalExam.Hlt.wpd        14

1  and defense psychiatrist Samuel G. Benson, M.D. informed Holt's trial

2  attorneys that "Holt suffered organic brain damage and that [they]

3  believed] he was suffering from a seizure condition at the time he

4  committed the crime."   Dr. Pierce further averred that additional

5  details regarding Holt's social history especially events supporting

6  a diagnosis of post-traumatic stress disorder, which were unknown to

7  the medical team at the time of Holt's trial, "would have been

8  properly considered in evaluating [ ] Holt's competence to fully

9  understand court proceedings."   The decision not to offer testimony

10  in support of a mental health defense came from defense counsel

11  Charles Soria.   In his post-conviction declaration, Mr. Soria averred

12  *he* decided not to use evidence of Holt's psychological and

13  neurological condition during the guilt phase because *he* did not

14  believe this evidence "gave rise to any valid defenses pursuant to

15  California law."   He further averred that none of the experts

16  consulted at trial provided *a legal theory* which would have made

17  Holt's organic brain damage and brain dysfunction relevant to the

18  guilt phase proceedings.[10]

19  **IV.   Order.**

20      The State's request for a mental examination pursuant to Rule

21  35(a) of the Federal Rules of Civil Procedure is denied without

22  prejudice.   After Holt conducts the depositions of Holt's treating

23  doctors, including Aubrey Dent, M.D., Lois Williams, Ph.D., and

24  Roderick D. Ponath, M.D., the State may renew it's request for a

25  mental examination.   The request shall address the requirements of

26

27  _____

28      [10] As noted in the March 30, 2004 Memorandum Order, Holt's
current counsel have argued Mr. Soria's expectation that his retained
experts would supply a legal theory was deficient representation.

1  Rule 35(a) in light of this order and the deposition testimony of the

2  treating doctors.

3  IT IS SO ORDERED.

4

5  Date: _____ August 29, 2006 _____

                                            /s/ Anthony W. Ishii
6                                           Anthony W. Ishii
                                    United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28