UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JOHN LEE HOLT,

        Petitioner,

    v.

OAK SMITH, Warden of San Quentin State Prison,

        Respondent.[1]

Case No.  1:97-cv-06210-DAD

DEATH PENALTY CASE

MEMORANDUM AND ORDER (**REDACTED**): (1) CONDITIONALLY GRANTING HABEAS RELIEF ON GUILT PHASE CLAIMS 11, 12, 13 (portion) and 14, (2) DECLINING ISSUANCE OF A CERTIFICATE OF APPEALABILITY; AND (3) DIRECTING THE CLERK OF COURT TO SUBSTITUTE OAK SMITH AS THE RESPONDENT WARDEN AND ENTER JUDGMENT

## NOTICE REGARDING REDACTION

      **On July 10, 2006, this court entered a protective order pursuant to *Bittaker v. Woodford*, 331 F.3d 715 (9th Cir. 2003), concerning the files of Petitioner's trial counsel, including the files and notes made by experts, investigators, paralegal/legal assistants, and others involved in the preparation of the defense of petitioner's trial.[2]  (See Doc. No. 138 at**

---

[1]  Oak Smith, named as acting warden of San Quentin State Prison in January 2023, is substituted as respondent in place of his predecessor wardens.  Fed. R. Civ. P. 25(d).

[2]  The court previously interpreted the protective order to mean that documents containing such

**6-8.)  The protective order includes within its reach testimony in this proceeding referring to such confidential materials, as well as testimony by petitioner, trial counsel or any investigator or expert retained by trial counsel.  (*Id*.)  The protective order continues in effect after the conclusion of the habeas corpus proceedings and specifically shall apply in connection with all state court proceedings including a retrial of all or any portion of petitioner's criminal case.  (*Id*.)**

**In the order below, the Court has redacted allegations filed under seal and evidence from exhibits and state court records filed and lodged under seal.   The court, throughout this order refers to confidential information and testimony that otherwise appears in the public record.  Where noted, sealed content and confidential information and testimony not in the public record has been redacted.  Issued concurrently with this memorandum and order is an unredacted version of the memorandum and order, filed under seal.**

*****

Petitioner John Lee Holt is a state prisoner sentenced to death proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He is represented in this action by appointed counsel Robert Myers and Assistant Federal Defender Jennifer Mann.

Respondent Oak Smith is named as Warden of San Quentin State Prison.  He is represented in this action by California Deputy Attorney Generals Sean McCoy and Peter Thompson.

Before the court for a decision following the limited evidentiary hearing that took place before the undersigned on October 24, 26, and November 1, 2017 are the following claims asserted in petitioner's writ of habeas corpus filed December 1, 1998 pursuant to 28 U.S.C. § 2254: claim 11 (alleging petitioner's incompetence to stand trial), claim 12 (alleging ineffective assistance of counsel by failing to raise incompetence to stand trial), claim 13 (alleging ineffective assistance of counsel by failing to raise certain mental state defenses at the guilt phase

---

confidential material must be filed under seal in connection with the evidentiary hearing.  (*See* Doc. No. 275 at 1-2.)

of the trial), claim 14 (alleging ineffective assistance of counsel by calling petitioner to testify at the guilt phase of the trial), claim 15 (alleging ineffective assistance of counsel by failing to request lesser included jury instructions to rape, and trial court error by *sua sponte* failing to give such lesser included instructions),[3] and claim 16 (alleging ineffective assistance of counsel by failing to investigate and defend against the rape charge).[4]

After careful consideration of the record and the parties' post-hearing briefs, the undersigned: (i) conditionally grants federal habeas relief as to petitioner's guilt phase claims 11, 12, 13 (portion), and 14 and vacates petitioner's conviction and sentence entered on May 30, 1990 in *People v. John Lee Holt*, Kern County Superior Court Case No. 39910;[5] (ii) denies federal habeas relief as to petitioner's guilt phase claims 2, 3, 6, 8, 9 (portion), 10, 13 (portion), 15, and 16;[6] and (iii) declines to issue a certificate of appealability.[7]   The court does not address

---

[3]   The claimed trial court error, not included in the motion for evidentiary hearing (*see* Doc. No. 96 at 237 n.161), is reviewed under § 2254(d), *post*.

[4]   The court previously deferred holding an evidentiary hearing on the unresolved claim 9 allegations (Doc. No. 96 at 113), and reserved ruling on petitioner's request for an evidentiary hearing as to his claims 19, 21, 22, 32, 33, 41 and 43 (*id.* at 13).

[5]   The court previously denied relief as to petitioner's claim 9 to the extent it sought relief on grounds that juror Billy Ross was partial and biased other than as to his short term memory loss and his dealings with Mary Callahan (Doc. No. 96 at 269) and that portion of claim 13 seeking relief on grounds of unconsciousness and insanity.  (Doc. No. 96 at 270.)

[6]   The court previously dismissed petitioner's claim 44 (alleging incompetence for execution) without prejudice (Doc. No. 44 at 24; *see also* Doc. No. 96 at 12 n.1) and denied on the merits petitioner's claims 2, 3, 6, 8, and 10, and also denied petitioner's request for an evidentiary hearing as to those claims (Doc. No. 96 at 268-69).

[7]   Unless otherwise indicated, throughout this order, "CT" refers to the Clerk's Transcript on Appeal, "SCT" refers to the Supplemental Clerk's Transcript on Appeal, "RT" refers to the Reporter's Transcript on Appeal, "SRT" refers to the Supplemental Reporter's Transcript on Appeal, "1SHCP" refers to petitioner's first state habeas corpus petition, "2SHCP" refers to petitioner's second state habeas corpus petition, "1Inf. Resp." and "2Inf. Resp." refer to respondent's informal response to the first and second state habeas corpus petitions respectively, "1Inf. Reply" and "2Inf. Reply" refer to petitioner's informal reply in support of the first and second state habeas corpus petitions respectively, "EH" refers to evidentiary hearing held October 24, 26 and November 1, 2017, "EH Ex." refers to an exhibit at the evidentiary hearing, and "EHRT" refers to the Reporter's Transcript of the evidentiary hearing.  Other transcripts are referenced by date in this order.  Reference to page numbering is to original document pagination, except that reference to page numbering for documents filed electronically on the docket is to electronic court filing system pagination and reference to page numbering for the CT and SCT is to Bates numbering.  Reference to state law is to California law unless otherwise noted.

the unresolved claims in the federal petition, rendered moot hereunder.[8]  Should a higher court disagree with this court's conclusions granting federal habeas relief as to the guilt phase claims, this court will consider the unresolved claims at that time.

BACKGROUND FACTS

This factual summary is taken from the California Supreme Court's summary of the facts in its May 19, 1997 opinion on direct appeal.  The summary of facts is presumed correct except to the extent inconsistent with the court's intrinsic review under 28 U.S.C. § 2254(d)(2).  (*See* Doc. No. 96 at 144, 150, 153, 236–37, 259, 268–72); 28 U.S.C. § 2254(e)(1); *see also Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) (acknowledging Antiterrorism and Effective Death Penalty Act ("AEDPA") deference to state court factual findings) (overruled on other grounds by *Murray v. Schriro*, 745 F.3d 984, 999–1001 (9th Cir. 2014), *as recognized by Prescott v. Santoro*, 53 F.4th 470, 480 (9th Cir. 2022)); *Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

Guilt-Phase Evidence

A.      The Prosecution Case

Defendant had been employed for one month in door-to-door sales of household cleaning products on July 6, 1989, when he called at the Bakersfield home of 65-year-old Marie Axtell, a widow who lived alone.  He had undergone a short training period before being sent to Bakersfield on July 3, 1989, as part of a 15-person sales crew which was staying in a local hotel.  On the morning of July 6, defendant and Cameron Bearden, who had been assigned to assist in training defendant, worked together on one street, after which they split up.  Defendant was repeatedly rebuffed in his efforts to make sales.

When defendant arrived at the home of Ms. Axtell, she was lying on the living room sofa.  The door was open.  When she said she did not want his products, defendant jerked opened the screen door, entered the living room, and sexually assaulted Ms. Axtell, first in the living room and then in the master bedroom of the home.  Ms. Axtell was strangled and rendered unconscious at some point during the assault.  Defendant then took jewelry from the bedroom, root beer from the refrigerator in the kitchen, and money from Ms. Axtell's wallet, which was on the kitchen table.  Returning to the bedroom, he left the unopened root beer on a dresser, took more jewelry, and departed.  His company identification badge was found in the living room.  His fingerprints were found on items throughout the house, including the root beer can.

---

[8]  *See e.g.*, Doc. No. 104 at 6-7, wherein the court stated that if relief were to be granted as to any of petitioner's guilt phase claims, "the [bifurcated] penalty phase claims will be moot and will not be addressed."

Glenn Copeland, Ms. Axtell's son, who lived in Tehachapi, had visited the Axtell house about 8 a.m. He left at 9 a.m. to do an errand for his mother. When he left the house, Ms. Axtell's purse and wallet were on the kitchen table. On Copeland's return to the house about 11:30 a.m., he saw a brown briefcase near the front door. The screen door, which his mother had latched when he left, was unlatched and open several inches. The latch had been bent. Alarmed, he entered and found his mother unconscious, lying facedown on the floor in the bedroom. What appeared to be a bag was in her mouth and a cloth was wrapped around her neck and double knotted. Copeland called 911, and after again checking his mother's condition went next door to seek assistance. As he left the house he confronted defendant who was picking up the briefcase. When accused, defendant denied being inside the house. When Copeland again accused defendant of being in the home, defendant said he was going to check with his boss in the van across the street. There was no van across the street. Copeland directed defendant to remain, but when Copeland returned two minutes later from the house of the neighbor, defendant and the briefcase were gone. Emergency vehicles arrived several minutes later and Ms. Axtell was taken to the hospital.

Just after he saw an ambulance on the street defendant was supposed to be working on, Cameron Bearden saw defendant near the pickup area for the sales crew. Defendant beckoned him to come over. Bearden observed that defendant was "hyper," his hair was "messed up," and he did not have his briefcase. The briefcase was one issued to salespeople by the company. It contained a "sales kit" of items used in making the sales presentation. Defendant said his briefcase was at the pickup area. Bearden saw the briefcase at the pickup stop. Defendant and Bearden were picked up by a supervisor in a company van. Defendant told the supervisor that he had not made any sales. The supervisor then dropped the two men off in the same area even though defendant said he wanted to work in another area. Defendant left the sleeveless vest he always wore, even in the Bakersfield heat, in the van.

The two men were then stopped by Detective West who had heard a police radio call regarding an attempted homicide and a description of a suspect. Defendant was carrying a brown briefcase. The location of the detention was one block from Ms. Axtell's home. West questioned defendant and Bearden who denied having been on the street on which Ms. Axtell's home was located. He spoke to them for about 10 minutes.

Aubin, another officer, who had heard a description of the suspect, arrived to back up West, as defendant and Bearden were walking away. He detained defendant and Bearden at the request of Detective Vest who arrived with Ms. Axtell's son. Glenn Copeland told the officers that he believed he recognized the briefcase

carried by defendant, and one of the men as the person he had seen at his mother's house.

The officers conducted a pat-search of Bearden and defendant preparatory to placing them in a patrol car. Aubin found a pen, ointment jar, and jewelry in defendant's right front pants' pocket. Defendant was arrested and a more thorough search revealed $160 in $20 bills and cigarettes in the left front pocket.

In the meantime, Ms. Axtell was transported to a hospital where she died on July 15, 1989, without regaining consciousness. An examination at the time of her admission revealed no external trauma to the vaginal area. The vault was red,

5

which was consistent with penetration by an adult penis, however.  There was no evidence of external trauma in the anal area, but evidence of blood was found in a stool sample or the rectum.  This was consistent with penetration by an adult penis.  Other forensic evidence also connected defendant to the assault.

An autopsy revealed the following external injuries.  The tip of Ms. Axtell's hyoid bone, located high in the throat area above the voice box, was fractured, as were the second and third cartilaginous rings of the trachea, located in the midline of the throat.  The damage to the hyoid bone was consistent with manual strangulation.  Fractures of the cartilages of the larynx can be seen in either manual strangulation or ligature strangulation.  The pathologist later testified that bruises appearing in photos of Ms. Axtell's neck area were consistent with ligature strangulation.  The cause of death was hypoxic brain damage due to strangulation.  Death was the result of pneumonia involving both lungs with abscess in the lower lobe of the right lung which resulted from the brain damage.

Bearden identified the company photo-identification card found in Ms. Axtell's home as that issued by the company to defendant and testified that the briefcase was also company issue.  He had been surprised at the amount of money found in defendant's pocket.  The company never provided more than a $25 draw for lunch and other expenses, and during the time Bearden worked with defendant, defendant made very few sales.

Ms. Axtell's purse and wallet held no currency when examined by police.  Ms. Axtell had cashed a $200 check on July 3, 1989, receiving all of the money in $20 bills.  On July 4, she had spent just over $39.  The jewelry in defendant's possession was identified as belonging to Ms. Axtell.

At the Bakersfield Police Department after his arrest, defendant had been advised of his constitutional rights.  He had waived them and was questioned by Detective Boggs.  Boggs testified that defendant initially denied any involvement in the crimes, but later admitted he had assaulted Ms. Axtell.  He said he had been aggravated by people slamming doors in his face and became irritated when she said she was not interested in his products.  When she told him to leave, something in his head "snapped," he got mad, jerked open the screen door, and grabbed Ms. Axtell with both hands around her throat and began to choke her as she rose from the couch.  When his hand tired as she struggled and tried to escape, he released her and picked up a cloth he found in another part of the living room.  He then returned to Ms. Axtell and placed her in a "choke hold."  She continued to struggle until he tightened the choke hold and she became limp and semiconscious.  He then wrapped the cloth around her neck and twisted it until she became unconscious.  At some point he warned her that if she did not stop moving he would have to hurt her.

Defendant then dragged the victim into the bedroom, threw her onto the floor next to the bed and sexually assaulted her.  He did not recall whether he had anal or vaginal intercourse, but had ejaculated.  He denied stuffing anything into Ms. Axtell's mouth.  He acknowledged that a belt found in the bedroom was his and came off during the struggle, but said he did not remember using it to choke the victim.  After the sexual assault he got dressed, took several items of jewelry from a box on the dresser, went to the kitchen where he got a can of root beer, and returned to the bedroom, looked through jewelry and other items, and left.  He denied taking any money from the residence.  Defendant made his statement in a matter-of-fact demeanor, displaying little emotion.  n.3

6

----------------------------------------FOOTNOTE----------------------------------------

n.3 Detective Boggs did not tape-record his interview with defendant. He explained that it was not his practice to do so because he believed that tape recording intimidated people. He also tried to maintain eye-to-eye contact with the person being interviewed. Operating a tape recorder, turning it on and off, and changing the tape interrupted the flow of the interview.

------------------------------------END FOOTNOTE------------------------------------

B.    The Defense

Defendant was the only defense witness during the guilt phase. His testimony was consistent with his earlier statement to the police, and he confirmed that Detective Boggs's testimony was "pretty much [what I] stated." Defendant testified that before approaching the Axtell home he had been the object of racial comments. Ms. Axtell told him she was not interested in his product. He persisted and showed her the product. She said she did not want to buy anything. He considered making another sales pitch, but decided to put the product back into the briefcase. At that point he "snapped" or "blew up," opened the screen door, and ran toward Ms. Axtell who was on the couch. On cross-examination he testified that he did not intend to sexually assault her when he entered, although he did intend to steal something from the house. He began choking Ms. Axtell and told her to remove the belt he was wearing which she did. He took the cloth from a pillow because his hands were getting tired, put it around her neck and tied it. He told her to remove her panties, and when he noticed the front door was open, took her to the bedroom where he pushed her onto the bed. He took items from the dresser, and then sodomized Ms. Axtell. Defendant denied vaginal penetration. Ms. Axtell was conscious at that time.

Defendant testified that he then went to the kitchen because he was hot and sweaty. He told Ms. Axtell to get off the bed and lie on the floor, which she did. In the kitchen he took a root beer can from the refrigerator and took the bills from a wallet he saw on the kitchen table. The money taken from him after his arrest was this money. He then returned to the bedroom, put the root beer can on the dresser and took some necklaces or chains. He looked through a jewelry box and took some jewelry. These were the items taken from him in the search at the time he was detained by the police. He left, leaving Ms. Axtell on the floor with the blue cloth still tied around her neck. Defendant testified that Ms. Axtell was conscious the entire time he was in the house. He denied putting the plastic bag in her mouth. He denied telling Detective Boggs that she was unconscious. He had not used that word, but had said that Ms. Axtell was not moving. The only time she started to lose consciousness was when he first grabbed her around the neck in the living room.

When defendant realized he had left his briefcase at the house he returned to get it. He rang the doorbell, which was answered by Ms. Axtell's son who accused him of having been in the house. He said he "didn't do it" and left when the son went next door.

The defense conceded sodomy, but argued that the evidence of rape was insufficient, and that the broken hyoid bone and cartilaginous rings of the trachea might have been broken during attempts to resuscitate Ms. Axtell, in which case that injury could be an intervening cause of death.

Penalty-Phase Evidence

A. Aggravating Evidence

In addition to the circumstances of the offense, the aggravating evidence offered by the People was limited to evidence of two Colorado incidents.  The first was the rape and robbery of 90-year-old Candeo Tresso during a burglary of her Pueblo Colorado home in 1984.  Gino Tresso, son of the victim, testified that his mother did not speak English and had difficulty moving around, even with a walker.  Gino Tresso visited her daily at lunch time.  On October 7, 1984, he noticed that two windows which looked out from his mother's duplex unit into a garage were intact.  When he arrived the next day, about 40 minutes after his sister, who lived with their mother, had left, he saw a brick and broken glass in the yard.  The back door was locked, and when he entered he found Mrs. Tresso standing in the hallway "scared to death."  She stated that she had been robbed.  Her bank books were on the bed and envelopes in which she kept her money were scattered about.  About $500 in cash was missing.

Subsequent examination revealed that Mrs. Tresso had been sexually assaulted.  Defendant, then a juvenile placed in a home for troubled children, was questioned and denied involvement even when confronted with evidence placing him at the scene.  When his fingerprints were identified he confessed, however, and eventually pled guilty to rape and robbery.

The second incident led to defendant's conviction for the 1988 second degree burglary of the apartment of Mary and Glenn Johnson from which he took a ski jacket, a steak knife, an ashtray, and $1.57.  He was apprehended by residents of the apartment building without violence.

B. Mitigating Evidence

The theory of the penalty phase defense was that, at the time of his assault on Ms. Axtell, defendant was in a state of altered consciousness, a "fugue state" caused by a temporal lobe epileptic seizure.  The defense also attempted to evoke sympathy for defendant because his parents rejected him and because his childhood problems had been misdiagnosed as having an emotional origin when he was in fact brain damaged.  As a result of the misdiagnosis, the responsible public agencies and residential facilities failed to provide appropriate treatment and remediation.

Evidence was presented that defendant suffered a brain injury at birth as a result of oxygen deprivation.  He exhibited self-destructive behavior when he was four years of age.  He tried to stab himself, he cut his fingers and arms, he stole things, and he gave pesticide to a cousin to drink.  At age nine he received treatment when he complained of hearing voices.  At age 11 he was institutionalized for 10 months for auditory hallucinations of the devil who told him to do good or bad things.  He was diagnosed at that time as having an undersocialized aggressive reaction to childhood.

Defendant's parents removed him against medical advice after he spent one year in a subsequent institutionalization at the Colorado Boys Ranch.  In 1981, when he was 13 years old, he knocked an elderly woman down and fled with her purse after posing as a Boy Scout to help her with her groceries.  Defendant's parents refused to have him returned to the home at one point and, when he was returned to his home even though a social worker reported that defendant's parents were abusive

and uncooperative, his parents refused to participate in therapy, and refused to acknowledge any wrongdoing.  They claimed that defendant was "evil," was "born from the devil," and expressed the view that defendant, rather than his twin brother, should have died shortly after birth.

Defendant's parents continued to be uncooperative and left the state, abandoning him, while he was in one group home placement.  The social worker found that defendant had trouble following through on things, but believed this was due to emotional problems, not retardation.  The emotional problems affected defendant's learning ability and led to a diagnosis of learning disability.  In shelter schools he functioned at the second, third, and fourth grade levels, but was good at imitating things.  From April 1982 to October 1984, defendant was in a residential child care facility for children with emotional problems and those who had committed criminal misconduct.  He was then described as a very angry person who did not get along well with his peers, but while in this facility he became more receptive to staff, got along better with his peers, and opened up.  He was permitted to attend a public middle school, an alternative school, and then a public high school as his grades got progressively better, possibly because he was in special education classes in which the standards were not as exacting as those in regular classes.

A clinical psychologist at the residential facility testified that defendant had a "conduct disorder," a term used to describe persons under 18 who have significant social problems, lie, run away from home, lack respect for authority, and tend to deny responsibility for their behavior.  Defendant did not sleep well, sometimes a symptom of depression.  He was suspected of committing several burglaries before the rape and robbery of Mrs. Tresso while in this placement.

Following his conviction of the earlier offenses, defendant had been placed in a closed treatment center.  The psychologist who worked with defendant there also believed he had an emotional disorder, not an organic problem.  He did not act out his anger, but she could tell that he was angry.  When upset he wore many layers of clothing even on hot days and refused to talk.  Defendant's family participated in some family therapy, but his father was not willing to discuss abuse, rigid rules, or defendant's hatred of him.  The mother seemed "overly physical" with defendant.  Defendant continued to feel guilt about the Tresso assault and felt responsible when she later died of a heart attack.

Defendant was paroled in February 1988 and assigned to a subsidized housing unit.  His parole agent testified that had she not been on vacation at the time she would have refused supervisory responsibility, as defendant was not ready to care for himself.  He had no savings, was unemployed, and his social skills were deficient.  Parole was terminated as a result of a court decision on June 1, 1988.  At that time the parole agent was preparing to seek revocation of parole because defendant was becoming more frustrated and careless about taking care of himself and his apartment.  He had lied about efforts to find employment and was not participating in treatment programs. He had told the parole agent about a door-to-door job which she believed was inappropriate because it involved travel outside the State of Colorado, and because defendant was a very serious offender who lacked the social skills necessary to handle rejection.  She believed that with his low frustration level he might commit another offense if rejected.

When parole was terminated prematurely, defendant had to leave his apartment.  He lived with his parents on two occasions for one week but they rejected him both times.  He then committed the burglary for which he was convicted on August 3, 1988.

After defendant was convicted of second degree burglary in that incident, he was granted probation, but probation was revoked for 60 days when he tested positive for marijuana. He absconded two weeks later. A Colorado arrest warrant was outstanding when the California offenses were committed.

The defense also presented evidence that defendant actually suffered from a brain injury. Dr. Monte Buchsbaum, a professor of psychiatry and human behavior at the University of California at Irvine, testified that positron emission tomography (PET) testing suggested that appellant's temporal lobes and part of the frontal lobe of his brain were "two standard deviations below normal." Dr. Buchsbaum detected "emotional system damage" to the cingulat gyrus portion of defendant's brain, damage consistent with sexual aberrations. Abnormality in defendant's frontal lobe was associated with judgment, planning, and execution functions, and suggested impulsiveness and poor judgment. Areas of his brain with diminished metabolic activity are those involved in cognitive skills-reading, writing, and arithmetic-and some kinds of abstract reasoning. The abnormalities were most likely a result of brain damage, possibly prenatal or during delivery, when a shortage of oxygen occurred or the head was damaged. The PET scan diagnosis was consistent with that from an electroencephalogram (EEG) which reflected abnormality in both temporal lobes of defendant's brain.

Dr. Buchsbaum concluded, based on the PET scan and EEG that an area of brain dysfunction was present, probably in both the left and right temporal lobes, and that because of brain damage defendant's brain function would be abnormal.

Dr. Buchsbaum acknowledged, however, that violent behavior cannot be predicted on the basis of the data obtained in the tests performed on defendant.

Dr. Raul Guisado had conducted a neurological examination of defendant, including an EEG. Computerized interpretation of that examination confirmed an unusual amount of alpha wave activity in the front of defendant's brain and a relative lack of activity in the side and back. There was abnormal theta wave activity in the temporal regions, and occasional abnormal bursts of theta wave activity in the temporal regions on both sides of defendant's head. Other tests reflected normal hearing, but abnormal processing of auditory information. Defendant described lifelong symptoms consistent with temporal lobe epilepsy. An abnormality in the function of the right hemisphere of the brain was also suggested by an abnormal relaxation of muscles on defendant's left side.

Dr. Guisado also performed tests on defendant related to auditory perception and cognitive ability. Based on the auditory tests, Dr. Guisado concluded that defendant had an abnormality on the right side of the brain, mostly localized in the right temporal lobe. This impaired defendant's ability to understand auditory information. The test of cognitive ability, the ability to pay attention and concentrate on one particular task, was normal.

In a history Dr. Guisado took from defendant, defendant described having experienced since age 14 or earlier sudden onsets of an abnormal sensation. His body would go numb, after which he had sharp pains either in the left arm or head. This was followed by a short period during which he was not aware or completely aware of his surroundings. Defendant also stated that he sometimes had episodes when he blanked out. Dr. Guisado testified that these symptoms were commonly described by persons who suffered from temporal lobe epilepsy. While this was highly suggestive of an epileptic form disorder, it was not diagnostic of that

condition.  Defendant was also found to have abnormalities in the muscle tone on the left side of his body.  This finding was tied very well to the physiological evidence of the involvement of the right hemisphere of defendant's brain.

Without additional information Dr. Guisado could not diagnose epilepsy in defendant.  He did testify, however, that research into epilepsy and violent behavior suggests that persons with temporal lobe epilepsy, particularly that involving the right hemisphere of the brain, tended to have a higher degree of violent, impulsive behavior and aggression than normal people or those with abnormalities in the left side of the brain.

Samuel Benson, M.D., who also held doctorates in physiology and pharmacology, was a specialist in psychopharmacology, and treated persons who had been unsuccessful in other treatment programs. He interviewed defendant and evaluated him based on those interviews as well as records of defendant's birth, records of other experts, and a description of defendant's crimes.  He concluded that defendant had an organic mental disorder and that there was tissue damage to the brain.  Defendant had organic personality syndrome, a partial complex seizure disorder with brain damage particularly to the right temporal lobe.  Dr. Benson concluded that the lesions in defendant's brain likely occurred at birth when defendant delivered in a "double-footed breach" position, did not breathe or cry for two minutes, had to be intubated, and was slow to react normally.  He believed that defendant was deprived of oxygen for longer than two minutes, as the placenta would have started to break away when contractions and expulsion of the infant began.  In addition, there would have been occlusion in the birth canal cutting off the flow of blood and oxygen to the brain.  Defendant's childhood history included inability to learn, behavioral disturbance, and both auditory and visual hallucinations, which were all signs of organic brain damage.

The treatment defendant received in Colorado was not appropriate for a person with organic brain injuries.  In Dr. Benson's opinion defendant did have epilepsy which he had attempted to conceal.  Defendant very much wanted to believe that he was normal and to appear normal to others.  While defendant's symptoms were observed and recorded by those providing therapy, they did not have defendant's birth records, and defendant was never seen by a competent neurologist or psychiatrist.  The therapy provided was not effective with a person who had organic brain damage.  The proper therapy would have been administration of medications which increase the activity of the brain cells that functioned below normal levels, and antiseizure medication to raise the seizure threshold and allow the brain to function in a normal manner.

This expert believed that defendant "confabulates."  In his description of the crimes against Ms. Axtell, although he could not tell Dr. Benson what he intended to do at a particular time, and there were moments in which it was "like he was not there," he added to his "recollection" of the crimes against Ms. Axtell details he had learned from others.  The events about which defendant lacked recall, and as to which his description of the crime varied in different interviews with the experts and Detective Boggs, were not crucial to defendant's guilt or innocence.  He had no incentive to lie about them and simply tried to fill in the gaps in his memory.  This is common with people who have organic brain disease.  Defendant's actions during the crimes, such as leaving the briefcase and identification tag, getting the root beer but not drinking it, and other conduct that was nonsensical, reflected a disorganization which, when coupled with defendant's description of his right temporal lobe pain, the odd feeling down his left shoulder with loss of control and tremor of his left arm and a tingling sensation, followed by a period of confusion,

11

suggested to Dr. Benson that at the time of the attack on Ms. Axtell defendant was experiencing a seizure disorder.

Dr. William Pierce, a clinical psychologist, whose report Dr. Benson had reviewed, had himself reviewed the various records about defendant, and had interviewed defendant, his brother, and the persons who had tested or worked with defendant. He testified that defendant was bewildered about his situation, genuinely tried to piece together what had happened and was embarrassed by his conduct. Like Dr. Benson, Dr. Pierce was impressed by the impulsiveness of defendant's conduct and his confusion and spotty recollection of his acts. Dr. Pierce, too, concluded that defendant had an organic mental disorder, an organic personality syndrome evidenced by aberrant behavior at a very young age and, in later years, leading to development of a borderline personality disorder within the meaning of the third edition of the Diagnostic and Statistical Manual of Mental Disorders.

Dr. Pierce also found evidence in the tests he administered that defendant's problems were organic in nature, and he believed that defendant was in a "fugue" state at the time of the offenses. In that state a person does not lose consciousness, but there is an alteration of consciousness resembling a dreamy or twilight state, followed by confusion that is reflected by gaps in memory. It is characteristic of the disorder for a person to act out very violent behavior that almost looks planned, and for the person to be in a state in which it seems they see themselves doing the act. They give a third party description of their conduct, as if they were watching it. Defendant described his conduct to Dr. Pierce in this manner. Dr. Pierce was also impressed that the things that defendant said he did not remember-such as what happened to his belt, losing his name tag, and putting the plastic bag in Ms. Axtell's mouth-did not help or hurt him. Like the other experts, Dr. Pierce could not rule out the possibility that defendant had lied in some of his statements, but he did not believe that to be the case. Rather, the memory gaps and later confabulation as defendant tried to fill them in were symptomatic of the fugue state in which defendant had been acting during the temporal lobe attack.

After closing argument and instruction, the jury returned a penalty verdict of death after 60 minutes of deliberation. Defendant's motions to strike the special circumstances and automatic motion for modification of the penalty (§ 190.4) were denied. Glenn Copeland and defendant each addressed the court, after which the court pronounced judgment, imposing the death penalty for the murder of Ms. Axtell and determinate terms on the remaining counts.

*People v. Holt*, 15 Cal. 4th 619, 639–50 (1997), *as modified on denial of reh'g* (July 9, 1997).

<u>PROCEDURAL HISTORY</u>

A.    <u>State Proceedings</u>

Petitioner is in the custody of the California Department of Corrections and Rehabilitation pursuant to the judgment of the Kern County Superior Court entered on May 30, 1990, imposing the death sentence in case number 39910.[9]  (CT 891–95.)

---

[9] The parties stipulated that the reporter's transcripts and clerk's transcripts from *People v. John Lee Holt*, Kern County Superior Court Case No. 39910, are deemed part of the record for the evidentiary hearing before this court.  (Doc. No. 284 at 2; Doc. No. 295 at 10.)

Petitioner was detained on July 6, 1989, in Bakersfield, California for offenses committed there that same day.  (CT 280–85); *see also Holt*, 15 Cal. 4th at 640–41.

On July 14, 1989, the trial court appointed attorney Charles Soria as petitioner's lead defense counsel.  (RT July 14, 1989 at 3; 1SHCP Ex. 31.)  On July 24, 1989, the trial court appointed attorney George Peterson as second defense counsel.  (RT July 21, 1989 at 2; 1SHCP Ex. 30.)

On September 15, 1989, the District Attorney of Kern County charged petitioner with the first-degree murder of Marie Margie Axtell (hereinafter "Ms. Axtell") with special circumstances that the murder was perpetrated during the commission or attempted commission of robbery, rape, sodomy, and burglary (Count 1); robbery (Count 2); rape (Count 3); sodomy (Count 4); and burglary (Count 5).  (CT 374–76.)

On September 27, 1989, petitioner was arraigned.  (CT 377–78.)  Petitioner entered a plea of not guilty to all Counts and denied all allegations.  (*Id.*)

Jury selection began on February 26, 1990 (RT 43) and concluded on April 9, 1990 with the impaneling and the swearing of the jury and alternate jurors (RT 1953–54, 1956).

The jury trial commenced on April 9, 1990.  (RT 1957.)  On April 17, 1990, the jury returned a verdict finding petitioner guilty on all Counts of the first-degree murder (Penal Code § 189); first-degree robbery (Penal Code § 212.5(a)); rape (former Penal Code § 261(2)); sodomy (Penal Code § 286(c)); and first-degree burglary (Penal Code § 460(a)).  (CT 630–31, 741–751; RT 2609–12.)  The jury also found true the special circumstance allegations charging that the murder occurred during the commission or attempted commission of robbery, rape, sodomy, and burglary (former Penal Code § 190.2(a)(17)(i), (iii), (iv), and (vii)).  (*Id.*)

The penalty phase of  petitioner's trial began before the same jury on April 23, 1990.  (RT 2615.)  On May 2, 1990, after deliberating for little over an hour, the jury returned a death verdict.  (CT 762–63, 843; RT 3359–61.)

On May 30, 1990, the trial court denied an application for modification of the verdict and imposed a judgment of death (Penal Code § 190.4) on Count 1, and sentences of imprisonment for six years on Count 2 and eight years on Counts 3 and 4 and six years on Count 5.  (CT 887–

888; RT 3380–97.)  The term of imprisonment as to Count 3 was imposed to run consecutive to that imposed on Count 2.  The prison terms imposed as to Counts 2 through 5 were stayed pursuant to statute.  (*Id.*)

On April 4, 1996, petitioner filed his first petition for writ of habeas corpus with the California Supreme Court stating sixteen claims for relief, alleging mental incompetence; actual innocence; misconduct by trial spectators, jurors and the prosecution; trial court error; ineffective assistance of counsel at the guilt and penalty phases; denial of speedy trial rights; and the unconstitutionality of California's death penalty statute.  *In re Holt (John Lee) on H.C.,* Case No. S057078.  On May 19, 1997, the California Supreme Court affirmed the trial court's judgment on automatic appeal.  *See People v. Holt*, 15 Cal. 4th 619.

On October 22, 1997, the California Supreme Court summarily denied petitioner's first state habeas corpus petition without issuing an order to show cause.  (Order, *In re Holt (John Lee) on H.C.,* Case No. S057078 (Cal. Oct. 22, 1997), Lod. Doc. No. 31.)

On December 8, 1997, the Supreme Court of the United States denied petitioner's petition for writ of certiorari.  *Holt v. California*, 522 U.S. 1017 (1997).

On June 18, 2003, petitioner filed his second petition for writ of habeas corpus with the California Supreme Court alleging, pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), that his mental impairments make his execution unconstitutional.  *Holt (John Lee) on H.C.*, Case No. S116794.  On September 1, 2010, the California Supreme Court issued an order to show cause (returnable to the Kern County Superior Court) on the issue of whether petitioner is mentally impaired and therefore exempt from execution under the decision in *Atkins.*

B.      Federal Proceedings

On December 15, 1997, petitioner initiated these federal habeas proceedings by filing requests for *in forma pauperis* status, appointment of counsel, and stay of execution.  (Doc. Nos. 1, 2, 3.)

Petitioner, through counsel, filed his federal petition on December 1, 1998.  (Doc. No. 29.)

On March 12, 1999, the court found the petition to be fully exhausted.  (Doc. No. 44 at 23.)  The court concurrently found petitioner's claim 44 (alleging lack of competence to be

14

executed under *Ford v. Wainwright*, 477 U.S. 399, 410 (1986)), to be premature and dismissed that claim without prejudice.  (*Id.* at 24.)

On March 1, 2001, petitioner filed a motion for an evidentiary hearing and to expand the record.  (Doc. No. 80.)

On March 30, 2004, the court denied on the merits claims 2, 3, 6, 8, and 10, and denied petitioner's request for an evidentiary hearing as to those claims. (Doc. No. 96 at 268.) Concurrently, the court bifurcated proceedings between guilt and penalty phases, and ordered that a limited evidentiary hearing be scheduled on the following guilt phase claims:

> Claim 9 alleging trial court error, ineffective assistance of trial counsel, and juror misconduct relating to allegations that juror Billy Ross had undisclosed short-term memory problems, lacked impartiality, and was biased (all other claim 9 allegations were denied on the merits);[10]
>
> Claim 11 alleging that petitioner was incompetent to stand trial;
>
> Claim 12 alleging that trial counsel was ineffective by failing to investigate, develop and present petitioner's incompetence to stand trial;
>
> Claim 13 alleging that trial counsel was ineffective by failing to present a defense that he lacked the requisite *mens rea* for the charged offenses (all other claim 13 allegations including failure to present unconsciousness and insanity defenses were denied on the merits);
>
> Claim 14 alleging that trial counsel was ineffective by presenting petitioner as sole defense witness during the guilt phase;
>
> Claim 15 alleging that trial counsel was ineffective by failing to request instructions on lesser included offenses to rape; and
>
> Claim 16 alleging that trial counsel was ineffective by failing to investigate and defend the rape charge (provided that the prejudice inquiry regarding the rape charge was limited to guilt phase issues only, with the penalty phase prejudice inquiry regarding the rape charge reserved).

(Doc. No. 96 at 269–71.)

Concurrently, the court granted petitioner's motion to expand the record with two confidential funding authorization requests directed to the California Supreme Court and the two orders denying those requests.  (Doc. No. 96 at 12 at n.2.)  The court deferred the remaining

---

[10] Juror Billy Ross has been deposed (Doc. No. 158) and the parties have briefed the unresolved claim 9 allegations (Doc. Nos. 234; 242; 255).  However, the unresolved claim 9 allegations were not developed at the evidentiary hearing and the court does not consider them in this order.

claims as to which an evidentiary hearing was requested by petitioner, i.e. claims 19, 21, 22, 32, 33, 41, and 43.  (Doc. No. 96 at 13.)

On October 7, 2004, the court ordered these proceedings held in abeyance pending exhaustion of petitioner's second state habeas (*Atkins*) petition.  (Doc. No. 104.)

On March 7, 2005, the court granted petitioner's request to reinstitute these federal habeas proceedings.  (Doc. No.  107.)

On July 10, 2006, the court granted expansion of the record to include all documentary evidence presented in petitioner's first state habeas corpus petition.  (Doc. No. 138 at 6.)

On July 2, 2007, the court granted petitioner's motion to further expand the record to include deposition transcripts of California Department of Corrections and Rehabilitation mental health care providers, Lois Armstrong, Ph.D., Aubrey Dent, M.D., and Roderick Ponath, M.D.; and the deposition of juror Billy Ross.  (Doc. No. 169 at 2.)

On November 21, 2008, the court stayed these proceedings pursuant to *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003), pending petitioner's restoration to mental competence.  (Doc. No. 199.)  The *Gates* stay was lifted, effective January 8, 2013, when the Supreme Court filed its opinion in *Ryan v. Gonzales*, 568 U.S. 57 (2013).  This court, on November 15, 2013, ordered reinstitution of preparations for the limited evidentiary hearing. (Doc. No. 206.)

The evidentiary hearing addressing claims 11–16 was held before this court on October 24, 26 and November 1, 2017.  On June 29, 2018, petitioner filed his proposed findings of fact and conclusions of law (Doc. No. 318) and post-hearing brief (Doc. No. 319).  Also, on June 29, 2018, respondent filed his post-hearing brief.  (Doc. No. 320.)  On September 21, 2018, the parties filed their respective reply briefs.  (Doc. Nos. 323, 324.)

On May 29, 2020, the court issued its order granting the submitted cross-motions to admit as substantive evidence the Rule 26 reports of petitioner's deceased trial and habeas experts Drs. Williams Pierce and Samuel Benson (Doc. Nos. 280-4, 280-5, 280-6), and respondent's unavailable habeas expert Dr. James Missett (EH Ex. 151).[11]  (Doc. No. 326.)

---

[11]  Rule 26 of the Federal Rules of Civil Procedure.

1

JURISDICTION

2 Relief by way of a petition for writ of habeas corpus extends to a person in custody

3 pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

4 or treaties of the United States. 28 U.S.C. §§ 2241(c)(3), 2254(a); *Williams v. Taylor*, 529 U.S.

5 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the

6 U.S. Constitution. The challenged conviction arises out of the Kern County Superior Court,

7 which is located within the jurisdiction of this court. 28 U.S.C. §§ 2241(d), 2254(a).

8

APPLICABLE LEGAL STANDARDS

9 As noted above, this action was initiated on December 15, 1997. Because this action was

10 initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of AEDPA

11 apply. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148

12 (9th Cir. 2000), overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

13 Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred

14 unless a petitioner can show that the state court's adjudication of his claim:

15
16     (1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

17
18     (2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

19 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Lockyer*, 538 U.S. at 70–71;

20 *Williams*, 529 U.S. at 413.

21 AEDPA deference to the factual determinations of the state court pursuant to § 2254(e)(1)

22 is available only if the state court acted reasonably within the meaning of § 2254(d)(2). *See*

23 *Hurles v. Ryan*, 752 F.3d 768, 790 (9th Cir. 2014). If a state court's fact-finding process as to

24 matters in the state record survives intrinsic review under § 2254(d)(2), then the state court's fact-

25 finding may be overturned based on new evidence presented for the first time in federal court

26 only if such new evidence amounts to clear and convincing proof, under § 2254(e)(1), that a state

27 court finding is in error. *See Taylor*, 366 F.3d at 999-1000; *see also Leite v. Anglea*, No. 17-CV-

28 06707-YGR (PR), 2019 WL 1767337, at *5 (N.D. Cal. Apr. 22, 2019) (citing *Taylor*, 366 F.3d at

17

1000) ("Significantly, the presumption of correctness and the clear-and-convincing standard of

proof only come into play once the state court's fact-findings survive any intrinsic challenge; they

do not apply to a challenge that is governed by the deference implicit in the 'unreasonable

determination' standard of § 2254(d)(2)."); *Espinoza v. Montgomery*, No. 17-CV-02159-YGR

(PR), 2018 WL 3589017, at *7 (N.D. Cal. July 24, 2018), *aff'd,* 816 F. App'x 217 (9th Cir. 2020)

(same); *Simon v. Macomber*,  No. CV 14-3763-MMM SH, 2015 WL 1525478, at *7 (C.D. Cal.

Feb. 24, 2015), *report and recommendation adopted,* No. CV 14-3763-MMM SH, 2015 WL

1541885 (C.D. Cal. Mar. 31, 2015), *aff'd sub nom*. *Simon v. Gastelo*, 697 F. App'x 903 (9th Cir.

2017)[12] (citing *Mendez v. Knowles*, 556 F.3d 757, 771 (9th Cir. 2009) (a state court factual

determination is entitled to AEDPA deference unless it is unreasonable within the meaning of §

2254(d)(2)).  As one district court has observed:

> Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges a state court's fact-findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court.  *See Taylor*, 366 F.3d at 999-1000. In *Taylor*, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1).  *Id.*  First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process under the "unreasonable determination" clause of § 2254(d)(2).  *Id.* at 1000. The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings.  *Id.*  Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by addressing the state court finding of a presumption of correctness under § 2254(e)(1).  *Id.*  According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error.  *See* 28 U.S.C. § 2254(e)(1). "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." *Taylor*, 366 F.3d at 1000.

*Kennedy v. Gastello*, No. 16-CV-01686-YGR (PR), 2019 WL 1117539, at *14 (N.D. Cal. Mar.

---

[12]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36–3(b).

1     11, 2019), *aff'd sub nom. Kennedy v. Broomfield*, 850 F. App'x 578 (9th Cir. 2021).

2          "After *Pinholster*, a federal habeas court may consider new evidence only on *de novo*

3     review, subject to the limitations of § 2254(e)(2)." *Murray*, 745 F.3d at 1000. The Ninth Circuit

4     has suggested some uncertainty exists as to whether and the extent to which the § 2254(e)(1)

5     presumption of correctness applies upon *de novo* review where new evidence introduced in the

6     federal habeas proceeding. *Id.* at 1000–01. For example, the Ninth Circuit, acknowledging that

7     the Supreme Court has left open the question of how § 2254(e)(1) interacts with § 2254(d)(2),

8     deferred to a state court's factual findings under § 2254(e)(1) on *de novo* review in a case where §

9     2254(d)(2) was not in play because the underlying claim had not been reviewed on the merits by

10     the state court. *Stevens v. Davis*, 25 F.4th 1141, 1153 n.6, 1165–66 (9th Cir. 2022) (citing

11     *Brumfield v. Cain*, 576 U.S. 305, 322 (2015) and *Crittenden v. Chappell*, 804 F.3d 998, 1011 (9th

12     Cir. 2015)), *cert. denied*, ___U.S.___, 143 S. Ct. 584 (2023).

13          This court has previously determined that petitioner's claims 11–16, adjudicated on the

14     merits by the California Supreme Court and considered during the evidentiary hearing before this

15     court, did not survive intrinsic review and thus passed through the 28 U.S.C. § 2254(d) gateway.

16     (*See* Doc. No. 96 at 144, 150, 153, 223-25, 236–37, 257-62, 268-69; *see also* Doc. No. 298 at 4;

17     Doc. No. 319 at 8.) Thus, the court considers these claims *de novo* without according §

18     2254(e)(1) deference to state court fact finding, pursuant to the standards discussed above.

19     *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (when § 2254(d) is satisfied, "[a] federal court

20     must then resolve the claim without the deference AEDPA otherwise requires."); *Yun Hseng Liao*

21     *v. Junious*, 817 F.3d 678, 688 (9th Cir. 2016); *cf. Williams v. Davis*, Case No. CV 00-10637

22     DOC, 2016 WL 1254149 at *8 (C.D. Cal. Mar. 29, 2016) ("where the analysis on federal habeas .

23     . . results in the conclusion that § 2254(d)(1) is satisfied, then federal habeas courts must review

24     the substantive constitutionality of the state custody *de novo*.") (citing *Frantz v. Hazey*, 533 F.3d

25     724, 737 (9th Cir. 2008)); *Riel v. Warden, San Quentin State Prison*, No. 2:01-CV-0507 MCE

26     DAD, 2015 WL 6690127, at *5 (E.D. Cal. Oct. 30, 2015) (same regarding § 2254(d)(1)(2))

27     (citing *Panetti,* 551 U.S. at 953); accord *Delgadillo v. Woodford,* 527 F.3d 919, 925 (9th Cir.

28     2008).

1          EVIDENTIARY ISSUES

2     A.     Petitioner's Objections to Respondent's Post-Hearing Brief and Proposed Findings

3          Petitioner asserts 23 separate objections to respondent's post-hearing brief and proposed

4     findings.  (*See* Doc. No. 323 at 8–32.)  The court rules as follows as to these objections.

5          Petitioner objects on grounds that respondent's argument and proposed findings are

6     factually inaccurate.  He points out that his visit to an emergency room in the months preceding

7     the crimes committed against Ms. Axtell occurred on February 13, 1989, not February 2, 1998, as

8     stated by respondent.  (*See* 1SHCP Ex. 120 [same as EH Ex. J]; Doc. No. 320 at 2, 33.)  Petitioner

9     is correct regarding the date in question.  Objection 1 is therefore sustained.

10         Petitioner objects on grounds that respondent's argument and proposed findings are

11    misleading and mischaracterize and selectively quote the record.  These objections constitute

12    mere argument and fall short of any valid basis for objection.  Objections 2–17 and 19–23 are

13    therefore overruled.

14         Petitioner's remaining objection 18 is simply a request that the court adopt respondent's

15    proposed finding that attorney Soria did not specifically investigate a diminished actuality (i.e.,

16    mental state) defense.[13]  No valid basis for this objection is stated and, therefore, objection 18 is

17    overruled.

18          REVIEW OF CLAIMS

19    A.     Petitioner's Claim 11 – Incompetence to Stand Trial

20         Petitioner claims he was incompetent to stand trial due to mental and intellectual

21    impairments and/or disabilities that left him unable to understand the proceedings and assist his

22    counsel in his defense, and to make valid waivers, violating his rights under the Fifth, Sixth, and

23    Fourteenth Amendments.[14]  (Doc. No. 29 at 69–72; *see also* Doc. No. 96 at 142.)

24         1.     Legal Standard

25    _____

26    [13]  See *People v. Clark*, 52 Cal. 4th 856, 880 n.3 (2011) (a diminished actuality defense shows
      that the defendant actually lacked the mental states required for the charged offenses).

27    [14]  Petitioner does not raise a procedural due process claim relating to the trial court's failure to
      hold a competency hearing "because much of the evidence of incompetence was not presented to
28    the trial court."  (Doc. No. 65 at 88; *see also* Doc. No. 29 at 69–72.)

1    "A criminal defendant may not be tried unless he is competent." *Pate v. Robinson*, 383

2    U.S. 375, 378 (1966); *accord Medina v. California*, 505 U.S. 437, 439 (1992); *see also Drope v.*

3    *Missouri*, 420 U.S. 162, 172 (1975) ("[T]he failure to observe procedures adequate to protect a

4    defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his

5    due process right to a fair trial"); *Sully v. Ayers*, 725 F.3d 1057, 1070 (9th Cir. 2013).  Relatedly,

6    a criminal defendant may not waive his right to counsel or plead guilty unless he does so

7    "competently and intelligently[.]"  *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938); *accord Godinez*

8    *v. Moran*, 509 U.S. 389, 396 (1993).

9    The trial or conviction of a person who is legally incompetent is a violation of substantive

10   due process.  *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *see also Maxwell v. Roe*, 606 F.3d

11   561, 568 (9th Cir. 2010) ("It is undisputed that the conviction of an accused person while he is

12   legally incompetent violates due process.") (quoting *Robinson*, 383 U.S. at 378).

13   "[T]he standard for competence to stand trial is whether a defendant has sufficient present

14   ability to consult with his lawyer with a reasonable degree of rational understanding and has a

15   rational as well as factual understanding of the proceedings against him."  *Moran*, 509 U.S. at 396

16   (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960)); *see also Clark v. Arnold*, 769 F.3d 711,

17   729 (9th Cir. 2014).  "It has long been accepted that a person whose mental condition is such that

18   he lacks the capacity to understand the nature and object of the proceedings against him, to

19   consult with counsel, and to assist in preparing his defense may not be subjected to a trial."

20   *Anderson v. Gipson*, 902 F.3d 1126, 1133 (2018) (citing *Drope*, 420 U.S. at 171).

21   A "substantive" competency claim focuses on whether the defendant was actually

22   incompetent at trial.  *Boyde v. Brown*, 404 F.3d 1159, 1165 (9th Cir. 2005).  "Even where the

23   evidence before the trial judge was insufficient to raise a good faith doubt with respect to

24   [defendant]'s competency, he would still be entitled to relief if it now appears that he was in fact

25   incompetent."  *Id.* (quoting *Steinsvik v. Vinzant*, 640 F.2d 949, 954 (9th Cir. 1981)); *Deere v.*

26   *Woodford*, 339 F.3d 1084, 1086 (9th Cir. 2003).

27   The petitioner bears the burden of proof on a claim of incompetency to stand trial by a

28   preponderance of the evidence.  *Hayes v. Woodford*, 301 F.3d 1054, 1078 n.28 (9th Cir. 2002)

1  (citing *Simmon v. Blodgett*, 110 F.3d 39, 41 (9th Cir. 1997)), *rev'd en banc on other grounds sub*

2  *nom. Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005); *see also Cacoperdo v. Demosthenes*, 37 F.3d

3  504, 510 (9th Cir. 1994).

4      Generally, in federal habeas cases, the harmless error test of *Brecht v. Abrahamson*  507

5  U.S. 619 (1993),  is applicable.  *See Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000).  Under

6  this test, error is harmless unless it had a "substantial and injurious effect or influence in

7  determining" petitioner's sentence.  *Brecht*, 507 U.S. at 623.

8      Trial incompetency, if demonstrated, is "trial error" amenable to the harmless error

9  analysis under *Brecht v. Abrahamson,* 507 U.S. 619 (1993),  rather than "structural error"

10  necessitating automatic reversal.  *See Jones v. Neuschmid*, No. 18-01738 EJD (PR), 2021 WL

11  1056597, at *30 (N.D. Cal. Mar. 18, 2021)[15] (citing *Washington v. Recuenco*, 548 U.S. 212, 218

12  (2006) and *Powell v. Galaza*, 328 F.3d 558, 566 (9th Cir. 2003)) (structural error, where the

13  constitutional deprivation affects the framework within which the trial proceeds, is present only in

14  rare cases where the criminal trial cannot reliably determine guilt or innocence); *see also People*

15  *v. Anzalone* (2013) 56 Cal.4th 545, 554 (structural errors require automatic reversal because they

16  "go to the very reliability of a criminal trial as a vehicle for determining guilt or innocence . . . .").

17  Here, petitioner has not shown that a defendant's trial incompetence presents such a rare case.

18  *See Jones,* at *30-31 (and cases cited therein).  Particularly, petitioner has not provided clearly

19  established federal authority that substantive incompetence is the equivalent of a complete denial

20  of counsel, thereby constituting structural error.  *See Gideon v. Wainwright,* 372 U.S. 335, 344-45

21  (1963).

22      2.    State Court Direct and Collateral Review

23      The California Supreme Court considered these allegations as raised in petitioner's first

24  state habeas petition and summarily denied relief on the merits without explanation or issuance of

25  an order to show cause.  (Order, *In re Holt (John Lee) on H.C.,* Case No. S057078 (Cal. Oct. 22,

26  1997), Lod. Doc. No. 31.)

27      3.    Analysis

28  ───────────────
[15]  *See* 2022 WL 10448247 (9th Cir. June 10, 2022) (denying certificate of appealability).

Petitioner argues that he was incompetent for trial because he was then suffering from mental disorders and/or developmental disabilities that substantially impaired his capacity to reasonably and rationally understand the trial proceedings and exercise his rights therein and assist counsel with his own defense.  (*See* Doc. No. 29 at 69, 72–72; Penal Code § 1367); *see also Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985) (citing *Steinsvik*, 640 F.2d at 954) (the habeas court may consider facts creating a real and substantial doubt as to petitioner's competency, even if those facts were not presented to the trial court); *Boyde*, 404 F.3d at 1166.

California law prohibits trial of mentally incompetent persons:

> A person cannot be tried or adjudged to punishment while such person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.

Penal Code § 1367.

This court previously stated the ultimate issue for resolution at the evidentiary hearing is "whether [petitioner's] mental impairments, however they are characterized, were the type of impairments which would have rendered him incapable of understanding the trial proceedings and assisting his attorney with the defense."  (Doc. No. 96 at 150); *see also* Penal Code § 1367; *Chavez v. United States*, 656 F.2d 512, 518 (9th Cir. 1981) ("Trial courts must assess a defendant's competence with specific reference to the gravity of the decisions the defendant faces.") (citing *de Kaplany v. Enomoto*, 540 F.2d 975, 985 (9th Cir. 1976)).

Here, the court concludes that petitioner has carried his burden of demonstrating by a preponderance of the evidence that he was incompetent to stand trial, for the reasons explained below.

   a.   <u>Petitioner's Family History of Mental Illness, Substance Abuse, Physical Abuse, and Deprivation</u>

Petitioner has presented evidence of his multi-generational family history that includes mental illness, depression, attention deficit and hyperactivity disorder, bipolar disorder, psychotic disorder, schizophrenia, seizure disorder, and epilepsy.  (1SHCP Ex.'s. 8–12, 14–15, 17–18, 20–21, 34, 38, 42– 45, and 170; *see also* 1SHCP Ex. 1 ¶¶ 18–28; EH Ex. 21 at 6–8.)  Excessive

23

drinking of alcohol also appears in his immediate and extended family history.  (1SHCP Ex.'s 11, 13–15, 21, 23, 35, 46, 48–49, 51.)

Petitioner's grandparents and parents were poor, deprived, and physically abusive. (1SHCP Ex.'s 8, 12–15, 16, 18, 19, 21, 35, 46, 55–57, 60–61; EH Ex.'s 15, 16, and 21 at 5–7.) His father, Silas Holt, left school after the sixth grade and then worked a variety of short-lived jobs.  (1SHCP Ex.'s 11–12, 14, 21.)  Petitioner's mother, Gladys Holt, married Silas at age fourteen and had seven children with him.  (1SHCP Ex. 68; EH Ex. 15 at 3–4.)  She was fifteen years old when she gave birth to petitioner and his twin brother, Silas Holt, Jr.  (1SHCP Ex. 129; EH Ex. 15 at 1.)  Silas Jr. died suddenly at ten weeks of age.  (1SHCP Ex.'s 57, 174; EH Ex. 15 at 3.)

Petitioner's parents both drank heavily and reportedly were alcoholics.  (*See* RT 2808–09, 2860–61; EH Ex. 15 at 2–3; EH Ex. 21 at 5.)  Gladys Holt reportedly drank even during her pregnancies.  (1SHCP Ex.'s 8, 13, 14, 15, 17, 18, 19, 21, 22, 23, 56.)

      b.     Petitioner's Personal History of Mental, Intellectual, and Functional Impairments and Disabilities

Petitioner suffered hypoxia during his breech (double-footed twin presentation) birth, likely causing him to suffer organic brain damage.  (Doc. No. 29 at 70–75; Doc. No. 96 at 17 citing RT 3111–18, 3206; *see also* 1SHCP Ex. 1 ¶¶ 10, 12, 26, 93, 94; 1SHCP Ex. 129.) Petitioner's apparent organic impairment contributed to and was exacerbated by emotional and behavioral problems, and mental and intellectual disabilities, discussed below.

      i.     Problems as a Youth

Petitioner's parents were at times physically abusive to each other and neglectful of petitioner's needs and those of his siblings.  (1SHCP Ex.'s 8, 15, 40; EH Ex. 15 at 4–5.) Petitioner's father, Silas, was described as a violent drunk.  (1SHCP Ex.'s 8, 15, 18–19, 21, 23; *see also* EH Ex. 15.)

Petitioner, from an early age endured [redacted] and emotional abuse, malnutrition, and [redacted].  (1SHCP Ex. 1 ¶¶ 15, 16, 43–59, 65–67, 87; 1SHCP Ex.'s 8–9, 11–12, 15–16, 19, 22–23, 55–57, 59, 60, 63, 67, 71–72; EH Ex.'s 15–19, 21, 60 [sealed]).  For example, Silas had a

practice of denying petitioner food, and when food was provided petitioner was sometimes forced to eat in a locked closet.  (EH Ex. 18 at 6.)  Physical abuse by his parents included whippings with a belt, switch, and a garden hose.  (1SHCP Ex.'s 9, 11–12, 19.)  Ultimately, an elementary school official referred the family to child protective services due to the signs that petitioner was being physically abused.  (1SHCP Ex. 60.)

Petitioner had problems performing routine tasks.  (EH Ex. 15 at 6–7, EH Ex. 16 at 1–5; EH Ex. 17 at 1, 4; EH Ex. 18 at 1–7.)  For example, he had difficulties dressing and cleaning himself, telling time, keeping track of dates, cooking, cleaning the house, shopping, counting money, traveling around town, and taking out the trash.  (*Id.*)

Petitioner had learning difficulties including significant problems with reading.  (EH Ex. 15 at 6–7.)  Petitioner generally performed poorly at school.  (EH Ex. 25 at 3–4; 1SHCP Ex. 128.)  At times while in public school, petitioner and four of his five siblings attended special education classes.  (1SHCP Ex. 128; EH Ex. 16 at 1; *see also* 2Inf. Reply at Ex. 9.)  Petitioner generally attended special or alternative education classes while institutionalized.  (*See e.g.*, 1SHCP Ex.'s 84, 89; RT 3228–35.)

Petitioner complained of [redacted].  (1SHCP Ex. 63; *see also* EH Ex. C at 1–2 [sealed].)  During his youth, family members observed petitioner's apparent symptoms of psychosis and seizure activity.  For example, petitioner sometimes claimed to be his dead brother Silas; his eyes fluttered; he appeared dazed and stared off into space; he "zoned out" and displayed nervous twitches; and he quickly changed personality.  (1SHCP Ex.'s 8–9, 11–13, 15, 18, 22, 35, 61.)

Petitioner early on engaged in misbehavior and petty crime.  He repeatedly stole and shoplifted items and when disciplined tended to run away from home.  (*See e.g.,* 1SHCP Ex.'s 97, 104.)  He was suspended from school for a time due to behavioral problems and on one occasion had an institutional stay extended by court order due to a shop lifting incident.  (1SHCP Ex.'s 90, 94.)

At age nine, petitioner was examined by a mental health expert regarding his complaints of hearing voices.  Psychologist Dr. Stewart Nyholm examined petitioner in his hometown of Denver and found him to be emotionally disturbed, manipulative, and self-destructive, with little

control over his behavior and only a tenuous grip on reality.  (*See* 1SHCP Ex. 61.)  Dr. Nyholm found that even at this young age, petitioner's distortion of reality pervaded all areas of his functioning.  (*See* 1SHCP Ex.'s 61, 62.)  When Dr. Nyholm recommended his residential placement for treatment, petitioner's parents agreed.  (1SHCP Ex.'s 63, 64.)

Beginning at age ten, petitioner's parents largely abandoned him to institutional life and refused to participate in his treatment programs.  (1SHCP Ex.'s 1, 72–74, 83–84; *see also* RT 2732–33.)  When petitioner was eleven years old, a Dependent and Neglect Petition was filed by the Colorado Department of Social Services on behalf of petitioner and his siblings.  (1SHCP Ex. 104.)  Treating mental health professionals noted the physical abuse perpetrated by petitioner's parents and the resultant physical and emotional scars petitioner presented.  (1SHCP Ex.'s 63, 65, 67, 71–72.)  Family members confirmed [redacted].  (*See e.g.*, 1SHCP Ex.'s 8–9, 13, 15–17, 19; EH Ex. 21; EH Ex. 46 at 38 [sealed].)

Petitioner's parents viewed him as "bad fruit" and resisted involvement in his treatment and counseling.  (*See e.g.,* EH Ex. 26 at 2.)  Petitioner was institutionalized at various locations in Colorado no less than twelve times.  (RT 2734–42, 2789–97; *see also* 1SHCP Ex. 1 ¶ 124.)  This led to further abuse.  For example, petitioner reported that [redacted].  (EH Ex. 60 at 2 [sealed].)

At age thirteen, following minor criminal acts and running away from his home and institutions several times, petitioner was placed in a locked facility in Fort Logan, Colorado.  (1SHCP Ex. 80.)  Petitioner's then probation officer, Lee Kaspari, noted in his 2005 habeas declaration the evidence of petitioner's abusive homelife and rejection and abandonment by his parents.  (EH Ex. 26 at 1–5.)

### ii.    Problems as an Adolescent

In 1981, at age fourteen, petitioner's parents voluntarily placed him in the Gemini Shelter Home in Denver, Colorado.  During this time, Beverly Wright, a social worker with the Denver Department of Social Services was assigned to petitioner.  Ms. Wright testified at the penalty phase of petitioner's trial about the physical abuse of petitioner and his siblings by their parents (RT 2731), and the parents' rejection of petitioner (RT 2732).  She testified that the parents were "extremely religious" (RT 2739) and told her that petitioner was "evil" and "born from the devil"

1  and that "they didn't want to have any contact with him." (RT 2732.)  Ms. Wright testified that

2  petitioner was "very angry." (RT 2744.)  She found petitioner to have severe emotional

3  problems. (EH Ex. 25 at 3; *see also* RT 2753.)

4        Ms. Wright further testified as follows.  Petitioner was beyond his parents' control from

5  an early age, demonstrating behavioral problems, aggression and stealing.  (RT 2760.)  He had a

6  verified "learning disability" and suffered with "tremendous school problems."  (RT 2748, 2778.)

7  Petitioner tried to cover-up his reading problems. (RT 2748–49.)  During Ms. Wright's time with

8  petitioner, he was functioning at the second to fourth grade levels.  (RT 2758.)  Petitioner did not

9  readily communicate with the other children.  (RT 2776.)  During this time, petitioner continued

10  to complain of auditory and visual hallucinations (1SHCP Ex. 63; RT 2744, 2772), paranoid

11  thoughts, and claimed to have special powers.  (*See e.g.*, 1SHCP Ex. 97.)  At times it seemed

12  petitioner did not hear what she was saying to him (RT 2745), and that often he had an

13  inappropriate smile (RT 2746).  Ms. Wright also noted that petitioner displayed possible seizure-

14  type activity.  For example, when angry petitioner would "ball his fist up and put them straight on

15  the side of him and start shaking and rolling his head around at whoever he was looking at and

16  grit his teeth and doing one of these kind of numbers."  (RT 2746–47.)

17        At the same time, Ms. Wright found petitioner to be "manipulative."  (RT 2741.)  She

18  testified that petitioner tended to falsely claim abuse and mental problems such as hearing voices,

19  as a means of avoiding responsibility for his conduct.  (RT 2738, 2745, 2769–74.)

20        Ms. Wright recounted her belief at the time that petitioner should remain in residential

21  placement due to his emotional problems; his parents' refusal to participate in his treatment; and

22  his parents' moving to another state and abandoning him.  (1SHCP Ex.'s 81, 83–84.)

23                 iii.    Problems as a Teen and Adult

24        At age fifteen and pursuant to state order, petitioner was institutionalized at the Sacred

25  Heart Home in Pueblo, Colorado.  Petitioner was placed under the care of the Reverend Marvin

26  Kapushion, a clinical social worker.  (*See* 1SHCP Ex.'s 87–100.)  Father Kapushion testified

27  during the penalty phase of petitioner's trial that he had provided treatment to petitioner from

28  1982–84, when petitioner was 15 to 17 years old.  (RT 2785–89.)  He described petitioner as

having a "tremendous amount of anger" and "very, very difficult to get to."  (RT 2796.)  Father

Kapushion noted that at times petitioner seemed not to understand what was happening around

him, that he stared blankly or just smiled.  (RT 2805.)

Dr. Nancy Aldrich, a clinical psychologist, evaluated petitioner around this time and

found him to demonstrate a conduct disorder and an aggressive borderline personality with

paranoid features.  (1SHCP Ex. 97.)  Like Ms. Wright, Dr. Aldrich also found petitioner to be

manipulative.  Petitioner admitted to Dr. Aldrich that he told stories about his parents abusing and

neglecting him in order to embarrass them.  (*Id.*)  Dr. Aldrich felt petitioner was a candidate for

short-term anti-psychotic medication.  (*Id.*)

Father Kapushion testified that petitioner initially attended some Education Behavior

Program ("EBP") classes, i.e., special education classes for behavioral problems, during non-

mainstream middle schooling.  (RT 2800.)  By age sixteen, petitioner was attending alternative

public school (1SHCP Ex. 90), and for a time progressed well given his abilities (1SHCP Ex.'s

92, 93), but soon lapsed into poor academic performance (1SHCP Ex. 96).  Petitioner briefly was

allowed to attend a mainstream public high school, taking some EBP classes but mostly regular

classes.  (RT 2801–27.)  Petitioner, while attending public high school, performed below his

grade level and demonstrated behavioral issues.  (RT 2825; *see also* 1SHCP Ex. 97.)

Father Kapushion testified that petitioner had run-ins with law enforcement.  Specifically,

petitioner had multiple arrests relating to thefts during this time and [redacted].  (RT 2803; *see*

*also* EH Ex. 44 at 25 [sealed].)

Father Kapushion testified to his belief that petitioner had a conduct disorder and was

socially aggressive and under socialized.  (RT 2815.)  Contrary to Dr. Aldrich's contemporary

opinion, Father Kapushion did not believe petitioner was psychotic or had difficulties

distinguishing reality from non-reality.  (RT 2818.)

As noted, at the age of sixteen petitioner burglarized the home of and raped Candeo

Tresso, an elderly woman, who lived near the Sacred Heart Home.  Petitioner was adjudicated a

delinquent and initially placed in a detention center in Pueblo, Colorado.  (1SHCP Ex. 99.)  At

age seventeen, petitioner was placed in a Closed Adolescent Treatment Center (hereinafter

1    "CATC").  (RT 2835–38; 1SHCP Ex.'s 101, 104.)  At that time, petitioner tested to the fourth to

2    seventh grade level, dependent upon the subject matter, with an overall ability to acquire

3    knowledge at the fourth-grade level; he continued in special education.  (1SHCP Ex.'s 102, 105,

4    106.)  Petitioner showed "mental confusion, impulsiveness, acting out and possible brain

5    damage" at that time.  (1SHCP Ex. 102 at 2.)  While at the CATC, petitioner struggled to acquire

6    survival skills.  (EH Ex. 2 at 31–32.)

7           Saundra Johnson, a clinical therapist with the Colorado Department of Institutions

8    assigned to petitioner at the CATC, appeared as a witness at the penalty phase of his trial.  Ms.

9    Johnson testified that petitioner's personality bordered on psychotic; that he was irrational,

10   paranoid, and had multiple thought disorders.  (RT 2834–38, 2851.)  She found that petitioner

11   exhibited symptoms of schizophrenia.  (EH Ex. 23 at 2.)  She also noted that petitioner acted

12   strangely.  She observed that petitioner often spoke in the realm of fantasy and that his thought

13   process was disjointed and difficult to follow.  (EH Ex. 24 at 1–2.)  She testified to petitioner's

14   cognitive distortions including trouble understanding, and misinterpreting communications and

15   messages.  (RT 2851–52.)  Ms. Johnson testified that when angry or upset, petitioner would wear

16   layers and layers of clothing, his body would tense up and he would refuse to talk.  (RT 2843–

17   44.)

18          Sandra Lane, a psychiatric nurse who worked with petitioner while he was at the CATC

19   and during his transition following his release from the CATC (through an outpatient sexual

20   offender program called Redirecting Sexual Aggression) also testified at the penalty phase of

21   petitioner's trial.  She found petitioner to be of borderline intelligence, if not intellectually

22   disabled (RT 2899), with significant problems reading and writing (RT 2903), and unable to

23   mainstream into the community (*see* EH Ex. 22 at 4–5).  Petitioner's level of understanding was

24   below age appropriate, and he had difficulty grasping abstract concepts.  (RT 2899–03, 2921–22.)

25   Petitioner tried to conceal his lack of understanding.  (RT 2902.)  Like Dr. Nyholm and Ms.

26   Wright, Ms. Lane found that petitioner could be manipulative, feigning a lack of understanding

27   when he did not want to hear things.  (RT 2922–23.)

28          Micheline Brault, a juvenile parole officer for the Colorado Department of Institutions

1   assigned to petitioner following his parole from the CATC, testified at the penalty phase of

2   petitioner's trial.  She found that petitioner's social skills were extremely deficient (RT 2929–32),

3   and that he lacked a strong basis in reality (RT 2934–36).  Ms. Brault had denied petitioner's

4   request to take a door-to-door sales job because she feared that upon rejection, he might re-

5   offend.  (RT 2935–38.)  Ms. Brault acknowledged that petitioner was not a candidate to achieve a

6   GED, and that his abilities were in the fourth to fifth grade level even at age eighteen years.  (RT

7   2938–39.)  Ms. Brault testified that Petitioner failed to comply with his parole condition of

8   finding a job; falsely stated attempts at finding a job (RT 2935–42, 2950, 2957–60); and failed to

9   comply with the sex offender treatment requirements of parole.  (*Id.*)

10         Following petitioner's release from the CATC in 1987, he pled guilty to the above noted

11   1988 residential burglary.  (1SHCP Ex.'s 115–118.)  He was placed on probation from which he

12   absconded in the days preceding the capital crime.  (1SHCP Ex. 121.)  Kenneth Tomlinson, the

13   Colorado probation officer then assigned to petitioner testified during the penalty phase of

14   petitioner's trial.  Mr. Tomlinson found petitioner to be highly institutionalized and unable to

15   function in the outside world.  (RT 2966–79.)  In fact, petitioner had difficulty gaining and

16   keeping employment (*see e.g.*, 1SHCP Ex.'s 110, 111, 117–118, 121–124), and conforming with

17   parole requirements (*see e.g.*, 1SHCP Ex.'s 117, 118; *see also* RT 2927–52).  Still, according to

18   Mr. Tomlinson, at times petitioner appeared to be coherent, organized, and oriented.  (*See e.g.*,

19   1SHCP Ex. 116 at 2–9; 1SHCP Ex. 124 at 2–9.)   For example, petitioner participated in his 1988

20   criminal trial and post-trial proceedings in Colorado without doubt being raised as to his

21   competence.  (*See* 1SHCP Ex. 116 at 2–9; 1SHCP Ex. 118 at 1–4; 1SHCP Ex. 124 at 2–9.)

22         While out on parole and about four months before the capital crime, petitioner visited a

23   Denver area emergency room seeking counseling for hopelessness and suicidal feelings and his

24   fears that he might harm others.  (1SHCP Ex.'s 120; *see also* 1SHCP Ex. 1 at ¶ 139, 1SHCP Ex.

25   124.)  Shortly thereafter, petitioner expressed concern to his probation officer that he might

26   commit another crime.  (1SHCP Ex.'s 121, 122.)

27         Just weeks before the assault upon Ms. Axtell which led to the capital charge, petitioner

28   violated his Colorado probation.  (1SHCP Ex. 125.)  The state court reinstated probation and

1   released him against the recommendation of his probation officer that he be incarcerated.

2   (1SHCP Ex. 1 ¶¶ 142–144; Vol. XI SCT 12; *see also* 1SHCP Ex.'s 121–124.)  Petitioner soon left

3   Colorado in violation of his probation (1SHCP Ex. 125), traveling to Chicago to take the door-to-

4   door sales job which ultimately placed him at the scene of the capital crime.

5          Petitioner was housed at the Kern County jail prior to and during his capital trial.

6   Jailhouse medical records reflect that at times he was documented as feeling under severe stress,

7   somewhat paranoid, obsessing over religion and death, and depressed to the point he received

8   anti-depression medication.  (1SHCP Ex. 1 ¶¶ 100–106; *see also* 1SHCP Ex.'s 126, 175.)

9   Petitioner's jailhouse records also show occasions where his thought process was clear, he was

10  eating and sleeping well, and was in good spirits.  (*See* 1SHCP Ex. 126.)  Still, there were

11  increasingly frequent requests from petitioner and jail staff for mental health services to be

12  provided to him prior to his trial based on reported depression, sleeplessness, paranoia, and fear

13  that he might harm his cellmate.  (*Id.*; *see also* 1SHCP Ex.'s 1 ¶¶ 101–106.)  Though denying

14  hallucinations, petitioner at times claimed to be his deceased twin brother.  (*Id.*)  During this

15  period, petitioner was treated with prescription medication for depression (*id.*), but he stopped

16  taking the medication because he said it made him sick (1SHCP Ex. 126).

17                 c.       Petitioner's Trial Testimony

18         Petitioner's testimony at the guilt phase of his trial was at times coherent and grounded in

19  the factual record.  (RT 2409–54.)  Still, he occasionally displayed confusion and lack of

20  understanding of events relating to the crimes he committed against Ms. Axtell and why the

21  crimes occurred.  For example, he testified that he left Denver "because I was on probation."  (RT

22  2410.)  In actuality, he had absconded from probation and a warrant for his arrest was issued in

23  Colorado.  (RT 2981; Vol XI SCT 12.)  Petitioner testified that he made a sale at the first house

24  he approached on the morning of the crimes against Ms. Axtell (RT 2413), but co-worker

25  Bearden denied petitioner made any sales that morning.  (RT 2260.)  Petitioner later explained

26  that the receipt for the alleged sale "was not signatured yet."  (RT 2428.)

27         Petitioner showed similar confusion and an inability to explain the events that took place

28  at Ms. Axtell's home.  He testified that it was his intention to leave the home after Axtell refused

31

to buy his product, but then he just "blew up." (RT 2429.)  He also testified, however, that it was

his intent to "steal," or to "do something" upon entering the Ms. Axtell home, but he did not

know necessarily what he was going to do. (RT 2431.)  He testified that while in the back

bedroom and just prior to the assault, he went to a dresser and "picked up quite a few things[,]"

but he could not remember what he picked up. (RT 2420.)  He testified that after assaulting Ms.

Axtell and grabbing money and jewelry he found around the house, he left, forgetting his

briefcase on the porch. (RT 2422–26.)  He testified that Ms. Axtell was conscious during his

assault upon her in the bedroom and thereafter (RT 2447–54), even though he had told detective

Boggs that Ms. Axtell was rendered unconscious during the assault (EH Ex. H at 10, 11).  He

testified that within minutes of leaving the home, he returned for the forgotten briefcase,

inexplicably rang the doorbell, and denied the assault when the victim's son, Glen Copeland,

unexpectedly appeared at the door. (RT 2422–26, 2449–50.)

  In many other respects petitioner's trial testimony suggests his memory lapse and

detachment from his actions.  For example, regarding the sexual assault in the bedroom, petitioner

testified that "[t]o be honest with you, I don't know exactly that part, but I – I mentioned I pushed

her, because I'm looking at from the whole scene.  I'm pretty sure that's probably [sic] what I've

done – what I did." (RT 2438.)  He also testified that he ejaculated "[a]s far as I remember."

(RT 2439.)

  When cross-examined as to why he rang the doorbell upon returning to the Axtell home to

retrieve his briefcase, petitioner testified "I don't know.  I – I'm – the only thing I could – I can't

even say – conclusion that I came to was that when he – I figured I was going to try and sell.

That's the only – I mean that's the only reason why I would think I would ring the door.  I mean I

didn't have my briefcase in my hand.  I don't know.  It was just sort of – I can't explain that one."

(RT 2448–49.)

  Petitioner's testimony also suggested confabulation, a tendency to fill-in memory gaps,

more fully discussed below by defense mental health experts.  For example, he testified that

during his interview with detective Boggs, "I was – I – I was – I mean I was aware of what was

going on, but I was pretty out of it, too.  I mean I was – I mean I knew what I had done, and I

1   think that's why when he was asking me some of the questions that he was asking me I just kind

2   of said whatever was on my mind at that time." (RT 2454.)

3       Petitioner's statement to the court just prior to the imposition of judgment following his

4   conviction and sentence provides a further indication of the disjunction in his thought process:

5       As to Mrs. Axtell's life, a part of in honesty, I really don't – I don't believe it
        happened – In my mind – I don't know how to say this, but – maybe I'm not

6       suppose (sic) to say this, but Mrs. Axtell and her family is probably the most
        important thing to me right now and I think about it every single day, and I will

7       honestly say in this courtroom I do pray about it.  I prayed.  The only reason why
        I do is because I really don't understand why I did what I did.  I know I did it and

8       I was aware of what I was doing, but I don't know if I just don't – it was difficult
        for me, too.  That's all I can say – And I also want to state before I end this is I

9       have a lot of good, a lot more than what a lot of people think right now.  And I'm
        hurt about it because it really contradicts and really I can't even explain that.

10

11  (RT 3384–87.)

12          d.      Findings and Opinions of Mental Health Experts in State
                    Proceedings

13

14              i.      Dr. William Pierce

15      Dr. Pierce, a clinical psychologist for the defense, testified at the penalty phase of

16  petitioner's trial that he was retained in order to "evaluate [petitioner] and to give [defense

17  counsel Soria] a confidential consultation concerning [petitioner's] psychological profile [and to]

18  consult with [Soria and co-counsel Peterson] concerning the penalty phase of the trial, if it came

19  to that." (RT 3200; *see also* EH Ex. K at 7; 1Inf. Resp. Ex. A at 2–7; 1Inf. Reply Ex. 3 at 1.)

20  Attorney Soria testified that he retained Dr. Pierce (and Dr. Samuel Benson, *see infra*) in order to

21  gain an understanding of petitioner's general mental situation. (EHRT 296.) Notably, Dr.

22  Pierce's evaluation and testimony included his assessment of indicia of petitioner's competency.

23  (RT 3228–29.)

24      Dr. Pierce, along with his colleague defense psychiatrist Dr. Benson, [redacted]. (EH

25  Ex.'s A–D [sealed]; *see also* RT 3194–3249.) Dr. Pierce [redacted]. (*Id.*; *see also* EH Ex. 45

26  [sealed].)

27      Dr. Pierce, in forming his penalty phase opinions, considered all of the records provided

28  by Soria, which included medical records from petitioner's youth in Memphis, Tennessee;

33

1   Bakersfield police reports regarding the crimes committed upon the victim, Ms. Axtell; Colorado

2   law enforcement, institutional and educational records including petitioner's placement at the Fort

3   Logan Mental Health Center, Savio House, Sacred Heart Home, the Denver Children's Home, the

4   Colorado [Boys] Ranch, the CATC, and the Community Learning Center; and Colorado court

5   records relating to petitioner's 1984 juvenile adjudication of rape, and 1988 residential burglary.

6   (RT 3200–01, 3206–17.)

7       Dr. Pierce traveled to Denver with defense investigator Bruce Binns and interviewed

8   petitioner's brother Alex Holt, Father Kapushion, Ms. Johnson, Ms. Lane, Ms. Wright, Ms.

9   Brault, and Mr. Tomlinson; however, petitioner's parents refused to meet with Dr. Pierce.  (*See*

10  EH Ex. 55; RT 3201–33; *see also* 1Inf. Resp Ex. A at 3.)  Dr. Pierce also considered the brain

11  imagery conducted prior to the penalty phase by Drs. Buchsbaum and Guisado (i.e., PET and

12  EEG tests, *see infra*), as well as petitioner's guilt phase testimony and that of detective Boggs.

13  (RT 3220–28.)

14      At the penalty phase, Dr. Pierce testified that he diagnosed petitioner with organic mental

15  disorder manifested by organic personality syndrome with a borderline personality, and partial

16  complex temporal lobe seizure disorder.  (RT 3220–23.)  He noted that such seizures disturb the

17  conscious thought process leaving one in a confused, dreamy or "fugue" state, leading to possible

18  confabulation.  (*Id.*).

19       In arriving at this diagnosis, Dr. Pierce observed [redacted].  (RT 3206; EH Ex.'s 54–55

20  [sealed].)  He suspected a resultant organic brain function issue (1SHCP Ex. 105; *see also* RT

21  3205–20) coupled with organic personality syndrome and a partial seizure disorder (RT 3222–

22  37).

23      Dr. Pierce observed petitioner's history of [redacted].  (*Id.*; *see also* EH Ex.'s 51 [sealed],

24  53 [sealed] and 57 [sealed]; RT 3208–18.)  He also noted early life reports that petitioner twitched

25  and was hyperactive, suggesting neurological problems that were substantiated by circa 1985

26  psychomotor and visual motor coordination testing that showed confusion, impulsiveness, acting

27  out, and possible brain damage (RT 3206–14).

28      Dr. Pierce observed that petitioner's learning and intellectual impairments variously

34

1   manifested themselves by a tendency to "space out" and show explosive anger.  (RT  3216.)  He

2   noted the disparity between petitioner's verbal IQ and his relatively higher performance IQ as an

3   indication of a learning disorder relating to auditory (organic) problems.  (RT 3213; *see also*

4   1SHCP Ex. 105.)  For example, petitioner told Dr. Pierce that [redacted].  (EH Ex. 46 at 1

5   [sealed]; *see also* EHRT 99–100.)

6   /////

7       Dr. Pierce testified that during interviews petitioner tended to confabulate by filling-in

8   gaps in his memory of the circumstances surrounding his assault upon Ms. Axtell with facts

9   learned after the assault.  (RT 3200–05.)  For example, Dr. Pierce pointed to petitioner's varying

10   statements as to:  the beverage he removed from Axtell's refrigerator (whether a soda or a Hires

11   Root Beer); when he took Ms. Axtell's jewelry (whether before he entered the kitchen or

12   afterwards); how he applied the ligature to Ms. Axtell's throat (whether by twisting or by

13   knotting); where he placed Axtell in the bedroom prior to sodomizing her (whether on the bed or

14   on the floor); whether he placed a plastic bag in Ms. Axtell's mouth; and what happened with his

15   belt and name tag, both of which were found at the crime scene.  (RT 3241–48.)

16       Dr. Pierce later provided an updated opinion in support of petitioner's first state habeas

17   petition.  (1Inf. Reply, Ex. 3.)  Dr. Pierce, in the course of preparing that updated opinion,

18   considered the declaration of defense post-conviction expert Dr. Roderick Pettis.  (*Id.*; *see infra*.)

19   Dr. Pierce found that Dr. Pettis's conclusion that petitioner then suffered from post-traumatic

20   stress disorder ("PTSD") and chronic psychosis, reached upon Dr. Pettis's review of social

21   history information unavailable at trial, was consistent with Dr. Pierce's own finding of periodic

22   psychosis which he had testified to at the trial.  (*Id.*)

23                    ii.      Dr. Samuel Benson

24       Dr. Benson, a defense psychiatrist, testified at the penalty phase of petitioner's trial.  (RT

25   3103–94.)  Dr. Benson examined petitioner in the months before trial and accompanied Dr. Pierce

26   during pretrial interviews with petitioner.  Dr. Benson reviewed the same materials attorney Soria

27   had provided to Dr. Pierce.  (RT 3112–32, 3144–46.)  Dr. Benson also interviewed Colorado

28   institutional witnesses Ms. Wright, Ms. Johnson, Ms. Lane, parole officer Ms. Brault, and

1    probation officer Mr. Tomlinson.  (RT 3154.)

2           Dr. Benson testified at the penalty phase that he diagnosed petitioner as suffering from

3    organic mental disorder, organic personality syndrome, partial complex seizures, and brain

4    damage to the right temporal lobe possibly originating in hypoxic damage at birth.  (RT 3110–18,

5    3151; *see also* EH Ex. 6 at 2.)  Dr. Benson described for the jury at petitioner's trial the

6    disorganized thought process and seizure-like symptoms he believed petitioner exhibited during

7    his commission of the crimes against Ms. Axtell.  (RT 3110–11, 3134–35, 3177.)  Dr. Benson

8    testified that petitioner also suffered from, but had not been diagnosed with, epilepsy.  (EH Ex. 6

9    at 7.)

10          Dr. Benson testified that petitioner had difficulty processing auditory information and

11   tended to confabulate rather than provide truthful answers.  (RT 3131–37.)  Dr. Benson noted

12   petitioner's statements that [redacted].  (*Id.*; *see also* EH Ex. C at 4–5 [sealed].)  Dr. Benson

13   observed petitioner's statement that [redacted].  (EH Ex. C at 10-11 [sealed].)  Although

14   petitioner testified in some detail as to his crimes carried out against Ms. Axtell, Dr. Benson

15   ascribed some of these apparent memories to confabulation of facts petitioner heard from others

16   during the course of the criminal proceeding.  (RT 3186–91.)

17          Dr. Benson conceded that petitioner was consistent about certain details of the crimes and

18   had a history of fabricating the extent of physical abuse he suffered at the hands of his father.

19   (RT 3155–56.)  Still, Dr. Benson found it significant that petitioner was unable to explain why he

20   did what he did in Ms. Axtell's home.  Dr. Benson maintained that petitioner tended toward

21   [redacted].  (RT 3132, 3185–91, 3241; EH Ex. C at 7–13 [sealed].)

22          Dr. Benson requested, and attorney Soria sought and obtained, funding for the brain

23   imagery discussed below, i.e., a PET scan and an EEG.  (RT 3135–38; *see also* 1SHCP Ex. 127.)

24   Dr. Benson requested this testing even though a contemporaneous MRI of petitioner's brain had

25   come back normal (RT 3135–36), and petitioner's 1978 EEG at Fort Logan Mental Health Center

26   in Colorado also was normal (RT 3157).

27          Dr. Benson believed that petitioner's mental health had worsened over time because his

28   brain damage had gone unrecognized and untreated.  (RT 3127–31.)  Dr. Benson believed that the

36

1    mental health treatment petitioner had received during his institutional life was ineffective

2    because his underlying organic brain damage had gone unrecognized. (*Id.*) Dr. Benson pointed

3    out that in 1978 at the Colorado Boys Ranch, petitioner tested to a verbal IQ of 70 and a

4    performance IQ of 86, and that anything below 70 would be considered potentially intellectually

5    disabled. (RT 3126.) He noted similar IQ testing results in the following years. (RT 3128–31.)

6    He noted that staff members at the Boys Ranch suspected petitioner had a learning disability

7    related to an auditory problem of organic origin. (RT 3127.)

8        Dr. Benson observed that at a very early age petitioner demonstrated [redacted]. (RT

9    3119–23; *see also* EH Ex.'s 51, 53, 57 [sealed].) Still, Dr. Benson acknowledged petitioner's

10    statements to him that [redacted]. (EH Ex. C at 1-3 [sealed].)

11                 iii.     Dr. Monte Buchsbaum

12        Dr. Buchsbaum, a defense psychiatrist and expert in brain imagery, testified during the

13    penalty phase of petitioner's trial. (RT 2994–98; 1SHCP Ex. 2.) As noted above, the defense

14    team had sought and obtained funding for brain imagery and testing of petitioner. (1SHCP Ex. 31

15    at 1–2.) Attorney Soria testified at his 2007 deposition that he retained Dr. Buchsbaum to assist

16    in showing that petitioner was mentally deficient and to provide support for the expert testimony

17    of Drs. Pierce and Benson. (EH Ex. Q at 28.)

18        Dr. Buchsbaum examined petitioner around the time of his trial and concluded that

19    petitioner had an abnormal brain. (RT 3051.) Dr, Buchsbaum testified to evidence of organic

20    brain damage and behavioral consequences which he reaffirmed in his October 25, 1996

21    declaration submitted in support of petitioner's state application for habeas relief. (RT 3011–21;

22    1SHCP Ex. 2 at 5–11; *see also* 1Inf. Resp. Ex. A at 4.) Dr. Buchsbaum administered a positron

23    emission tomography("PET") scan and an electroencephalogram ("EEG") to petitioner and

24    opined that the results showed impaired functionality of the left and right temporal lobes which

25    relate to speech and language skills, planning, judgment and understanding, memory and

26    cognitive skills, and impulsiveness. (RT 3011–21; *see also* 1SHCP Ex. 2 ¶¶ 4–32.)

27        Dr. Buchsbaum found evidence of unusually high metabolic activity in areas of the brain

28    involved with emotionality. (RT 3013–14.) He suggested in his trial testimony that petitioner's

1  abnormal brain function could have been caused by damage to the brain during birth. (RT 3014–

2  20.) Dr. Buchsbaum discounted the possibility that petitioner's test results were impacted by any

3  malingering because petitioner's PET scan did not show the increase in brain metabolism that

4  malingering would require. (RT 3030, 3044–46, 3051–52.)

5          During his trial testimony Dr. Buchsbaum, conceded that a small percentage (2.5% or

6  less) of his normal test subjects tested as did petitioner, and that studies did not link the

7  abnormalities he found in petitioner to any particular types of behavior. (RT 3037–38.)

8                              iv.    Dr. Raul Guisado

9          Dr. Guisado, a defense neurologist and expert in mapping brain electrical activity,

10 examined petitioner on April 7, 1990, just prior to the start of the guilt phase of petitioner's trial.

11 (1SHCP Ex. 128.) Attorney Soria testified at his 2007 deposition that he retained Dr. Guisado to

12 assist in showing that petitioner was mentally deficient and to provide support for the testimony

13 of Drs. Pierce and Benson. (EH Ex. Q at 28.)

14         Dr. Guisado found evidence that petitioner suffered from a brain abnormality. (RT 3056–

15 67.) He administered a computer enhanced EEG which showed abnormalities consistent with the

16 PET scan, i.e., decreased metabolism in the right frontal and temporal regions as well as atrophy

17 and decreased metabolism in the left parietal region. (RT 3056–81; *see also* 1SHCP Ex. 128 at 3;

18 1SHCP Ex. 178 at 58.) Dr. Guisado's evaluation was consistent with the previously noted right

19 temporal lobe abnormalities and early onset partial seizure disorder. (1SHCP Ex. 128 at 3.)

20 Notably, Drs. Pierce and Benson considered Dr. Guisado's findings and conclusions in

21 diagnosing petitioner as suffering from temporal lobe seizure disorder and epilepsy, respectively.

22 (*See* RT 3221, 3177.)

23         Dr. Guisado testified that petitioner's EEG and clinical examination suggested impaired

24 auditory processing, asymmetrical muscle tone, and electrical "paroxysmal" or "burst" activity in

25 petitioner's brain consistent with his self-described seizure activity. (RT 3056–81, 3092–93.) Dr.

26 Guisado also testified that the foregoing findings were in turn consistent with symptoms seen in

27 people with temporal lobe epilepsy and that such findings had been linked to violent behavior.

28 (*Id.*). Relatedly, Dr. Guisado noted a possible correlation between his findings and petitioner's

1   history of learning and behavioral problems, violent behavior, and borderline low intellectual

2   functioning.  (*Id.*; *see also* 1SHCP Ex. 128 at 3.)

3        Dr. Guisado held these opinions notwithstanding that the EEG alone did not support a

4   diagnosis of seizure disorder (RT 3092–93; 1SHCP Ex. 128 at 3); that petitioner was articulate

5   and engaging at the examination (1SHCP Ex. 128 at 2); and that Dr. Pierce found petitioner's

6   description of his apparent seizure episodes to be "very fake."  (RT 3088.)

7                  v.     Dr. Roderick Pettis

8        Dr. Pettis, a psychiatrist, was retained in connection with petitioner's first and second state

9   habeas petitions.  Dr. Pettis reviewed the interviews, opinions, and testimony of the above noted

10   defense trial experts.  (1SHCP Ex. 1 at 2.)  Dr. Pettis examined petitioner in 1996 and reviewed

11   testimony of various trial witnesses and records from petitioner's life history.  Dr. Pettis provided

12   a November 3, 1996 habeas declaration (1SHCP Ex. 1), that was updated in a February 13, 2008

13   Rule 26 report, which also considered his several circa 2002–03 interviews with petitioner and his

14   review of additional habeas proffered materials (EH Ex. 3).

15        Dr. Pettis observed evidence of [redacted].  (1SHCP Ex. 1 at 3–27; *see also* 1SHCP Ex.'s

16   8–9, 11–12, 15–16, 19, 22–23, 55–57, 59–60, 63, 67, 71–72; EH Ex.'s 15–19, 21, 60 [sealed].)

17        Dr. Pettis concluded that petitioner's ability to function socially was impaired.  (1SHCP

18   Ex. 1 at 24–25.)  He found that petitioner had significant problems learning and performed

19   several grade levels below that appropriate for his age.  (*Id.* at 5–7, 40; *see also* 1SHCP Ex. 82.)

20   Dr. Pettis observed petitioner's difficulty gaining and keeping employment and conforming with

21   parole requirements.  (1SHCP Ex.'s 110–113, 117–118, 121–127; *see also* RT 2927–52.)  Dr.

22   Pettis noted that petitioner had difficulty adjusting to non-institutional life, pointing out

23   petitioner's February 13, 1989 emergency room visit seeking counseling for suicidal feelings and

24   his fear of harming others.  (1SHCP Ex. 1 at 42; *see also* 1SHCP Ex. 120.)  Dr. Pettis also noted

25   petitioner's serial violations of probation and parole in the lead-up to his capital crimes, only to be

26   released from confinement.  (1SHCP Ex. 1 at 42–43; *see also* 1SHCP Ex.'s 123–124.)

27        Dr. Pettis observed in petitioner signs of long-standing chronic psychosis.  (1SHCP Ex. 1

28   at 28–30.)  Petitioner talked to himself and suffered hallucinations.  (1SHCP Ex. 1 at 28, 43.)

1  Petitioner wore layers of clothing even when the weather was warm.  (*Id.*; *see also* RT 2843–44.)

2  Petitioner had an inappropriate affect (i.e., smiling inappropriately).  (1SHCP Ex. 1 at 34.)

3  Petitioner suffered auditory and visual hallucinations.  For example, petitioner suggested other

4  people (including his dead twin brother Silas and Ms. Axtell) lived inside him.  (1SHCP Ex. 1 at

5  7–8, 29–30, 35.)  Petitioner believed he had supernatural powers.  (1SHCP Ex. 1 at 35.)

6  Petitioner also referred to himself as a "supreme religious being," he responded to internal voices,

7  and his notes made during his trial suggested delusion and paranoia and ranged from lucid to

8  disjointed to unintelligible.  (1SHCP Ex. 1 at 32–33; 1SHCP Ex. 175.)

9  　　　Dr. Pettis also observed that petitioner abused himself as a child (1SHCP Ex. 1 at 27);

10  received anti–depressant medication while held in the Kern County jail (1SHCP Ex. 1 at 31);

11  demonstrated a pre–occupation with the "devil" (1SHCP Ex. 1 at 28, 35–36); talked to himself

12  (*id.; see also* RT 2843–44); professed a desire to be dead like his twin brother Silas (who died

13  shortly after birth); and occasionally claimed to be Silas (1SHCP Ex. 1 at 21; 1SHCP Ex.'s 72,

14  73, 92).  Dr. Pettis found petitioner's EEG and PET brain scans taken contemporaneously with

15  his trial served to verify organic damage affecting these behaviors.  (1SHCP Ex. 1 at 8.)

16  　　　In support of petitioner's application for habeas relief, Dr. Pettis provided a diagnosis of

17  PTSD and chronic psychosis.  (1SHCP Ex. 1 at 28–29, 35–36.)  Dr. Pettis opined that during the

18  commission of the capital crime, petitioner suffered a partial seizure or psychotic/dissociative

19  state and effectively lacked the intent to do what he did.  (*Id.* at 5–9, 43–47.)  Dr. Pettis opined

20  that petitioner was in an "altered and/or impaired mental state" and not "fully conscious of his

21  actions nor capable of controlling them" (*id.* at 50), and that petitioner did not form any specific

22  intent with reference to the acts of which he was convicted (*id.* at 51).  Dr. Pettis opined that these

23  circumstances left petitioner with memory gaps filled-in by confabulation.  (1SHCP Ex. 1 at 47–

24  49.)  For example, petitioner told Dr. Pettis that when he rang the doorbell upon returning to the

25  crime scene, he felt as if he was "in a dream."  (*Id.* at 45–46, 50–51.)  Dr. Pettis observed that

26  dissociation is frequently reported by persons like petitioner who suffer from PTSD.  (*Id.* at 44.)

27  　　　As to his competence, Dr. Pettis opined that although petitioner tried to hide it, his mental

28  and intellectual impairments made his confession to detective Boggs likely unreliable as a product

1   of confabulation (1SHCP Ex. 1 at 47) and interfered with his ability to fully comprehend events

2   and the language used at his trial, leaving him delusional and not psychologically present.

3   (1SHCP Ex. 1 at 34).  Dr. Pettis found that petitioner's mental impairments left him "unable to

4   knowingly and intelligently waive his rights . . . [and] incapable of understanding and rationally

5   choosing between alternative courses of action and their possible consequence"  (1SHCP Ex. 1 at

6   51), and "would have interfered with [his] ability to aid and assist counsel [and] understand[]

7   courtroom discussions" (*id.* at 52).

8        In his 2008 Rule 26 report, Dr. Pettis noted petitioner's continued decompensation into

9   schizoaffective disorder and involuntary medication resulting from his lifelong dysfunction due to

10  the noted combination of mental illness and apparent organic disease.  (EH Ex. 3 at 1–4.)

11       Although Dr. Pettis initially examined petitioner six years after his trial, and partially

12  contradicted the trial diagnoses of Drs. Pierce and Benson, he did so upon information that was

13  unavailable to Drs. Pierce and Benson at the time of the trial.  (1SHCP Ex. 1 at 47, 49); *cf. Odle v.*

14  *Calderon*, 919 F. Supp. 1367, 1378 (N.D. Cal. 1996) (concluding that expert opinion based upon

15  examinations occurring years after trial to be insufficient to create a doubt as to trial competency)

16  (reversed on other grounds and remanded by *Odle v. Woodford*, 238 F.3d 1084, 1089 (2001)).

17                          vi.    <u>Dr. Mary Ann Kim</u>

18       Dr. Kim, a clinical neuropsychologist, was retained by the defense in connection with

19  petitioner's second state habeas (*Atkins*) petition in which petitioner asserted his execution

20  incompetency on grounds of intellectual disability.  (*See* EH Ex. 7; 2SHCP Ex. 2.)  Dr. Kim

21  reviewed the transcripts of petitioner's trial, his notes and his psychosocial history and the

22  conclusions and opinions of Drs. Pierce, Benson and Pettis, and also consulted with Dr. Pettis.

23  (EH Ex. 7 at 6–8.)

24       Dr. Kim examined petitioner twice in 1998 to determine whether there were any cognitive

25  defects and neuropsychological impairments prior to and during his capital trial.  (*Id.* at 4, 7-8.)

26  Dr. Kim administered a variety of tests.  (*Id.* at 9–20.)  Dr. Kim also tested petitioner for brain

27  impairments resulting from trauma and the effects of such impairments.  (*Id.* at 3–5.)

28       Dr. Kim found that petitioner's comprehension, auditory receptive and spontaneous

1    speech processes, thought processes, and memory were impaired. (*Id.* at 10–28.) Dr. Kim also

2    found petitioner to have subaverage intellectual functioning, in the mild to moderate range of

3    mental retardation, consistent with the findings of petitioner's trial and habeas experts including

4    as to their findings of cognitive and organic impairment. (*Id.*)

5          Dr. Kim, like Dr. Buchsbaum, found evidence of organic deficits impacting petitioner's

6    functioning including as to comprehension and verbal expression. (*Id.*) Dr. Kim noted

7    petitioner's difficulties following instructions and attempts to hide his impairments and to

8    confabulate. (*Id.*) Dr. Kim noted petitioner's delusions and thought disorder indicating an

9    underlying psychosis. (*Id.*)

10         Dr. Kim, in her May 19, 2003 declaration, concluded that petitioner was only marginally

11   oriented, with severely impaired visual and verbal memory due to dissociation and confabulation.

12   (*Id.*) Dr. Kim opined that petitioner could not be relied upon to self-report his symptoms and

13   impairments and was only minimally aware at his trial and was unable to understand his trial

14   proceedings. (*Id.*) Dr. Kim further opined that these deficits and impairments, combined with

15   petitioner's underlying psychosis, impacted his mental state at the time of the commission of the

16   capital crime, during his interrogation by police, and his competence to stand trial. (*Id.*)

17                                 vii.    Dr. Timothy Derning

18         Dr. Derning, a clinical and forensic psychologist, was retained by the defense in

19   connection with petitioner's second state habeas (*Atkins*) petition. (*See* 2SHCP Ex. 3.) Dr.

20   Derning reviewed:  a comprehensive summary of petitioner's life history, social history

21   declarations, a summary of petitioner's capital crime, and the declarations of Drs. Pettis and Kim

22   submitted in support of petitioner's habeas application. (*Id.* at 6.)

23         Based upon that review, Dr. Derning concluded that petitioner had a lifelong history of

24   chronic intellectual and adaptive deficits leaving him incompetent for execution. (*Id.* at 8, 44.)

25   Dr. Derning found "significant limitations both in intellectual functioning and in adaptive

26   behavior as expressed in conceptual, social, and practical adaptive skills . . . originating before

27   age 18." (*Id.* at 9.) Significantly, Dr. Derning observed that his findings were not inconsistent

28   with petitioner performing adequately in some areas and inadequately in others. (*Id.* at 10.)

e.      Findings and Opinions of Mental Health Experts in these Federal Habeas
        Proceedings

i.      Dr. Pierce

Dr. Pierce served as a defense expert in this habeas proceeding.  (EH Ex.'s 4–5; *see also*
Doc. No. 238.)  In that capacity, Dr. Pierce reviewed the state habeas proffer evidence including
petitioner's trial notes, the declarations of his family members, and the conclusions and opinions
of Dr. Pettis.  Dr. Pierce provided a diagnosis in these habeas proceedings of partial complex
seizure disorder and temporal lobe epilepsy.  Dr. Pierce concluded that petitioner was
incompetent to stand trial.  (EH Ex. 4 at 2–5.)  Particularly, he noted that temporal lobe epilepsy
can occur chronically and cause a "dreamy" impairment of consciousness followed by confusion
and amnesia that can last seconds to minutes to hours, with the stricken individual appearing to be
"zoned out".  (*Id.*)

ii.     Dr. Benson

Dr. Benson also served as a defense expert in this habeas proceeding.  (EH Ex. 6; *see also*
Doc. No. 238.)  Upon review of the habeas proffer evidence including petitioner's trial notes, the
declarations of petitioner's family members and institutional care providers, and consultations
with Dr. Pierce, Dr Benson diagnosed petitioner as suffering from partial complex seizure
disorder and temporal lobe epilepsy. (EH Ex. 6 at 1–11.)  Based on that diagnosis, Dr. Benson
concluded that petitioner was incompetent to stand trial and that his organic mental disorder,
organic personality syndrome, seizure disorder and other brain damage impacted his ability to
form the *mens rea* required for the charged crimes.  (*Id.*)

iii.    Dr. James Missett

Dr. Missett, a psychiatrist, was retained by respondent in connection with this federal
habeas proceeding.  Dr. Missett reviewed and considered psychosocial documents including those
related to:  petitioner's institutional care, treatment, and probation in Colorado; law enforcement
and trial records relating to petitioner's capital offense; reports and notes from petitioner's trial
and petitioner's state habeas experts; post-conviction prison records including involuntary
medication orders and mental health evaluations and expert depositions; and the 2007 deposition

43

of petitioner's trial counsel, attorney Soria.  (EH Ex. 151 at 2–5.)

Dr. Missett provided a February 29, 2008 Rule 26 report wherein he opines that at the time of the capital crime and at his trial:

> [Petitioner] was mentally alert; oriented; able to concentrate and pay attention; able to communicate his ideas well to others; able to think and speak and behave in a goal-directed manner; able to set objectives for himself and reach them; able to exercise judgment about the objective reality of the world as he encountered it; able to have insight into his own psychological state; and able to tell what was real from what was not real in the world around him.

(EH Ex. 151 at 111.)

Dr. Missett observed that petitioner consistently could recollect, recite, and testify to material facts and circumstances of his crime prior to and during the trial.  (*Id.* at 12, 48.) Dr. Missett found an "extremely close parallel" in the facts and circumstance petitioner related. (*Id.*)  Dr. Missett observed that "the closeness of the parallel makes it unlikely in the extreme that [petitioner] before, during, or after the attack on Mrs. Axtell was suffering from any altered state of consciousness, any fugue state, or any seizure activity."  (*Id.* at 20–21; *see also id.* at 35.)

Dr. Missett observed that petitioner demonstrated indicia of competence to stand trial.  He found that petitioner was oriented as to person, place, time and event; able to recite his recollections into the record including efforts to avoid detection and apprehension after the crime; and able to understand and respond to courtroom proceedings and coherently and responsively testify under oath and exercise judgment in doing so.  (*Id.* at 109–10.)

Particularly, Dr. Missett found that during the capital crime committed by petitioner and continuing thereafter through trial, petitioner demonstrated:

> [N]ormal ability to recognize and identify various items and objects of the world in which he lived; that he was alert; that he was able to understand and respond without undue difficulties to the questions that were asked him; that he was suffering from no significant defects in his memory for immediate or recent or remote events; that he was able to concentrate and pay attention without undue difficulties; that he was able to speak in a goal-directed manner without any undue tendency to go off on tangents or speak around the subject; that he was able to exercise a normal level of judgment with respect to the outside and objective world; that he was able to exercise an appropriate level of insight into his own psychological state and his moods and emotions; and that he was evidencing no obvious or debilitating indications of any psychotic thought processes.

(*Id.* at 35–36.)

1       Dr. Missett observed that petitioner's Kern County jail records reflected only anxiety,

2   depression and paranoia not rising to psychotic proportions or showing clearly delusional

3   thinking on his part.  (*Id.*)

4        Dr. Missett further supported his conclusions and opinions by pointing to the penalty

5   phase testimony of petitioner's experts Drs. Benson and Pierce.  Those experts testified that

6   petitioner's IQ testing did not show intellectual disability.  Dr. Missett found that petitioner's

7   ability to recollect, recite and testify to what happened while he was in Ms. Axtell's home, and

8   his EEG history, suggested that he was not seizing and in a fugue state at the time of his

9   commission of the crimes against Ms. Axtell or while awaiting and during his trial.  (EH Ex. 151

10  at 94, 103, 106.)

11       Dr. Missett also supported his conclusions and opinions by pointing to petitioner's normal

12  mental presentation upon arrival at San Quentin Prison following his conviction and for years

13  thereafter, i.e., functioning without evidence of organic brain dysfunction, psychosis, or serious

14  psychological impairment.  (*Id.* at 107–10.)

15       Dr. Missett did not find petitioner's noted psychosocial history to be evidence of

16  intellectual deficiencies or psychosis, but rather as evidence of merely mitigating value.  For

17  example, Dr. Missett observed significant mitigating value in the penalty phase testimony of

18  Colorado social worker Beverly Wright that petitioner had been abused and abandoned by his

19  family.  (*Id.* at 64.)  Dr. Missett also noted mitigating value in the penalty phase testimony of

20  Father Kapushion that petitioner presented behavioral and conduct problems resulting in his

21  academic problems and poor performance.  (*Id.* at 78–79.)

22       Finally, Dr. Missett offered his view that trial counsel Soria appropriately decided to

23  present mental state evidence only at the penalty phase, stating that:

24      Defense attorney Charles Soria's 10/5/07 deposition testimony is significant
        because it reflects an ongoing awareness during the preparation and presentation of
25      a defense by an experienced criminal defense attorney of those possible mental
        difficulties or problems in [petitioner] that might be of most importance to the
26      triers of fact as regards his level of mental competency or moral responsibility at
        the time of the offense and at the time of his trial.
27

28  (*Id.* at 16.)

45

iv.     Dr. Pablo Stewart

Dr. Pablo Stewart, a clinical psychiatrist, was called by petitioner's counsel to testify at the evidentiary hearing conducted in this federal habeas proceeding.  This court found Dr. Stewart's testimony to be credible, compelling, and persuasive.

Dr. Stewart reviewed and considered materials including:  (i) testimony from petitioner's trial; (ii) the examination notes of Drs. Pierce and Benson; (iii) the declarations, reports and opinions of habeas mental health experts in petitioner's state and federal habeas proceedings; (iv) petitioner's medical and psychiatric records from San Quentin Prison; (v) the deposition testimony of Drs. Armstrong, Dent, and Ponath, the corrections department mental health professionals who treated petitioner on death row; (vi) declarations from petitioner's family members, social service providers, and coworker; (vii)  petitioner's institutional, scholastic and jailhouse records; (viii) trial counsel Soria's statements and testimony in the related habeas proceedings, (ix) petitioner's courtroom notes; and (x) the report and opinions of respondent's evidentiary hearing expert, Dr. Firestone.  (EH Ex. 2 at 4–5 and App. 1 thereto.)

According to Dr. Stewart, petitioner's gravely disabled psychiatric condition prevented him from conducting an in-person evaluation.  (EH Ex. 2 at 2.)  Dr. Stewart disclosed an encounter with petitioner at San Quentin in 2013 while Dr. Stewart was working as an expert on a separate matter.  Dr. Stewart denied that his opinion in this case was influenced by that encounter, but he conceded that the encounter perhaps served to validate his opinions reached as to petitioner.  (EHRT 24–26.)

Dr. Stewart concluded in his March 30, 2017 Rule 26 report that petitioner was incompetent at the time of his trial because his mental impairments (including traumatic brain injury, intellectual disability, PTSD, and schizophrenia/schizoaffective disorder) would have prevented him from understanding trial proceedings and assisting in his defense.  (EH Ex. 2 at 1–2, 4, 27–30, 44–46, 56–57, 60–70, 76–79; EHRT 87–88.)  Dr. Stewart also concluded it is likely that petitioner lacked the required *mens rea* for the charged crimes.  (EH Ex. 2 at 4, 78–79.)

Dr. Stewart found that petitioner likely was in the prodromal (i.e., beginning) phase of schizophrenia at the time of the commission of the crime and at the time of his trial, drifting in

1  and out of lucidity.  (EHRT 79–83.)  Dr. Stewart felt petitioner then was just "starting to become

2  psychotic," that he was "psychotic under the surface, [but that] he was able to keep it together

3  during the course of his testimony."  (EHRT 109.)

4         Dr. Stewart observed petitioner's noted genetic and environmental predisposition toward

5  [redacted].  (*See* EHRT 110–11; EH Ex. 2 at 1–4, 26–35, 60–66; EH Ex. C at 15–17 [sealed]).)

6         Dr. Stewart observed that petitioner's cognition, judgment, impulse control, and anger

7  control were severely impaired and that he had difficulty distinguishing reality from non-reality.

8  (EH Ex. 2 at 77–79.)  Significantly, Dr. Stewart stated that at the time of the crimes committed

9  against Ms. Axtell and the trial, petitioner's psychosis and psychotic symptoms were not present

10  all the time, but rather were intermittent with periods of remission and exacerbation.  (EHRT 82–

11  83, 105–12.)  Dr. Stewart clarified his findings in response to the court's questions, and opined

12  that petitioner could have appeared normal, though in fact he was incompetent to stand trial.  (*Id.*)

13         Dr. Stewart found that [redacted].  (EHRT 63–64, 82–83, 105–10; *see also* EH Ex. A at

14  16–32 [sealed]; EH Ex. E at 1 [sealed]; EH Ex. F at 1 [sealed]; EH Ex. G at 1 [sealed].)  Notably,

15  Dr. Benson's penalty phase testimony was in accord, that even assuming petitioner suffered

16  organic personality syndrome, petitioner could have performed normal functions and made

17  decisions.  (RT 3167–68.)

18         Dr. Stewart acknowledged the evidence in the record indicating that petitioner's assault

19  upon Ms. Axtell was [redacted], including evidence that:

20         •    Petitioner had [redacted] (EHRT 36; *see also id.* at 28–39; EH Ex. B at 11–15
21              [sealed].)

22         •    Petitioner was upset when he reached Axtell's home because he had been rejected
             at his sales calls earlier that morning  (EHRT 39–40); according to Bakersfield
23           Police detective Boggs's report of July 7, 1989, upon Axtell's rejection of his
             repeated sales pitch petitioner stated he "just snapped and got extremely mad."
24           (EHRT 41 citing EH Ex. H at 9.)

25         •    Petitioner told Drs. Pierce and Benson that [redacted] (*id.*; *see also* EH Ex. D at 2
             [sealed]); that [redacted] (EHRT 47; *see also* EH Ex. A at 4 [sealed]); that
26           [redacted] (EHRT 47; EH Ex. A at 5 [sealed]); that [redacted] (EHRT 48; EH Ex.
             A at 5-7, 11, 13 [sealed]); and that [redacted]  (EHRT 61-62 citing EH Ex. B at 32
27           [sealed]).

28         •    Petitioner told Drs. Pierce and Benson that at the time of the assault [redacted]
             (EHRT 45 citing EH Ex. C at 10 [sealed].)

- Detective Boggs testified that petitioner stated he told Axtell "if you don't stop moving, I'm really going to have to hurt you." (EHRT 46.)

- Petitioner appeared oriented when Dr. Pierce interviewed him (EHRT 59) and made further statements to Dr. Pierce suggesting a consciousness of guilt; that when he encountered Axtell's son upon returning to the crime scene to retrieve his briefcase, he acted as if he had never been there and denied assaulting Axtell (EHRT 49–51); that he wanted the leave the area after the crime and removed the gray jacket he had been wearing (EHRT 51–55 citing EH Ex. N at 16–18); that he denied to the police that he had been wearing such a jacket (EHRT 54) and denied having been in Axtell's home (EHRT 54–56 citing EH Ex. H at 8–9; EH Ex. I at 2); and that he denied having left his sale ID badge in Axtell's home where police found it, suggesting that his sales partner Beardon may have placed it there. (*Id.*)

- Petitioner was able to consistently recollect and relate some facts of the crimes against Axtell during his confession to detective Boggs and his interviews with Drs. Pierce and Benson and his testimony at the guilt phase. (EHRT 57.)

- Petitioner was [redacted] when evaluated by San Quentin neuropsychiatric staff psychiatrists upon his arrival on death row in June 1990 (EHRT 65–66); psychological examination at the prison in March 1991 demonstrated [redacted] (EHRT 67; *see also* EH Ex.'s E [sealed] and G [sealed].)

Nonetheless, Dr. Stewart explained that these types of goal-oriented statements and seemingly normal thought processes can subsist with psychosis, that:

> [A] person can be psychotic and [it] certainly can interfere with a person's ability to understand, to assist counsel to a reasonably rational understanding, to understand the legal proceedings to a factual and rational understanding. It could interfere with that, but yet they can appear to be normal.

(EHRT 107.) Dr. Stewart further testified that:

> [Petitioner was at the time of trial] clearly suffering from a chronic psychotic illness. And given the record in his childhood and his adolescence and then at the time of the trial, it's clear that he was starting to become psychotic at that time.

(EHRT 109.) According to Dr. Stewart, petitioner's mental illness began in the 1980's and 1990's and "really came to fruition" in the early 1990's. (EHRT 110.)

Dr. Stewart generally discounted and distinguished findings, diagnoses, opinions contrary to his own. For example, Dr. Stewart suggested that any diagnosis petitioner suffered a mere personality disorder prior to and shortly after the capital crime was inconsistent with: (i) the record including petitioner's February 1989 visit to a hospital emergency room during which he expressed suicidal thoughts and his own fear of hurting people (EHRT 29, 98 citing EH Ex. J at 6; EH Ex. 2 at 45–46, 74–75); (ii) the federal habeas proffered evidence including petitioner's

48

trial notes (EHRT 79–80) and psychosocial history of organic brain damage, mental and intellectual disabilities and partial seizure symptoms from an early age, continuing to the time of his trial (EHRT 87, 113–18); and (iii) the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association ("DSM") criteria for personality disorder. (EHRT 67–68.)

Similarly, Dr. Stewart attributed post-conviction mental health evaluations of petitioner at San Quentin Prison in the years immediately following his conviction and sentence that reflected [redacted] to: (i) [redacted] (*see* EHRT 64–68, 83–90, 100–03, 110; *see also* EH Ex.'s E–G [sealed]); and (ii) the intermittent appearance of petitioner's psychotic symptoms (EHRT 105–07).

Dr. Stewart also noted post-conviction mental health evidence that was consistent with his diagnosis, that by 1996, petitioner's mental health had worsened. That same year, San Quentin mental health professionals diagnosed petitioner with schizophrenia. (EH Ex.'s 2 at 46; 28–43; Doc. No. 160 at 38–39.) By 2002, petitioner was being involuntarily medicated with psychotropic drugs by prison officials. (EH Ex. 2 at 46–49.) The record reflects the basis for medication was petitioner's grave disability arising from his chronic psychosis and paranoid schizophrenia. (EH Ex.'s 28–43.)

v.    <u>Dr. Marvin Firestone</u>

Dr. Marvin Firestone was called by respondent to testify at the evidentiary hearing before this court. (EHRT 136, 143-44.) Dr. Firestone, a clinical and forensic psychiatrist and licensed attorney, testified that about two-thirds of his professional time was devoted to psychiatry with the remainder devoted to practicing law including the field of wills and trusts. (Id.) As was the case above with Dr. Stewart, petitioner's gravely disabled mental state prevented Dr. Firestone from performing an in-person examination. (RT 140–44; EH Ex. O at 2 and Attach. A thereto.)

Dr. Firestone reviewed and considered some, but not all, of the materials that had been reviewed by Dr. Stewart. Specifically, Dr. Firestone reviewed: (i) portions of the trial record, (ii) portions of petitioner's institutional records from Colorado including mental health evaluations and reports, (iii) the Rule 26 reports and the notes of Drs. Pierce and Benson, (iv) petitioner's trial

notes; (v) petitioner's jailhouse and state corrections department mental health records including the deposition testimony of Drs. Armstrong, Dent, and Ponath (i.e. the corrections department mental health professionals who treated petitioner on death row); and (vi) trial counsel's files. (EHRT 186; EH Ex. O at Attach. A.)  Dr. Firestone testified that his practice was to merely skim over those records that he found not relevant to the issues as to which he was retained to render an opinion.  (EHRT 167, 173.)

Significant among the materials that Dr. Firestone did not review were:  (i) the Rule 26 report of Dr. Stewart; (ii) the state habeas declarations and opinions of trial experts Drs. Pierce and Benson (*see* 1Inf. Reply, Ex. 3; EH Ex.'s 4–6; *see also* EH Ex. O at Attach. A); (iii) petitioner's birth records (EH Ex. O at Attach. A; *see also* 1SHCP Ex. 129), and (iv) portions of petitioner's psychosocial history including declarations from his family members, co-worker Cameron Bearden, institutional caretakers, and educational and institutional materials (EH Ex. O at Attach. A; *see also* EH Ex.'s 15–21, 24, 26–27; 1SHCP Ex.'s 8–26, 34–35, 37–51, 170–71, 173, 176; EHRT 192–93).

Dr. Firestone was singular among the noted mental health experts in stating that  his opinions did not consider life history information from and relating to petitioner's parents, siblings, and extended family.  (EHRT 152–53. 192–97, 221–22.)  Dr. Firestone suggested the extent of his investigation and examination of a client was framed by whether the retainer sought a forensic opinion or a clinical opinion – with only the latter requiring comprehensive treatment. Dr. Firestone then stated his belief that life history information, while significant to the care petitioner received at the time, did not shed light on matters of petitioner's criminal intent and competence to stand trial.  (EHRT 208–20; *see also* Doc. No. 309 at 18-19.)  Dr. Firestone also testified that he believed the legal standard for trial competency is whether "the  person [is] able to cooperate with counsel in his defense . . . and has a reasonable understanding of the process in which he is embarking on and can testify, if asked to testify, in his defense in an appropriate way." (EHRT 190.)  With that standard in mind, Dr. Firestone concluded that petitioner was competent to stand trial.

Dr. Firestone based this conclusion upon subsidiary findings.  Dr. Firestone found that

50

1  mental health evaluations of petitioner as a youth and adolescent did not demonstrate psychotic

2  illness.  (EHRT 225–26.)  Dr. Firestone found that at the time the crime was committed,

3  petitioner's cognition, memory, and abstract thinking were not impaired.  (EH Ex. O at 2–3, 7–8.)

4  Dr. Firestone also found petitioner's crimes against Ms. Axtell were purposeful and intentional

5  and that petitioner's actions taken immediately after the crimes showed a consciousness of guilt,

6  lies, and attempts to avoid responsibility.  (EH Ex. O at 6–7.)  Dr. Firestone found that at the time

7  of his trial, petitioner was alert, oriented, focused, aware of his own mental state and mood and

8  the charges and proceedings against him, and was consistently able to recollect and relate details

9  of the crimes he committed against Ms. Axtell.  (EHRT 223–24; EH Ex. O at 2–8, Attach A.)

10      Dr. Firestone supported his conclusions by pointing to petitioner's consistent recollection

11  and recounting of the assault upon Ms. Axtell in his statements to the defense mental health

12  experts, Detective Boggs, and during his own trial testimony.  (EHRT 228–29, 258–59; *see also*

13  EH Ex. H at 10–11.)  Dr. Firestone also pointed to petitioner's ability to focus and communicate

14  rationally and intelligibly with his counsel regarding the defense and his trial.  Dr. Firestone

15  expressed his belief that petitioner had the ability to maintain contact with reality, exercise

16  judgment, and provide coherent trial testimony grounded in the record.  In addition, Dr. Firestone

17  pointed to the absence of credible facts suggesting that petitioner was then in an altered state of

18  consciousness and suffering a seizure disorder.  (EH Ex. O at 2–8.)

19      Although Dr. Firestone acknowledged inconsistencies between petitioner's statements to

20  detective Boggs and his trial testimony, he attributed such to pre-trial anxiety or simply a lack of

21  credibility on petitioner's part, rather than as an indication of any memory problems. (EHRT

22  223–26, 229–33.)  Similarly, Dr. Firestone found petitioner's odd trial notes likely to be the result

23  of anxiety (EHRT 233) rather than psychosis (EHRT 257).  For example, regarding petitioner's

24  March 6, 1990 *voir dire* note to his attorney Soria stating [redacted] (*see* 1SHCP Ex. 175; *see also*

25  EH Ex. 74 at 14–15 [sealed]), Dr. Firestone suggested that "[petitioner] was feeling a great deal

26  of anxiety and concern and questioning himself as well as wondering whether or not the jurors

27  were looking down on him. You know, he's a troubled individual, there's no question about that."

28  (EHRT 233.)

1       Dr. Firestone observed that around the time of the capital crime and his trial, petitioner

2   was able to "answer questions at length with linked sentences and paragraphs of thoughts in a

3   responsive manner that manifested his ability to exercise reasonable judgment."  (EHRT 226.)

4   Dr. Firestone testified at the evidentiary hearing before this court that:

5           When you take a look at all of the actions that he performed and his testimony, and
            what he told Dr. Pierce, it was pretty clear that he had intent.  If you look at the
6           fact that he tried to conceal his identity, that he lied to the police about when he
            was asked if he saw a black fellow in a gray jacket.  When he said that the jewelry
7           in his pocket was his mother's jewelry when clearly it was not.  When he was able
            to recite what had transpired when he entered the home and choked Mrs. Axtell
8           and dragged her to her bedroom.  All those indicate that that was purposeful
            movement, not a result of any complex seizure and that he had appropriate recall
9           and knew what he was doing when he did it.  Knew it was wrong.

10  (EHRT 256.)  Dr. Firestone suggested that any lack of recall reflected in petitioner's interview

11  with Drs. Pierce and Benson suggested merely a defect in his memory.  (EHRT 224.)

12      While Dr. Firestone agreed with Dr. Stewart that schizophrenia has exacerbations and

13  remissions (EHRT 258–59), he saw no symptoms of schizophrenia or delusion during petitioner's

14  commission of the crime and at his trial (EHRT 256–61) and observed that petitioner's death row

15  psychological evaluations in the years immediately following his conviction and sentence found

16  him to be of a normal mental state (EH Ex. O at 2–8).  Dr. Firestone found no reason to devalue

17  the findings of San Quentin Prison mental health providers that petitioner presented no serious

18  psychological problems when he arrived on death row.  (EH Ex. O at 6–7.)

19      Dr. Firestone discounted as irrelevant any diagnosis that did not relate to petitioner's

20  ability to understand the proceedings and cooperate with his counsel, and that did not play a role

21  in the crime committed.  (EHRT 159–62.)  Because Dr. Firestone found that petitioner intended

22  his actions in carrying out the crimes committed against Ms. Axtell and that petitioner was

23  competent at the time of his trial, he discounted as irrelevant the above noted diagnoses offered

24  by petitioner's experts.  (EHRT 220–25.)

25      Particularly, Dr. Firestone ruled out the possibility that petitioner confabulated details of

26  the crimes against Ms. Axtell because Dr. Firestone felt petitioner recalled and related accurate

27  facts.  (EHRT 258–59.)  Dr. Firestone also discounted the possibility that petitioner suffered

28  partial epileptic seizure symptoms during the commission of his crimes, observing that

1   petitioner's actions appeared to be purposeful and goal oriented.   (EHRT 256.)  Dr. Firestone

2   credited opinions provided by San Quentin Prison mental health providers that petitioner was of a

3   normal mental status.  (*See* EH Ex. O at 6–7; EHRT 245, 259.)  Dr. Firestone discounted the

4   evidentiary value of findings by San Quentin Prison mental health providers that petitioner

5   became schizophrenic years after the commission of his crime and his trial, again noting that

6   petitioner had shown no symptoms of schizophrenia during the commission of the crime or at his

7   trial.  (EHRT 245, 259–61; EH Ex. O at 6–7.)

8            As to the defense diagnoses of organic brain damage, Dr. Firestone discounted the

9   abnormal EEG taken by Dr. Guisado around the time of petitioner's trial, which Dr. Guisado

10  found consistent with epileptiform disorder.  Dr. Firestone pointed to a normal EEG taken years

11  earlier at Ft. Logan Colorado.  (*See* EHRT 235–38 citing EH Ex. O at 5; *see also* RT 3157.)

12  Moreover, Dr. Firestone found Dr. Guisado's EEG results and brain imagery irrelevant to the

13  issue of trial competency because Dr. Firestone believed petitioner functioned competently at his

14  trial.  (EHRT 236–38.)

15           f.       Petitioner Was Incompetent to Stand Trial

16           As will be explained in more detail below, this court concludes that the evidence before it

17  as catalogued above establishes that petitioner's organic, mental, and intellectual disabilities and

18  manifestations thereof left him unable to factually and rationally understand his trial proceedings,

19  assist his counsel, and waive his right to testify at the guilt phase of his trial.  *See Moran*, 509

20  U.S. at 402 (a defendant must be competent to stand trial, and any waiver of rights must be

21  intelligent and voluntary); *Medina*, 505 U.S. at 452–53 (regarding California's presumption of

22  competence and burden of proof).

23                   i.       Petitioner's History of Mental Impairments and Irrational Behavior

24           The court finds that petitioner, during the commission of this capital crime and prior to his

25  trial, demonstrated and suffered the effects of organic brain damage, mental and intellectual

26  disabilities, and early schizophrenia and psychosis.  These conditions manifested in varying and

27  intermittent thought impairments, unplanned and irrational behavior, memory gaps, seizure-like

28  symptoms, and confabulation – all building blocks of one's incompetence to stand trial.  *See*

1  *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997) (whether a defendant is competent is

2  dependent upon any evidence of irrational behavior, his demeanor in court, and relevant medical

3  opinions) (citing *Drope*, 420 U.S. at 180); *Amaya–Ruiz v. Stewart*, 121 F.3d 486, 489 (9th Cir.

4  1997) ("[A]lthough no particular facts signal incompetence, suggestive evidence includes a

5  defendant's demeanor before the trial court, previous irrational behavior, and available medical

6  evaluations."), overruled on other grounds by *United States v. Preston*, 751 F.3d 1008, 1019–20

7  (9th Cir. 2014) (*en banc*); *see also United States v. Dreyer*, 705 F.3d 951, 964 (9th Cir 2013).

8         Petitioner's borderline intellectual functioning at and near the time of the crime and his

9  trial is fully apparent from the record before this court.  A full-scale IQ near 70 is borderline for

10  intellectual disability.[16]  Petitioner's IQ was measured many times.  At age ten, petitioner tested

11  to a full-scale IQ of 72.  (*See* EH Ex. 8 at 39.)  At age eleven, he tested to a full-scale IQ of

12  [redacted].  (1SHCP Ex. 78; *see also* EH Ex. 70 at 3 [sealed].)  At age fifteen, petitioner tested to

13  a full-scale IQ of 81.  (1SHCP Ex. 85.)  At age sixteen, he tested to a full-scale IQ of 80.  (RT

14  3128, 3213; *see also* 1SHCP Ex. 97.)  When petitioner was released from the CATC in 1987 at

15  age nineteen, he tested to a full-scale (adolescent test) IQ score of 85 with particular impairment

16  in problem solving and short-term memory.  (1SHCP Ex. 109 at 1–3.)  At age twenty-one, seven

17  months before the capital crime, petitioner tested to a full-scale (adult test) IQ score of 73.

18  (1SHCP Ex. 118 at 1–4; *see also* EH Ex. 8 at 39–40.)

19         Petitioner's occasional full-scale IQ scores in the 80s are not conclusive of his

20  competence.  Scores can inflate where, as here, testing is repeated.  (EH Ex. 8 at 37–39 [June 17,

21  2003 Dr. Timothy Derning Decl. regarding the so called "Flynn effect"]; *see also* 2Inf. Resp. at

22  24–25 [wherein respondent fails to address the Flynn effect].)  Dr. Derning, in his declaration

23  submitted in support of petitioner's second state habeas (*Atkins*) petition, found most significant

24  petitioner's first full-scale IQ test which resulted in a score of 72 and petitioner's last full-scale IQ

25  test which resulted in a score of 73 – scores within the range of subaverage intellectual

26

---

27  [16]  The IQ level of 70 is the upper limit for significant subaverage intellectual functioning, plus or
minus a testing error of five points.  *See Money v. Krall*, 128 Cal. App. 3d 378, 400–01 (1982)

28  (citing the DSM, third edition).

functioning.  (EH Ex. 8 at 39–40.)  Moreover, the fact petitioner's functional IQ was consistently higher than his verbal IQ suggested possible organic brain issues with the processing of auditory information.  (*See e.g.,* 1SHCP Ex. 97.)

Petitioner's resultant learning deficiencies are also readily apparent in the record before this court.  Petitioner was repeatedly tracked for special and alternative education.  A special education assessment at age nineteen reported that he had made little progress due to his learning disabilities; that he performed below an age appropriate grade level; and that he had acquired only limited life skills.  (*See e.g.*, 1SHCP Ex.'s 108, 110–11; *see also* EH Ex. 2 at 31; EH Ex. 27 at 4.)  During his institutionalization, petitioner was viewed as being incapable of achieving a G.E.D.  (RT 2863.)  The psychological evaluation of petitioner by Dr. Robert Wolfsohn conducted shortly after petitioner was sentenced to probation in 1988 for residential burglary found that he suffered with impulsiveness and short-term memory and concentration problems. (1SHCP Ex. 118 at 1–4.)  Dr. Wolfsohn provided a 2003 declaration in support of petitioner's second state habeas (*Atkins*) petition wherein Dr. Wolfsohn suggested petitioner's full-scale IQ score of 73 at age twenty-one may have overstated petitioner's intellectual functioning, and that his subaverage intellectual functioning was not attributable to poor schooling.  (EH Ex. 14 at 2, 4.)

The record also reflects petitioner's functional limitations at the time of the crimes committed against Ms. Axtell.  Petitioner had demonstrated some problems interacting with people and perceiving, remembering, and communicating information.  Petitioner's co-worker and supervisor, Cameron Bearden, found petitioner to be "very mentally slow."  (EH Ex. 20 at 2; *see also* 1SHCP Ex. 24 at 1–2.)  For instance, petitioner's training in door-to-door sales took much longer than usual.  (EH Ex. 20 at 2.)  Petitioner had extreme problems memorizing the sales pitch, demonstrating the product, and filling-out sales forms. (*Id.* at 2–3.)  Petitioner froze-up during sales calls and went blank upon rejection.  (*Id.*; *see also* 1SHCP Ex. 24 at 1–2.)

Bearden otherwise found petitioner to be odd and with the communication skills and attention span of a six to seven-year-old.  (EH Ex. 20 at 4.)  Beardon often had difficulty understanding petitioner at all and at times found him to be incomprehensible.  (*Id.*)  Beardon observed that petitioner did not socialize with his co-workers.  (*Id.* at 5.)  Petitioner was unable to

1   maintain personal hygiene and grooming.  (*Id.*)  He "zoned out" during conversations.  (1SHCP

2   Ex. 24 at 2.)  As previously noted, petitioner regularly wore layers of clothing even in extreme

3   heat (*id.*; *see also* EH Ex. 20 at 5; RT 2253) and smiled inappropriately.  (1SHCP Ex. 25 at 2.)

4       The findings and conclusions of the defense habeas experts, that petitioner's then

5   seemingly normal mental process could give way to occasional psychotic and seizure-like

6   symptoms and dissociation, are rooted in the developed record before this court.

7       Immediately after the commission of the crime, petitioner seemingly knew what he had

8   done and sought to avoid apprehension.  Co-worker Bearden testified that when he met up with

9   petitioner minutes after the crime, petitioner did not have his sales briefcase with him, that it was

10  "laying off in the green, you know, kind of hid a little bit."  (RT 2251.)  Bearden testified that

11  petitioner removed the gray jacket he always wore and had been wearing that day (RT 2254) and

12  wanted to leave the area (RT 2252).  When stopped on the street and questioned by Bakersfield

13  detective Billy Ray West shortly after the crime, petitioner showed no reaction indicating his

14  criminal involvement (CT 47–49; RT 2112) and denied even being on the street where the crime

15  occurred (RT 2113–14).  When interviewed by Bakersfield detective Boggs, petitioner stated he

16  understood the *Miranda* warning and responded to Det. Boggs's questions in a matter of fact

17  manner.  (RT 2370–84.)  At first, petitioner falsely explained the source of the cash found in his

18  pockets, denied he left his company ID badge in Ms. Axtell's home (RT 2105–13, 2373–82), and

19  denied any involvement in the crime (RT 2373–76).  Later, he admitted to Det. Boggs his

20  involvement, while again showing little emotion.  (RT 2376–84.)

21      Months later, petitioner appeared [redacted] (*See* EH Ex. A at 2–5, 8–11[sealed]; EH Ex.

22  C at 8–9 [sealed]; Ex. H at 8–11; RT 2427, 2415–50; CT 198–202; EH Ex. 77 at 45–47 [sealed];

23  *see also* RT 3155, 3185–91; EHRT 323.)  During his interviews with Drs. Pierce and Benson,

24  petitioner was [redacted].  (*See* EH Ex. C at 1-3 [sealed].)  As noted, petitioner told these experts

25  that [redacted].  (*See* EH Ex. C at 10 [sealed]; EH Ex. D at 12-14 [sealed]; *see also* EHRT 46.)

26      However, petitioner also demonstrated [redacted].  For example, during his pretrial

27  interviews with Drs. Pierce and Benson, petitioner expressed [redacted].  Petitioner stated that

28  [redacted] (EH Ex. 44 at 7 [sealed]); as if [redacted] (*Id.*)  Petitioner also told Drs. Pierce and

1   Benson that [redacted]. (*Id.*)

2       Petitioner told Dr. Pierce that [redacted]. (RT 2378, 2416, 2429–30; EH Ex. A at 14

3   [sealed]; EH Ex. H at 9.) Petitioner was unable to explain, or inconsistently explained [redacted].

4   (EH Ex. 44 at 11–12 [sealed]); *see also* EH Ex. 4 at 4; CT 201; RT 2381–82.) Petitioner did not

5   explain specifically how his head hairs ended up on the blue washcloth found in the living room

6   and the pink washcloth found on the front porch, suggestive of memory gaps. (*See* RT 2525–26.)

7   Petitioner told detective Boggs that he became angry when Ms. Axtell rejected his sales pitch (RT

8   2390), and just "blew up" and attacked her (RT 2429–31). However, during his interview with

9   Dr. Pierce, petitioner denied that [redacted]. (EH Ex. 44 at 13 [sealed].) Petitioner suggested to

10   Drs. Pierce and Benson that [redacted]. (EH Ex. 48 at 12-14 [sealed]); *see also* RT 2448-49; *cf.*

11   CT 16-18; RT 2027 [redacted]. (*See* EH Ex. D at 12 [sealed]); EH Ex. 48 at 14 [sealed].)

12       Petitioner's memory of the assault upon Ms. Axtell was incomplete. Petitioner knew his

13   belt had come off during the assault, but he could not remember if he had used the belt to choke

14   Ms. Axtell. (RT 2381.) Petitioner denied placing in Ms. Axtell's mouth the plastic bag that

15   Copeland testified he had removed. (RT 2380, 2442; *see also* CT 15–16, 26; RT 2017–18.)

16   Petitioner told detective Boggs that Ms. Axtell was rendered unconscious during the assault (EH

17   Ex. H at 10, 11), but then testified at his trial that Ms. Axtell was conscious or semi-conscious

18   and still moving on her own (RT 2447–54).

19       The court finds persuasive the testimony of petitioner's experts that petitioner was

20   drifting in and out of lucidity and intermittent psychosis and/or post-seizure confusion during the

21   crime and its aftermath including during his confession to detective Boggs. (*See e.g.*, EHRT 82–

22   83; EH Ex. 2 at 2–4, 77–79.) For example, [redacted]. (RT 3245–48; EH Ex. 53 at 4–6 [sealed].)

23   Notably, in so opining, petitioner's experts expressly considered that petitioner initially denied

24   involvement in the crime and appeared to act in a manner demonstrating consciousness of guilt.

25   (RT 3248; *see also* CT 208; EHRT 36–62; EH Ex. 1 at 2; EH Ex. H at 8.)

26       The Ninth Circuit has observed that:

27           [R]etrospective competency determinations, although disfavored,
        are permissible when it is possible to make an accurate

28           retrospective evaluation, for example, by consulting

1
2
3
4
5
6

> contemporaneous medical reports. *See Moran*, 57 F.3d at 696. Without the benefit of such contemporaneous reports, the passage of time and the difficulties inherent in evaluating the defendant's competence from a written record reduce the likelihood of an accurate retrospective determination. *See Pate*, 383 U.S. at 387, 86 S.Ct. 836 (concluding that no meaningful retrospective competency determination could be made six years after trial). Because we doubt the accuracy of the retrospective competency determinations of Williams's habeas corpus experts, we conclude that the determinations are not especially probative of whether Williams actually was incompetent at the time of his trial.

7
8
9
10

*Williams v. Woodford*, 384 F.3d 567, 609–10 (9th Cir. 2004).  Here, however, petitioner's habeas experts Drs. Pierce and Benson both testified at trial and during the state post-conviction process, and Dr. Stewart reviewed these and other contemporaneous expert testimony and reports, as noted above.

11
12
13
14
15
16
17
18

Respondent's expert at the evidentiary hearing, Dr. Firestone, concluded that petitioner was not mentally impaired or psychotic during the commission of the crime and at his trial (*see* EH Ex. O at 7–8); that petitioner's statements about the crime were intelligible, generally consistent, and grounded in the record (*id.* at 4, 7–8; EHRT 224–30); and that any memory lapses by petitioner were due to simple anxiety and not mental impairment (*id.*).  However, Dr. Firestone's cursory and limited review of the fully developed trial and post-conviction record, which he suggests he merely highlighted in the Rule 26 report that served as his direct testimony, undermines both his credibility and the persuasiveness of his opinions and testimony.

19
20
21
22
23
24
25
26

Dr. Firestone did not provide any professional or scientific basis for his stated practice of reviewing and considering only portions of the available psychosocial record when, as here, he is evaluating a forensic case rather than a clinical case.  (*See* EHRT 144-220.)  Particularly, the court finds Dr. Firestone's belief that a forensic evaluation may properly focus only upon "the crime [a defendant] had in mind," without reviewing and considering all the available evidence impacting a defendant's state of mind, is contrary to self-acknowledged professional norms (see EHRT 178-18) and the weight of the noted professional opinion rendered in this case, and thus lacking in credibility.

27
28

During his evidentiary hearing testimony, Dr. Firestone agreed that:

1
2
3

> [I]n a criminal forensic setting, where you're trying to assess mental
> state at the time of the offense, whether in terms of insanity defense
> or some other mental state defense, you -- just like in testamentary
> capacity case, you're trying to get the most information you can
> about how that person was functioning at that time.

4   (EHRT 165-66.)  Yet in this case, Dr. Firestone ignored or discounted as irrelevant much of

5   petitioner's noted habeas proffered family, social and psychological history including multi-

6   generational mental health problems, petitioner's physical and emotional abuse and deprivation,

7   odd and self-destructive behavior, problems in school and performance well below grade, run-ins

8   with law enforcement, running away from home, and long term institutionalization; as well as his

9   neurological history and related testing prior to and at the time of trial – all the while appearing to

10  qualify his opinions based upon the purported absence of such information and material.  (*See*

11  EHRT 144-222.)

12          Inexplicably, Dr. Firestone did not review, much less respond to, Dr. Stewart's findings

13  based upon review of petitioner's fully developed psychosocial history, that petitioner was then

14  occasionally schizophrenic and psychotic.  Dr. Firestone's suggestion that, generally and in this

15  case, he can divine the relevance of psychosocial history information he has not reviewed and

16  considered and rely upon retaining counsel to identify what is relevant rather than reviewing all

17  available information himself, also seriously calls into question his credibility.  (*See* EHRT 165-

18  89.)  Especially so, given Dr. Firestone's testimony that "it's always good to have more rather

19  than less" and that "you never know completely whether it's relevant unless you review it."

20  (EHRT 173.)

21          Notably, Dr. Firestone's testimony that his Rule 26 report addressed only the "highlights"

22  of his evaluation of petitioner cannot readily be reconciled with respondent's stipulation to his

23  report as direct examination.  (EHRT 211, 214, 216.)  Ultimately, Dr. Firestone espoused a very

24  limited view of what information was relevant to "the important issue [of] whether or not

25  [petitioner] was able to cooperate with the attorney and whether he was able to understand the

26  proceedings."  (EHRT 236.)   As a result, Dr. Firestone's reaffirmation of that view upon his

27  colloquy with the court during the evidentiary hearing, wherein he suggested that petitioner's

28  death row diagnosis of schizophrenia was unrelated to petitioner's condition at an earlier point in

1    time (see EHRT 259-61) further serves to undermine his credibility in the court's estimation.  Dr.

2    Firestone's stated rationale for that conclusion, that he did not find petitioner to be "driven by

3    delusion in his behavior" at the time of the crime and trial (*id.*) is similarly uniformed by the fully

4    developed record and lacks persuasive weight.

5           Additionally, Dr. Firestone's review and consideration of only those portions of the

6    developed record that he felt were relevant to the issues of competency to stand trial and the

7    requisite mental state, runs contrary to his own stated approach to forensic cases.  (*See* EHRT

8    174, 184 [wherein Dr. Firestone testified that in conducting a criminal forensic evaluation, he

9    would typically review a social and psychiatric history].)  Like Dr. Missett, upon whose work he

10   relied (EHRT 245–52), Dr. Firestone focused only upon selected evidence drawn from the habeas

11   proffer including trial testimony, petitioner's pretrial interviews, San Quentin Prison mental

12   health reports in the years immediately following petitioner's capital conviction and sentencing,

13   and trial counsel Soria's 2007 deposition (EHRT 247–52).[17]

14          Oddly, Dr. Firestone deemed petitioner's family and mental health history to be irrelevant

15   (EHRT 150–52, 189–99), stating that he saw no direct relationship between clinical diagnosis and

16   treatment as versus criminal behavior and competency.  (EHRT 148–50, 157–61, 179–86, 193–

17   96, 208–30.)   As a result, Dr. Firestone did not fully consider the indicia of mental illness in

18   petitioner's immediate and extended family, notwithstanding Dr. Firestone's acceptance of the

19   proposition that a family history of mental illness places one at a greater risk of developing

20   mental illness.  (EHRT 220–22.)

21          Unsurprisingly, in his Rule 26 report Dr. Firestone did not even mention petitioner's low

22   APGAR score or breech birth and related symptoms of hypoxia.  (EHRT 197–98.)  Dr. Firestone

23   did not find relevant for purposes of his analysis evidence of petitioner's birth trauma and

24   resultant brain damage, exacerbated by abuse, deprivation, and low intellectual and adaptive

---

26   [17]  Dr. Missett opined in pertinent part that "[petitioner] suffered no significant cognitive
     interference with the clarity or rationality of his thinking, his orientation to time or place or
27   person or circumstances, his memory for immediate or recent or remote events, his ability to
     articulate such awareness and memories . . . his ability to answer questions . . . in a manner that
28   was generally responsive . . . [and] his ability to exercise judgment . . . ."  (EH Ex. 151 at 110.)

functioning.  (EHRT 194–96, 199–216.)  Dr. Firestone also did not address the proffered information from petitioner's family members regarding petitioner's apparent display of seizure symptoms:  petitioner's fluttering eyes, blank stare off into space, and disengagement from conversation.  (EHRT 205–20.)  If he did review social service reports noting petitioner's nervous twitches and rapid personality changes, Dr. Firestone simply did not find such matters at all relevant to the issues he had under consideration.  (*Id.*; *see also* EH Ex. O, Attach. A.)  Dr. Firestone made this relevancy determination notwithstanding his knowledge that damage to the frontal lobe of the brain can cause difficulty with abstract thinking and could trigger angry outbursts and impulsivity (EHRT 237–38), and that a normal mental status exam does not always rule out cognitive impairment from brain damage (EHRT 240).

Dr. Firestone also did not address any of the following evidence in the developed record before this court, evidence of petitioner's untreated mental and intellectual impairments, and functional impairments unremedied by special education classes:

- Evidence that as a child, petitioner engaged in self-destructive behavior. (EHRT 201–02.)

- Evidence that as a child, petitioner [redacted]. (EHRT 203–11; *see also* EH Ex.'s 58 [sealed], 61 [sealed], 63 [sealed], 70 [sealed].)

- Evidence that as a child, petitioner tested to a full-scale IQ of [redacted]. (EHRT 213; EH Ex. 70 at 3 [sealed].)

- Evidence that petitioner at age seventeen suggested he dissociated during his rape of Candeo Tresso.  (EHRT 216–17.)

- Evidence that during petitioner's [February 13, 1989] emergency room visit, he admitted suicidal thoughts and fear of getting angry and hurting people.  (EHRT 218–19.)

- Evidence that petitioner, while in jail awaiting trial on the capital charge sought mental health care and expressed his depression, fear and trouble sleeping to jail staff, and received medication for these complaints.  (EHRT 219–20.)

To the extent Dr. Firestone addressed petitioner's seemingly odd notes taken during jury *voir dire* at his trial, he did not find them to be evidence of reality distortion and detachment because, as he explained:

> [P]etitioner] was aware of his thoughts.  He was aware of his perceptions

1    of the jurors.  He shared his thoughts, even his inner thoughts, on paper as
     though he was writing a diary in between his observations of the jurors.
2    And I thought that that was further evidence that he was aware of the
     processes he was involved in.  Even noted that the case could lead to death.
3    And I think that those notes essentially support the fact that he had
     competence to stand trial.
4

5    (EHRT 232–35, 257.)  The court finds that Dr. Firestone simply failed to account for the evidence

6    of petitioner's organic brain injury, and transient seizure and psychotic symptoms.  Dr. Firestone

7    acknowledged that schizophrenia has exacerbations and remissions (EHRT 258), and that

8    suffering from schizophrenia could mean one is incompetent for trial (EHRT 260–61).  Yet Dr.

9    Firestone did not engage with petitioner's detailed psychosocial history relied upon by Dr.

10   Stewart when the latter opined that petitioner likely was in the beginning stages of schizophrenia

11   at the time of the crime and trial.  (EHRT 79–83.)  Dr. Firestone, in finding "no evidence that

12   [petitioner] was in an exacerbation at the time of the crime and . . . trial" (EHRT 258), simply

13   failed to account for the evidence of petitioner's organic brain injury, seizures and psychotic

14   symptoms as proffered in these federal habeas proceedings.

15        To the extent Dr. Firestone suggested that anxiety could be the cause of petitioner's

16   disturbed thought process (EHRT 224–25), the record reflects that Drs. Benson and Pierce did not

17   find petitioner to be suffering from anxiety when they evaluated him prior to trial.  Instead, these

18   experts found organic mental disorder manifested by organic personality syndrome with a

19   borderline personality, and partial complex temporal lobe seizure disorder with seizure-like

20   symptoms. (RT 3110–11, 3134–35, 3177, 3220–23.)  Also, Dr. Stewart, who reviewed the fully

21   developed record, expressly ruled out anxiety as a causal agent given the noted constellation of

22   organic, behavioral, and psychiatric problems from which petitioner suffered.  (EHRT 86–90; *see*

23   *also* EH Ex. 2 at 77–79.)   Dr. Firestone did not review, consider, or address Dr. Stewart's

24   finding.

25        Finally, the court finds Dr. Firestone's findings and conclusions suspect to the extent he

26   failed to apply the proper legal standard with respect to one's competency to stand trial.  Dr.

27   Firestone, who spends one-third of his time practicing law (*see* EHRT 136, 143-44), testified that

28   competency to stand trial presents "two main issues . . .  [o]ne is[,] was the person able to

cooperate with counsel in his defense [and] secondly, whether the person has a reasonable understanding of the process in which he is embarking on and can testify, if asked to testify, in his defense in an appropriate way." (EHRT 190.) But as noted, in fact "the standard for competence to stand trial is whether a defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Moran*, 509 U.S. at 396 (quoting *Dusky*, 362 U.S. at 402); *see also Drope*, 420 U.S. at 171 ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial"); *Bills v. Clark*, 628 F.3d 1092, 1098-99 (9th Cir. 2010); *McMurtrey v. Ryan*, 539 F.3d 1112, 1118 (9th Cir. 2008).

ii.   Petitioner's Irrational Conduct at Trial and with His Counsel

The court finds the developed record before it preponderates to a conclusion that during his trial petitioner in fact suffered from the effects of organic brain damage, mental and intellectual disabilities, and early schizophrenia and psychosis. The court also finds under the above noted legal standard and based upon a preponderance of evidence before it, that petitioner's mental and intellectual impairments and psychotic and seizure-like symptoms impeded his understanding of, and participation in his trial and in his own defense. *See Moran*, 509 U.S. at 396; *see also Miles*, 108 F.3d at 1112 ("Whether a defendant is capable of understanding the proceedings and assisting counsel is dependent upon evidence of the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on his competence."); *Amaya–Ruiz*, 121 F.3d at 489 ("[A]lthough no particular facts signal incompetence, suggestive evidence includes a defendant's demeanor before the trial court, previous irrational behavior, and available medical evaluations.").

The notes petitioner wrote during the *voir dire* strongly suggested he was at that time disturbed, delusional, and paranoid in his thinking to a level sufficient to impair his understanding of and participating in the trial. (*See e.g.*, EH Ex. 2 at 4.) For example, during jury selection petitioner wrote that:

[redacted].

63

1   (1SHCP Ex. 175; *see also* EH Ex. 74 [sealed].)

2       Dr. Pierce, in his Rule 26 report found petitioner's *voir dire* notes to be  evidence of his

3 intermittent altered states of consciousness during the trial that denied petitioner a sufficient

4 present ability to consult with his counsel and assist in his defense.  (EH Ex. 4 at 3.)  Dr. Benson

5 agreed, noting that in addition to organic brain and psychological disorders, petitioner was

6 distracted by his own internal reality content and process.  (EH Ex. 6 at 6–9.)  Dr. Benson

7 concluded that petitioner's mental and organic impairments would have left him altered, with

8 memory gaps and confusion with respect to reality during the time of the commission of the

9 crime and his trial, rendering him incompetent to stand trial and to testify and unable to assist his

10 trial counsel or to follow and understand the trial proceedings.  (EH Ex. 6 at 6–7.)

11       Defense habeas expert Dr. Kim agreed that petitioner's mental and organic impairments,

12 although unrecognized by petitioner, left him severely disabled in his ability to understand what

13 was happening at the time of his arrest and trial, and unable to assist his counsel in his defense.

14 (EH Ex. 7 at 20–22.)  Dr. Kim suggested that at best, given his impairments, petitioner would

15 have been only "minimally aware of the proceedings" at his trial.  (EH Ex. 7 at 26.)

16       Similarly, Dr. Stewart testified at the evidentiary hearing before this court that the notes

17 written by petitioner during *voir dire* and jury selection at his trial, suggested that he was

18 suffering from paranoia, delusion, and early psychosis with only mixed periods of lucidity.

19 (EHRT 79–83, 99–105; *see also* EH Ex. 2 at 2–3; 1SHCP Ex. 1 at 32–35 [Dr. Pettis's findings in

20 accord].)  Dr. Stewart concluded that petitioner's self-acknowledged inappropriate smiling was

21 further evidence that he was responding to internal stimuli during his trial.  (EHRT 80.)  The fact

22 petitioner persisted with his smiling even after trial counsel Soria told him to stop suggests that

23 his smiling was not motivated by courtroom tactics, but instead reflected his mental impairment.

24 (*See* 1SHCP Ex. 175 at 6.)

25       Trial counsel Soria knew petitioner suffered symptoms of organic and psychiatric

26 impairment (EHRT 280; *see also* 1SHCP Ex. 178 at 2–3; claim 12, *infra*), but believed that

27 petitioner must have been treated successfully for these impairments because Soria saw no

28 evidence of such problems and petitioner did not complain of them.  (EHRT 305–15.)   Attorney

1  Soria also acknowledged that [redacted].  (EHRT 279–80; *see also* EHRT 313–14; EH Ex. 77 at

2  42 [sealed].)  Still, Soria stated in his April 3, 1997 supplemental habeas declaration that

3  "although [petitioner] was not a person of high intelligence, he seemed to understand what was

4  happening and he was able to discuss the case . . . [and had] no difficulty communicating . . . both

5  in and out of court, and he was well controlled and responsive in the courtroom."  (*See* 1Inf.

6  Resp. Ex. A at 4.)

7      However, attorney Soria did not reasonably investigate whether or not petitioner was

8  competent to stand trial.  (*See* claim 12, *post.*)  Soria's opinion as to petitioner's trial competency

9  was unreliable, for the reasons explained below.

10     A defense attorney's opinion of their client's competence to stand trial has been found to

11 be "especially relevant."  *Williams*, 384 F.3d at 608 (citing *Medina*, 505 U.S. at 450); *see also*

12 *Hernandez v. Ylst,* 930 F.2d 714, 718 (9th Cir. 1990) (in a case involving the trial court's failure

13 to *sua sponte* raise competency, the fact that the defendant's attorney considered him competent

14 to stand trial constituted significant evidence of competency) (citing *United States v. Clark*, 617

15 F.2d 180, 186 (9th Cir. 1980)).  Moreover, retrospective determinations of incompetence are

16 disfavored, and courts give considerable weight to the lack of contemporaneous evidence of trial

17 incompetence.  *Williams*, 384 F.3d at 608.

18     Nonetheless, attorney Soria's view of petitioner's competence to stand trial is certainly not

19 controlling.  *Drope*, 420 U.S. at 177 n.13 (courts must resist the unquestioning acceptance of

20 counsel's representations concerning their client competence); *Miles*, 108 F.3d at 1113 (defense

21 counsel's opinion of a defendant's competence is not determinative); *id.* at 1112 (medical opinion

22 alone may be sufficient to raise a reasonable doubt about competence); *see also Maxwell v. Roe*,

23 606 F.3d 561, 574 (9th Cir. 2010) ("[A]though we acknowledge that "defense counsel will often

24 have the best-informed view of the defendant's ability to participate in his defense . . . we have

25 recognized that counsel is not a trained mental health professional and his failure to raise

26 petitioner's competence does not establish that petitioner was competent.").

27      Courtroom demeanor evidence such as alertness and apparent understanding alone is not

28 sufficient to establish a defendant's competence to stand trial and does not justify ignoring

1    uncontradicted evidence of a history of pronounced irrational behavior.  *See Robinson*, 383 U.S.

2    at 384–86 (mental alertness in courtroom colloquies is not a basis to ignore an uncontradicted

3    history of irrational behavior, in the context of a competency claim); *see also Odle*, 238 F.3d at

4    1088 (noting that a defendant's calm behavior in the courtroom is not necessarily inconsistent

5    with mental incompetence and observing that "counsel is not a trained mental health professional,

6    and his failure to raise petitioner's competence does not establish that petitioner was competent");

7    *de Kaplany*, 540 F.2d at 979 ("An orientation as to time and place with some recollection of

8    events is not enough" to establish a defendant's competence.).

9    Such circumspection is particularly appropriate here, given that attorney Soria's

10    assessment of petitioner's competence was based upon a wholly inadequate investigation and a

11    complete failure to follow his own self-stated standards for assessing a client's competence to

12    stand trial.  (*See* claims 12–14, *infra*.)  The persuasive weight of the evidence before this court

13    establishes that petitioner's mental impairments and occasional psychosis and seizure symptoms

14    would not have been readily apparent to attorney Soria.  Drs. Benson and  Stewart agreed that

15    petitioner might have appeared essentially normal during his periods of mental impairment and

16    altered consciousness.   (EH Ex. 6 at 9 and EHRT 105–07, respectively.)  For example, Dr.

17    Guisado found petitioner to be articulate and engaging and normal emotionally during his pretrial

18    examination.  (1SHCP Ex. 128 at 2.)

19    Moreover, attorney Soria was well aware that petitioner's IQ testing was borderline; that

20    at age twenty-one petitioner tested to a verbal score of 72, a performance score of 77, and a full-

21    scale score of 73.  (EHRT 314; *see also* 1SHCP Ex. 118 at 2.)  Soria believed that any IQ score

22    above 70 meant that petitioner was not intellectually disabled.  (EHRT 314–15.)  But as noted, an

23    IQ of 70 is the upper limit for significant subaverage intellectual functioning plus or minus a

24    testing error of five points.  *See Money v. Krall,* 128 Cal. App. 3d 378, 400–01 (1982).

25    Petitioner's full-scale IQ score of 73 was well within the margin of error.  Furthermore, the fact

26    petitioner's IQ testing resulted in occasional full-scale scores in the 80's is not conclusive of

27    competence.  As noted,  it is recognized that such scores can inflate where, as in petitioner's case,

28    such testing is repeated.  (EH Ex. 8 at 37–39; *see also* 2Inf. Resp. at 24–25 [wherein respondent

1   fails to address the Flynn effect].)  In this regard, Dr. Derning opined that petitioner's first full-

2   scale IQ test which resulted in a score of 72 and his last full-scale IQ test which resulted in a

3   score of 73 – again, well within the margin of error – were the most significant of his many IQ

4   test scores.  (EH Ex. 8 at 39.)

5         Attorney Soria also testified that his view of petitioner's competence for trial was

6   informed by the fact his selected trial experts refused to opine that petitioner was incompetent for

7   trial.  (EHRT 280–81, 300; EH Ex. Q at 28–29.)  But Soria admitted at the evidentiary hearing

8   before this court that soon after petitioner's trial commenced, both Drs. Pierce and Benson

9   informed him "you should move for incompetence[.]"  (EHRT 280.)  Relatedly, petitioner told

10   Dr. Pierce that [redacted].  (EH Ex. 44 at 1 [sealed].)

11         g.      Conclusions

12         Petitioner has demonstrated under the controlling legal standards and by a preponderance

13   of the above noted evidence that at the time of the capital crime and his trial, he occasionally was

14   in an altered mental state, unable to control his actions, form specific intent, understand, and

15   waive rights, and make rational decisions in the courtroom proceeding – such that he was

16   incompetent to stand trial notwithstanding periods of lucidity.  Particularly, the court's

17   conclusions are supported by the following findings.

18         i.      Petitioner's Psychosocial History

19         Petitioner has presented credible, consistent, and persuasive evidence of his chronic

20   psychotic disorder, schizophrenia, seizure disorder, and epilepsy, relating to hypoxic brain injury

21   at birth; his dysfunctional home life including physical and emotion abuse, poverty and

22   deprivation, and repeated institutionalization to which his parents ultimately abandoned him; his

23   youthful developmental and behavioral deficiencies, borderline intellect, and learning disabilities,

24   which provided a path to special education classes, juvenile crime, academic underperformance,

25   running away from home, and repeated institutionalization including locked facilities starting at

26   age 13; his youthful symptoms of delusion, psychosis, and temporal lobe seizure syndrome

27   including manifestations of problems communicating and socializing, and functional deficits and

28   odd behaviors; and his visit to a Denver area emergency room just months before the capital

67

1    crime, seeking counseling for hopelessness and suicidal feelings and his fears that he might harm

2    others.

3                    ii.    Petitioner's Functional Deficiencies

4       Petitioner has presented credible, consistent, and persuasive evidence that he displayed

5    symptoms of transient dissociation, seizure activity, and psychosis during and after the crime.  He

6    was unable to state with any consistency why he forcibly entered Ms. Axtell's home, what he

7    intended to do there, what he did there, and why he rang the doorbell upon returning to the home

8    after the crime.  He expressed uncertainty whether the crime really happened or was a dream, and

9    whether he was a participant in the crime or merely a detached observer.  His voir dire notes, and

10   his affect during trial, were odd.   While in jail on the capital charges, he displayed stress,

11   paranoia, obsessive conduct, and depression that was medicated with anti-depression medication.

12   His odd notes taken during voir dire and some of his comments to his counsel during trial

13   suggested occasional aberrant thinking not entirely grounded in fact and reality.   His trial

14   testimony, at times coherent and grounded in the factual record, displayed occasional confusion,

15   lack of understanding of events relating to the capital crime and why the crime occurred, and

16   memory lapses and detachment from his actions as to the crime and its aftermath.

17                   iii.    Findings and Opinions of Mental Health Experts

18      Petitioner has presented credible, consistent, and persuasive evidence proffered by his trial

19   and post-conviction mental health and brain imagery experts of his organic mental disorder and

20   abnormal brain; his organic personality syndrome with a borderline personality; his early chronic

21   psychosis and schizophrenia; his PTSD; his partial complex temporal lobe seizure disorder; his

22   potential intellectually disability; his manifestations of the foregoing including blanking out and

23   occasional confused, dreamy or "fugue" state; his tendency to confabulate; his difficulty

24   processing auditory information; and his difficulty communicating, understanding, remembering,

25   thinking, and controlling impulsiveness.

26      Respondent has presented some evidence proffered by his habeas mental health experts

27   that at the time of the capital crime and trial petitioner was oriented, able consistently to recollect

28   and recite facts and understand and rationally respond to courtroom proceedings and assist

                                      68

1    counsel.  However, respondent's experts failed to engage and address the fully developed record.

2    Respondent's proffer lacks relative persuasive weight.

3         In sum, the court finds petitioners' noted proffer persuasive and to preponderate in favor

4    of a finding that he would not have been able rationally to understand trial proceedings and assist

5    in his defense.  This is particularly so as to that portion of the proffer that petitioner's psychotic

6    symptoms were not present at all times, but rather were intermittent with periods of remission and

7    exacerbation – that  petitioner could have appeared normal, though in fact he was incompetent to

8    stand trial.

9         Accordingly, petitioner will be granted federal habeas relief as to his claim 11.

10   B.    Petitioner's Claim 12 – Ineffective Assistance at the Guilt Phase by Failure to Present a
          Defense of Incompetence to Stand Trial

11

12        Petitioner claims that his trial counsel was ineffective by failing to investigate, develop

13   and present an incompetency defense, thereby violating his rights under the Sixth and Fourteenth

14   Amendments.  (Doc. No. 29 at 72–76; *see also* Doc. No. 96 at 151.)

15        1.    Legal Standards

16             a.    Competency to Stand Trial

17        The governing legal standards for trial competency have been fully set forth in section

18   A.1. of this order, above, and will not be repeated here.

19             b.    Ineffective Assistance of Counsel

20        "The Sixth Amendment right to counsel in a criminal trial includes 'the right to the

21   effective assistance of counsel.'"  *Summerlin v. Schriro*, 427 F.3d 623,  629 (9th Cir. 2005) (*en

22   banc*) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  The Sixth Amendment

23   right to effective assistance of counsel, applicable to the states through the Due Process Clause of

24   the Fourteenth Amendment, applies through the sentencing phase of a trial.  *See Murray*, 745

25   F.3d at 1010–11 (citing U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1, *Gideon v.

26   Wainwright*, 372 U.S. 335, 343–45 (1963), and *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir.

27   2002)).

28        The Sixth Amendment standard for analyzing an ineffective assistance of counsel claim is

1    well established.  In order to prevail on such a claim, a petitioner must show that his trial

2    counsel's performance "fell below an objective standard of reasonableness" and that "there is a

3    reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

4    would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984); *see*

5    *also Carter v. Davis*, 946 F.3d 489, 502–03 (9th Cir. 2019) (under *Strickland*, a petitioner must

6    show counsel's deficient performance under prevailing professional norms and resulting

7    prejudice).

8                          i.       Deficient Performance

9            Under the first prong of the *Strickland* test, a petitioner must show that counsel's conduct

10   failed to meet an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687; *Wiggins v.*

11   *Smith*, 539 U.S. 510, 521 (2003).  There is "a 'strong presumption' that counsel's representation

12   was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104

13   (quoting *Strickland*, 466 U.S. at 689); *see also Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir.

14   1994).  A petitioner must rebut this presumption by demonstrating that his counsel's performance

15   was unreasonable under prevailing professional norms and was not the product of sound trial

16   strategy.  *Strickland*, 466 U.S. at 688-89; *see also United States v. Quintero-Barraza*, 78 F.3d

17   1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential, and

18   thus the court must evaluate counsel's conduct from his perspective at the time it occurred,

19   without the benefit of hindsight.  *Strickland*, 466 U.S. at 689; *see also Cullen v. Pinholster*, 563

20   U.S. 170, 196 (2011) ( The court is to "affirmatively entertain the range of possible reasons

21   counsel may have had for proceeding as they did.").

22           The Supreme Court has "declined to articulate specific guidelines for appropriate attorney

23   conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains

24   simply reasonableness under prevailing professional norms.'" *Wiggins*, 539 U.S. at 521 (quoting

25   *Strickland*, 466 U.S. at 688).  However, "general principles have emerged regarding the duties of

26   criminal defense attorneys that inform [a court's] view as to the 'objective standard of

27   reasonableness' by which [a court must] assess attorney performance, particularly with respect to

28   the duty to investigate." *Summerlin*, 427 F.3d at 629.  For instance, "strategic choices made after

                                                    70

1   thorough investigation of [the relevant] law and facts relevant to plausible options are virtually

2   unchallengeable." *Strickland*, 466 U.S. at 690.  However, the Supreme Court has explained,

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances.

*Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690-91); *see also Sanders*, 21 F.3d at 1457.

Similarly, a decision not to present a particular defense or not to offer particular mitigating evidence is unreasonable unless counsel has explored the issue sufficiently to discover the facts that might be relevant to making an informed decision.  *Wiggins*, 539 U.S. at 522-23; *see also Thomas v. Chappell*, 678 F.3d 1086, 1104 (9th Cir. 2012) (defense counsel's decision not to call a witness can only be considered tactical if counsel had "sufficient information with which to make an informed decision"); *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) ("An uninformed strategy is not a reasoned strategy.  It is, in fact, no strategy at all."); *Reynoso v. Giurbino*, 462 F.3d 1099, 1112–15 (9th Cir. 2006) (counsel's failure to cross-examine a witnesses cannot be considered strategic where counsel did not investigate possible areas of impeachment); *Stankewitz v. Woodford*, 365 F.3d 706, 719 (9th Cir. 2004) ("[T]here is no record evidence that [counsel] ever hired an investigator or interviewed Stankewitz's teachers, foster parents, psychiatrists, psychologists or anyone else who may have examined or spent significant time with him during his childhood and youth."); *Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of presenting an alibi defense and rejecting a mental health defense was not a reasonable strategy where counsel failed to investigate the possible mental defenses).

"[P]retrial investigation and preparation are the keys to effective representation of counsel."  *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983); *see also Ross v. Davis*, 29 F.4th 1028, 1053 (9th Cir. 2022) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.") (quoting

71

1    *Strickland*, 466 U.S. at 691); *Daniels v. Woodford*, 428 F.3d 1181, 1203 (9th Cir. 2005) ("We

2    have found counsel 'ineffective where he neither conducted a reasonable investigation nor made a

3    showing of strategic reasons for failing to do so.'") (quoting *Hendricks v. Vasquez*, 974 F.2d

4    1099, 1109 (9th Cir. 1992)).  This duty on the part of defense counsel to investigate begins prior

5    to trial.  It is well-recognized that competent strategy decisions cannot be made regarding

6    presentation of guilt phase or penalty phase evidence without a foundation of knowledge based

7    upon a thorough defense investigation that was completed long before jury selection begins.

8    *Williams*, 529 U.S. at 395 (holding that the petitioner received ineffective assistance in

9    connection with the penalty phase of his trial and noting the record established "that counsel did

10   not begin to prepare for that phase of the proceeding until a week before the trial"); *Earp v.

11   Ornoski*, 431 F.3d 1158, 1175 (9th Cir. 2005) ("The Supreme Court has conveyed a clear, and

12   repeated, message about counsel's sacrosanct duty to conduct a full and complete mitigation

13   investigation before making tactical decisions . . . [.]").

14          A failure by counsel to seek a competency hearing is deficient under the *Strickland*

15   standard, when there are "sufficient indicia of incompetence to give objectively reasonable

16   counsel reason to doubt the defendant's competency."  *Hibbler v. Benedetti*, 693 F.3d 1140,

17   1149–50 (9th Cir. 2012) (quoting *Stanley v. Cullen*, 633 F.3d 852, 862 (9th Cir. 2011)); *see also

18   Dixon v. Ryan*, 932 F.3d 789, 802 (9th Cir. 2019); *Weaver v. Chappell*, No. 1:02-cv-05583-AWI-

19   SAB, 2021 WL 4264070, at *149 (E.D. Cal. Sept. 20, 2021) (citing American Bar Association

20   Standards for Criminal Justice,  Mental Health, §§ 4-3.6 and commentary, 7-4.2

21   ("Defense counsel should move for an evaluation of the defendant's competence to stand trial

22   whenever the defense counsel has a good faith doubt as to the defendant's competence").

23                          ii.     Prejudice

24          Even where counsel's performance is found to be deficient, in order to prevail on such a

25   claim a petitioner is required to show that counsel's conduct prejudiced him.  *Strickland*, 466 U.S.

26   at 691-92.  To establish prejudice, a petitioner must demonstrate that there is "a reasonable

27   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

28   been different."  *Id.* at 694.  A reasonable probability is one "sufficient to undermine confidence

in the outcome" but is "less than the preponderance more-likely-than-not standard." *Summerlin*, 427 F.3d at 640, 643 (quoting *Strickland*, 466 U.S. at 693-94). Nonetheless, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. Prejudice is established if "there is a reasonable probability that at least one juror" would have found the defendant not guilty. *Wiggins*, 539 U.S. at 537; *see also Clark*, 769 F.3d at 728 (In making this assessment, the court "compare[s] the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently.") (quoting *Murtishaw v. Woodford*, 255 F.3d 926, 940 (9th Cir. 2001)); *accord Hernandez v. Chappell*, 923 F.3d 544, 551 (9th Cir. 2019).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner because of the alleged deficiencies. *Strickland*, 466 U.S. at 697. Since the petitioner must affirmatively prove prejudice, any claim of deficient performance on the part of counsel that does not result in prejudice must necessarily fail.

A failure by counsel to seek a competency hearing is prejudicial under the *Strickland* standard, when there is "a reasonable probability that the defendant would have been found incompetent." *Hibbler*, 693 F.3d at 1149–50; *see also Dixon*, 932 F.3d at 802.

2.      State Court Direct and Collateral Review

The California Supreme Court considered the petitioner's claim 12 allegations as raised in his first state habeas petition, and summarily denied relief thereon on the merits without explanation or issuance of an order to show cause. (Order, *In re Holt (John Lee) on H.C.,* Case No. S057078 (Cal. Oct. 22, 1997), Lod. Doc. No. 31.)

3.      Analysis

Petitioner argues that his trial counsel was clearly ineffective by failing to investigate, develop and present a defense based upon his incompetence to stand trial.

Under California law:

If counsel informs the court that he believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall

73

be held in the superior court.

Penal Code § 1368(b).  In addition, under California law:

> A trial by court or jury of the question of mental competence shall proceed in the following order:
>
> (a) The court shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant … If it is suspected the defendant is developmentally disabled, the court shall appoint the director of the regional center [for the developmentally disabled] … or the designee of the director, to examine the defendant ….
>
> (b)(1) The counsel for the defendant shall offer evidence in support of the allegation of mental incompetence.
>
> (2) If the defense declines to offer any evidence in support of the allegation of mental incompetence, the prosecution may do so.
>
> (c) The prosecution shall present its case regarding the issue of defendant's present mental competence.
>
> (d) Each party may offer rebutting testimony, unless the court, for good reason in furtherance of justice, also permits other evidence in support of the original contention.
>
> (e) When the evidence is concluded, unless the case is submitted without final argument, the prosecution shall make its final argument and the defense shall conclude with its final argument to the court or jury.
>
> (f) In a jury trial, the court shall charge the jury, instructing them on all matters of law necessary for the rendering of a verdict. It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent. The verdict of the jury shall be unanimous.

Penal Code § 1369.

a.   <u>Deficient Performance</u>

Trial counsel Soria had a duty to "prompt[ly] investigat[e] … the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction . . . .  1 ABA Standards for Criminal Justice 4–4.1 (2d ed. 1982 Supp.)."  *Rompilla v. Beard*, 545 U.S. 374, 387 (2005).  Counsel's failure to seek a competency hearing violates a  defendant's right to effective assistance of counsel when "there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and there is a reasonable probability that the defendant would have been found

74

incompetent to stand trial had the issue been raised and fully considered."  *Stanley*, 633 F.3d at 862 (citing *Jermyn v. Horn,* 266 F.3d 257, 283 (3d Cir.2001) *see also Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003) ("[T]rial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired."); *United States v. Quintero*, 995 F.3d 1044, 1059 (9th Cir. 2021) (citing Stanley, 633 F.3d at 862) (acknowledging the same and noting that "[a] failure to raise competency with the court may deprive a defendant of effective assistance of counsel").  Courts, in addressing indicia of incompetence and mental impairment, have considered evidence of a defendant's organic brain damage, intellectual impairment, and/or functional deficiency.  *See Bean v. Calderon*, 163 F.3d 1073, 1078-79 (9th Cir. 1998)).

As noted above, it is also the case that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.  "[A] lawyer may make reasonable decisions that render particular investigations unnecessary."  *Babbit v. Calderon*, 151 F.3d 1170, 1173–74 (9th Cir. 1998).

In determining whether a petitioner's counsel made reasonable tactical decisions about certain evidence, however, a court focuses on whether the investigation supporting counsel's decision to introduce or omit certain evidence was itself reasonable.  *Wiggins*, 539 U.S. at 523; *see also Williams*, 529 U.S. at 395; *Earp*, 431 F.3d at 1175; *Daniels*, 428 F.3d at 1203; *Soffar v. Dretke,* 368 F.3d 441, 473 (9th Cir. 2004) ("The scope of a defense counsel's pretrial investigation necessarily follows from the decision as to what the theory of defense will be."); *Stankewitz*, 365 F.3d at 719; *Jennings*, 290 F.3d at 1016; *Tucker*, 716 F.2d at 581.

The question here under *Strickland* then is whether, on the facts and circumstances known to petitioner's trial counsel, the decision not to further investigate, develop and present a defense at trial based upon petitioner's incompetency was objectively reasonable.

    i. <u>Trial Counsel Unreasonably Failed to Investigate and Develop a Defense Based Upon Petitioner's Incompetence to Stand Trial</u>

The court finds that trial counsel Soria lacked any reasonable strategic basis for curtailing the investigation and development of the widespread indicia of petitioner's incompetence to stand

1    trial that has been cataloged above.  As petitioner's lead trial counsel, Soria made all final

2    decisions for the defense.  (1SHCP Ex.'s 30, 31.)  Soria was responsible for presentation of guilt

3    phase defenses other than aspects of medical misadventure (discussed *infra*) which were handled

4    by second counsel Peterson. [18]  (1SHCP Ex. 178 at 21, 29.)

5          Prior to trial, the defense team began what turned out to be a limited investigation into

6    petitioner's psychosocial history.  The team reviewed petitioner's Colorado criminal and

7    institutional records and his birth records from Tennessee.  (EHRT 294; 1Inf. Resp. Ex. A at 2–3.)

8    They also reviewed discovery received from the Kern County District Attorney's office including

9    records of petitioner's detention, arrest, and confession to detective Boggs (*id.*), as well as

10   statements made to the police by petitioner, petitioner's sales partner Beardon, and the victim's

11   son Glen Copeland.  (*See* EH Ex. H, I.)

12         Trial counsel Soria conceded at the evidentiary hearing that his investigation did not

13   include family members other than petitioner's immediate family.  (EHRT 293-94.)  Defense

14   investigator Binns traveled to Colorado at least three times, once with defense expert Dr. Pierce,

15   to interview witnesses including petitioner's immediate family.  (1SHCP Ex. 178 at 6, 35; *see*

16   *also* 1Inf. Resp. Ex. A at 1, 3; EHRT 293–95.)  Notably, petitioner's parents refused to be

17   interviewed.  (*Id.*)  Dr. Pierce was able to speak with petitioner's brother, Alex Holt, about the

18   family including [redacted].  (*See* EH Ex. 46 at 37-38 [sealed]; EH Ex. 55 at 1 [sealed].)  Dr.

19   Pierce also [redacted].  (EH Ex. 55 at 1 [sealed].)  However, the defense team conducted no

20   research or investigation with respect to petitioner's extended family.  (RT 293–94.)

21          Attorney Soria testified at the evidentiary hearing in this proceeding that he retained and

22   consulted with the trial experts regarding petitioner's "mental situation," and to "review [his]

23   mental state one way or another[.]"  (EHRT 296.)  Even so, Soria believed that the prosecution's

24   case was "overwhelming," and that "a guilty verdict was probably inevitable," which in turn

25   drove his trial strategy of having petitioner take the stand to deny the rape, in the hope of having

26   ─────────────────────
[18]  The parties in this federal habeas proceeding have stipulated that petitioner's second counsel,
George Peterson, would not testify at the evidentiary hearing before this court and that his June
27   19, 1995 declaration (i.e., 1SHCP Ex. 30) would be admitted into evidence in lieu of live
28   testimony (*see* Doc. No. 270; Doc. No. 295 at 10).

1    "a shot in the penalty phase." (EHRT 281.)  Notably, attorney Soria was even uncertain whether

2    he passed all the psychosocial discovery materials the defense had received along to the defense

3    experts.  (1SHCP Ex. 178 at 2; EHRT 324–25; *see also* RT 3144–46, 3200–01.)

4           Given the noted considerable indicia of petitioner's incompetence raised by the defense

5    team investigation and experts, Soria's decision to curtail further investigation and development

6    of mental state evidence and forego an incompetency defense was not informed by a reasonable

7    investigation and was itself unreasonable.   The breakneck pace of this capital prosecution

8    suggests as much - petitioner was convicted, sentenced, and on death row a mere 11 months after

9    his assault upon and killing of Ms. Axtell.  (*See* Doc. No. 308 at 64, 108.)

10          Soria dismissed indications of trial incompetence apparent in petitioner's psychosocial

11   history as well as the advice of his own defense experts in favor of his perception that petitioner

12   appeared to understand what was happening and was able to discuss the case with him without

13   difficulty and was able to conduct himself appropriately in court.  (1Inf. Resp. Ex. A at 4–5.)  As

14   discussed more fully below, the evidence then known to Soria reasonably raised a doubt as to

15   whether petitioner was competent to stand trial and at the least would have led a reasonable

16   attorney to investigate further that avenue of defense.  *See Wiggins*, 539 U.S. at 527.

17          Attorney Soria knew from his own experience that petitioner was mentally slow and

18   behaved quite oddly while in court and elsewhere.  (EHRT 279–80; *see also* 1Inf. Resp. Ex. A at

19   4; 1SHCP Ex. 175.)  Specifically, Soria either knew or should have known that petitioner then

20   presented developable indicia of incompetence including: [redacted].[19]  (*See* EHRT 280–81, 304–

21   21; 1SHCP Ex.'s 62, 63, 74, 75, 89, 97,

22   102, 104, 108, 118, 120; *see also* EH Ex.'s 46 [sealed], 69 [sealed], 70 [sealed].)[20]  Significantly,

23   Soria knew or should have known that petitioner would not have himself been aware of his

24   impairments and limitations, or that he would  attempt to conceal them.  (*Id.*)

25   _____

26   [19]  Attorney Soria conceded that he did not even read all of these records produced by the
     prosecution in discovery, but merely skimmed some of them.  (EHRT 312, 316.)

27   [20]  The parties stipulated to expanding the record in these proceedings with the transcript of
     attorney Soria's October 5, 2007 deposition, but not as a substitute for direct examination of Soria

28   by either party.  (*See* Doc. No. 284 at 2–3; Doc. No. 295 at 10.)

1   Attorney Soria has attempted to explain his belief that the then existing psychological and

2   neurological evidence did not give rise to an adequate mental defense.  (*See* 1SHCP Ex. 178 at 2–

3   3.)  Soria points to the alleged unwillingness of defense trial experts Drs. Pierce and Benson to

4   opine that petitioner was incompetent to stand trial.   (1Inf. Resp. Ex. A at 7.)  Soria has

5   complained that these experts did not provide him with a legal theory of defense.  (1SHCP Ex. 31

6   at 2–3.)  Soria testified at his 2007 deposition that:

7   
> I asked my experts point blank could they say John was incompetent or was he
> insane.  They could say no.  So I couldn't raise either one of those so I thought it

8   
> was better to hold it back to the penalty phase.  It was just the decision I made . . .
> That's what caused us to bring in the psychologist, psychiatrist and then that led us

9   
> to the other experts to explain what was going on in his brain.  I asked them point
> blank could they say he was incompetent or was he insane.  They couldn't say yes

10  
> to either so I didn't feel I could use -- hold back and use it for the penalty.

11  (EH Ex. Q at 28–29; *see also* EHRT 75–76, 280–81; 1Inf. Resp. Ex. A at 7.)  But as noted above,

12  Drs. Pierce and Benson, in fact, expressly told attorney Soria at the time of petitioner's trial that

13  "you should move for incompetence."  (EHRT 280; *see also* 1SHCP Ex. 178 at 2–3.)  Moreover,

14  Soria's stated belief that he could not raise a doubt as to petitioner's competence unless his

15  retained experts specifically opined incompetence does not find support in the state law, and

16  alone suggests deficient performance on his part.  This is especially so since attorney Soria knew

17  even before the trial commenced that the results of testing conducted by his penalty phase expert,

18  neurologist Dr. Guisado, showed that petitioner suffered from brain abnormalities.  (1Inf. Resp.

19  Ex. A at 4.)

20   Defense co-counsel Peterson confirmed in his 1995 habeas declaration that during the

21  defense trial preparations, attorney Soria was well aware of the evidence that petitioner suffered

22  organic brain damage likely caused by anoxia at his breech-birth, and that Soria simply made the

23  decision to present that evidence only at the penalty phase of petitioner's trial.  (1SHCP Ex. 30 at

24  1–2.)  Soria confirmed as much in his 1995 habeas declaration.  (1SHCP Ex. 31 at 1.)  Indeed,

25  Soria testified that he based this decision simply on his own personal inability to understand

26  where and how petitioner could have suffered brain damage, ignoring the opinion of his experts

27  that petitioner's brain damage likely occurred at the time of his birth.  (EHRT 309–11; *see also*

28  RT 3228–29),

78

1   Significantly, in this case attorney Soria ignored his own standard for assessing the

2   competence of clients.  Soria testified that key to his consideration of a client's trial incompetency

3   was whether that client  "has been in special [ed]ucation as that would suggest mentally

4   disability" (EHRT 299–300), and whether the client has emotional symptoms such as auditory

5   and visual hallucinations (*id.*).  In fact, Soria testified that he would always request a competency

6   hearing where his client had been in special education "because they are mentally disabled."

7   (EHRT 299; *see also id.* at 305–16; EH Ex. 77 at 32–34 [sealed]; 1SHCP Ex.'s 74, 102.)

8   Nonetheless, Soria inexplicably did not do so here, even though petitioner had spent years

9   in special education through age nineteen at which point "[he] continue[d] to have multiple

10  difficulties in even the most structured of school environments [and had been] working with both

11  audiologists and learning disability specialists, with little signs of improvement."  (1SHCP Ex.

12  108 at 1; *see also* EHRT 280, 305–19; 1SHCP Ex. 5 at 3; RT 2778–79.)  Incredibly, attorney

13  Soria testified he was unaware that petitioner's history of individualized education planning

14  reflected placement in special rather than general education.  (EHRT 308–09; *see also* 1SHCP

15  Ex. 5 at 5–7.)  This inexcusable lack of awareness of information Soria himself believed critical

16  to deciding whether to request a competency hearing may well have been a result of his practice

17  of merely "skimming" records rather than actually reading them.  (EHRT 308.)

18  Soria knew or should have known that petitioner's institutional records  reflected a long

19  history of his auditory and visual hallucinations starting at age eleven.  (*See* 1SHCP Ex. 63 at 1;

20  1SHCP Ex. 97 at 1; RT 2744, 2772.)  Still, Soria did not raise a doubt as to petitioner's

21  competency to stand trial with the trial court.  Given the noted developed record, attorney Soria

22  could not have reasonably believed that petitioner's mental health impairments and deficiencies

23  and manifestations thereof must have resolved by the time of trial merely because petitioner did

24  not report such problems to Soria.  (See EHRT 307-08.)  Here again, the record suggests that

25  Soria simply failed to obtain and completely review and consider petitioner's institutional records

26  including those produced to the defense in discovery.  (EHRT 312, 316.)  For example, Soria

27  admitted during his evidentiary hearing testimony that he did not obtain records from the Kern

28  County jail where petitioner was incarcerated while awaiting trial, and thus was completely

1    unaware that petitioner then was receiving medication.  (EHRT 297-98.)

2         Soria testified at the evidentiary hearing before this court that petitioner's IQ score of

3    "70", and "full-scale IQ score of 73"suggested to him that petitioner was competent, albeit

4    "barely" so, because Soria believed a score of "70" was the disability and competency

5    benchmark.  (EHRT 280, 314–15; *see also* EH Ex. 77 at 29 [sealed]); 1SHCP Ex. 118.)

6    However, as discussed in detail above, even a score of 73 is within the margin of error for

7    borderline intellectual disability.  *See Krall,* 128 Cal. App. 3d at 400–01 (discussing an IQ of 65–

8    75 as the range of mild retardation in the context of civil commitment).

9         Soria also testified in these habeas proceedings that he was reluctant to credit petitioner's

10   psychiatric complaints during his voluntary emergency room visit in Denver in the months prior

11   to the commission of the capital crime because Soria either did not read the emergency room

12   record at all, or because he inferred from the report that no mental health professional attended to

13   petitioner during that emergency room visit, rendering the report irrelevant in his mind.  (EHRT

14   315–16.)  However, the court observes that petitioner's evidentiary hearing expert, Dr. Stewart,

15   credited those same emergency room visit records and found them to support his conclusions that

16   petitioner suffered from a mental impairment greater than mere antisocial personality disorder at

17   the time of the offense and his trial.  (EHRT 29, 98 citing EH Ex. J at 6; EH Ex. 2 at 74–75.)

18              ii.    Trial Counsel Presented an Unreasonable Guilt Phase Defense

19        Attorney Soria's decision to present guilt phase defenses of medical misadventure and

20   insufficiency of evidence of robbery and rape was not reasonably informed by then available

21   evidence of petitioner's mental impairments and intellectual deficiencies, and could not be

22   justified as a tactical decision, for the reasons already stated and those that follow.  *Wiggins*, 539

23   U.S. at 522; *see also Williams*, 529 U.S. at 396.

24        First, the noted developed and developable evidence of petitioner's incompetence at the

25   time of his trial was sufficient to raise a significant doubt whether petitioner was capable of

26   rationally and factually understanding the trial and assisting in his defense.  *See Hibbler*, 693 F.3d

27   at 1149–50; *Maxwell*, 606 F.3d at 568 (citing *Drope*, 420 U.S. at 180) ("[E]vidence of a

28   defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on

competence to stand trial are all relevant in determining whether further inquiry is required," and "one of these factors standing alone may, in some circumstances, be sufficient."); *Amaya–Ruiz*, 121 F.3d at 489; *see also* Penal Code § 1369.  This evidence strongly suggested that:

- Petitioner had a multi-generational history of epilepsy, depression, abuse, and seizure-type symptoms.

- Petitioner incurred anoxic brain damage at birth and suffered from organic personality syndrome, partial seizure disorder, disturbances of consciousness, impaired auditory processing, and deficits in judgment, cognition, planning, memory, and impulse control.

- Petitioner intermittently lost touch with reality.

- Petitioner had borderline intellectual ability and problems with behavior, perception, memory, and communication as a result of which he spent much of his academic career in special education classes and therapy.

- Petitioner was likely to deny and hide his mental impairments and limitations.

- Soria knew from his own interaction with petitioner that he was mentally slow and had a difficult time understanding things and displayed odd behavior in court and elsewhere.

- Petitioner presented psychological issues while detained in jail awaiting his trial and was administered anti-depressant medication.

Attorney Soria reasonably could not have determined to forego further investigation and presentation of a competency defense on the grounds that Drs. Benson and Pierce, based upon the information then available to them, would not opine that petitioner was incompetent or insane.[21] *(See* 1Inf. Resp. Ex. A at 4; EHRT 82–83, 105–10); *see also de Kaplany*, 540 F.2d at 983–85 (even a sane defendant may nonetheless be incompetent to stand trial); *Taylor v. Davis*, 164 F. Supp. 3d 1147, 1155–56 (N.D. Cal. 2016) (in the context of claimed trial court (due process) error for failure to hold a competency hearing, a *bona fide* doubt as to competency was found where the defendant had history of suffering from paranoid schizophrenia, was likely brain damaged, had a borderline personality disorder and potential transient psychosis, and exhibited behavior at trial that called into question his ability to communicate with his counsel).

---

[21] The test for insanity stated in *M'Naghten's Case*, 10 Clark & F. 199, 203, 210 (1843) considers mental capacity at the time of the crime to understand its nature and know that it is wrong.  *See Davis v. United States*, 160 U.S. 469, 480 (1895), superseded by statute as stated in *Dixon v. United States*, 548 U.S. 1, (2006); Penal Code § 25.

1    Attorney Soria's lament that his trial experts would not provide him with [redacted]  (*see*

2    1SHCP Ex. 31 at 2–3; EHRT 302; EH Ex. 77 at 28–29 [sealed]), and his unsupported belief that a

3    Kern County jury likely would have rejected a mental state defense (EHRT 303–04), serve only

4    to emphasize his unreasonable failure to pursue the known and then developable evidence of

5    petitioner's incompetence.  Soria reasonably could not discount petitioner's reported brain

6    damage based solely upon Soria's stated inability to understand how such brain damage could

7    have been caused.  (EHRT 310–11.)  Nor could Soria reasonably discount petitioner's reported

8    intermittent psychological problems based solely upon Soria's professed inability to  discern such

9    problems and their symptoms, and because petitioner did not specifically complain about them to

10   him.  (EHRT 306–08.)  Significantly, when Drs. Pierce and Benson were provided with the

11   habeas proffered evidence that Soria failed to even explore developing at the time of petitioner's

12   trial, they opined that petitioner was in fact incompetent to stand trial.  (EH Ex. 4 at 2–3; EH Ex.

13   6 at 6–10.)

14   Given the foregoing, as well as attorney Soria's admitted familiarity with competency

15   hearings (EHRT 327), he unreasonably failed to request such a hearing in petitioner's case.  *See*

16   *Stanley*, 633 F.3d at 862 (a failure by counsel to seek a competency hearing is prejudicially

17   deficient under the *Strickland* standard when there are "sufficient indicia of incompetence to give

18   objectively reasonable counsel reason to doubt the defendant's competency[,]" and "a reasonable

19   probability that the defendant would have been found incompetent."); *see also Hibbler*, 693 F.3d

20   at 1149-50.  Soria's explanation that he was concerned that his trial experts' competency

21   examination results would be shared with the prosecution does nothing to ameliorate this

22   deficient conduct on the part of defense counsel.[22]

23   Additionally, the defenses presented at trial by Soria were wholly undeveloped, generally

24   unsupported, and clearly unpersuasive.  The primary trial defense was that Ms. Axtell's death

25   nine days after the assault by petitioner was proximately caused by "medical misadventure", i.e.,

26

27   [22]  The court notes, for example, that attorney Soria does not account for the process of appointing
     independent mental health examiners contemplated by Penal Code § 1368.  (*See* 1SHCP Ex. 178
28   at 60.)

1  medical provider negligence.  (RT 1977, 2540–46; 1Inf. Reply at 1.)  That defense was predicated

2  on an alleged improperly placed or maintained airway or intervening injury to the hyoid

3  bone/tracheal rings that purportedly caused hypoxia allowing the fatal pneumonia to develop.

4  (*See* RT 2541–43.)

5          This court previously found that this defense was undeveloped by attorney Soria and

6  unsupported when presented at petitioner's trial.  (Doc. No. 96 at 234–35.)  The record before this

7  court reflects that defense counsel did not present evidence that the administered airway tube was

8  improperly placed by medical care providers and ineffective.  (*See* 1SHCP Ex. 178 at 47; *see also*

9  RT 2031–37, 2039–43, 2052–55, 2059–79, 2098–2104.)  Moreover, defense counsel did not

10 present any direct expert testimony and did not request any special jury instruction with respect to

11 this defense, but instead simply cross-examined the paramedic and medical doctors who treated

12 Ms. Axtell after the assault and performed the autopsy after her death.  (*Id.*; *see also* CT 665–736;

13 EHRT 287; 1SHCP Ex. 178 at 47.)

14         The testimony elicited at petitioner's trial also did not support this defense.  The

15 responding paramedic, Douglas Stagnaro, testified as follows.  Upon his arrival, Ms. Axtell was

16 not breathing and had no pulse.  CPR was initiated followed thirty seconds later by Stagnaro's

17 placement of a breathing tub and administration of oxygen.  Stagnaro verified oxygen was

18 flowing to all quadrants of Ms. Axtell's lungs and he provided her medication, found a pulse, and

19 transported Ms. Axtell to the hospital.  (RT 2031–37.)  Stagnaro testified on cross-examination by

20 defense co-counsel Peterson that puncture of the trachea by an errant breathing tube was rare and

21 did not occur in this case because he heard oxygen flowing into Ms. Axtell's lungs.  (RT 2041–

22 43.)

23         Dr. Farber, the attending emergency room physician testified at the guilt phase of

24 petitioner's trial that when Ms. Axtell arrived in the emergency room, she was unresponsive,

25 comatose, and not breathing on her own but rather through an endotracheal tube that was

26 conducting oxygen to her lungs.  (RT 2276–82.)  Dr. Farber also testified that a tracheal

27 laceration at a point above the end of the endotracheal tube as suggested on these facts would not

28 have impacted the flow of oxygen through the tube.  (RT 2303.)

1    Similarly, attending neurologist, Dr. Stephen Helvie, testified that Ms. Axtell's blood gas

2    measurements and chest x-ray did not suggest that the flow of oxygen to her lungs had been

3    impaired.  (RT 2078–79.)

4    Autopsy physician, Dr. Armand Dollinger, opined as early as petitioner's preliminary

5    hearing that improper intubation was a highly unlikely cause of the throat injuries he identified in

6    Ms. Axtell.  (CT 171.)  Dr. Dollinger testified that improper intubation would not account for the

7    fractured hyoid bone he noted at the autopsy (CT 176–77), but that these fractures were instead

8    consistent with strangulation.  (CT 165–67; *see also* RT 2086–95, 2099–2104.)

9    Even petitioner's own state habeas expert, Dr. Marraccini, M.D., who practiced as a

10   medical examiner and forensic pathologist, opined in 1996 that medical misadventure played no

11   part in causing Ms. Axtell's death.  (1SHCP Ex. 3 at 1–6.)

12   Notably, Soria later would distance himself from this defense which he had elected to

13   present, testifying that it was the idea of his co-counsel, Peterson, and that Soria did not think the

14   medical misadventure defense would work.  (EHRT 284.)  Although he presented it at trial, Soria

15   conceded on habeas the medical misadventure defense was "a red herring[.]"  (1SHCP Ex. 178 at

16   47.)  To the extent Soria argued to the jury that they should convict petitioner only of second-

17   degree murder based upon medical misadventure, he did so without pointing to any evidence

18   supporting that theory or any legal basis for believing that medical misadventure could constitute

19   second degree murder.  (*See* EHRT 286.)

20   The secondary trial defense, that the prosecution had presented insufficient evidence of

21   robbery and rape, was also unreasonably weak.  *See People v. Clark*, 52 Cal. 4th 856, 942–43

22   (2011) (substantial evidence is evidence which is reasonable, credible and of solid value such that

23   a reasonable trier of fact could find defendant guilty beyond a reasonable doubt).  The jury at the

24   guilt phase of petitioner's trial was instructed on the elements of robbery (CT 715–17) and rape

25   (CT 718–19).  The jury also received instructions on the sufficiency of circumstantial evidence

26   (CT 671–72), the credibility of witnesses (CT 676–77), and the prosecution's burden of proving

27   guilt beyond a reasonable doubt (CT 688).

28   Soria argued to the jury that there was no robbery because money from Ms. Axtell's

wallet was not taken in her "immediate presence" and thus that there was no "force or fear"

involved.  (RT 1977–78.)  However, the prosecution had introduced evidence at trial that

petitioner:  (i) entered Ms. Axtell's home intending to steal something; (ii) assaulted and strangled

her; (iii) told Ms. Axtell he would "have to really hurt her" if she continued to resist; (iv) left Ms.

Axtell incapacitated and conscious or semi-conscious on the bedroom floor and instructed her not

to move, (v) rifled through Ms. Axtell's purse and belongings taking cash and jewelry; and (vi)

told law enforcement that the cash and jewelry he had taken from her actually belonged to him.

(RT 2374, 2416–25, 2429–51.)

Petitioner himself admitted during his trial testimony that he took jewelry from the dresser

in the bedroom following his assault upon Ms. Axtell and while she was in the bedroom and less

than eight to ten feet away.  (RT 2446.)  Attorney Soria conceded in his 1995 habeas

questionnaire that the guilt phase defense did not include any serious challenge to the robbery

count based upon problems of proof involving immediate presence and/or force and fear.  (*See*

1SHCP Ex. 178 at 16.)  Notably, Soria did not argue insufficiency of the evidence as to the

robbery count during his guilt phase closing argument to the jury.  (RT 2533–36.)

Soria also argued there was no rape because petitioner denied it, and the prosecution's

case was circumstantial and insubstantial.  (RT 1978, 2534–36.)  However, the prosecution's case

as presented to the jury included evidence that:  (i) petitioner forced his way into Ms. Axtell's

home and instructed her to remove her panties, which she did; (ii) petitioner dragged Ms. Axtell

to a back bedroom where he sexually assaulted her; (iii) petitioner initially admitted penetration

but was uncertain whether it was vaginal or anal; (iv) the forensic evidence linked petitioner to

the crime scene and to Ms. Axtell; (v) the clinical evidence was consistent with vaginal

penetration; (vi) petitioner ejaculated during his assault upon Ms. Axtell; and (vii) petitioner

admitted to sodomizing Ms. Axtell.  (RT 2284–88, 2416–23, 2430–48, 2298–99, 2304–57, 2379–

80.)

Attorney Soria did not mount a serious defense to the rape charge.  Soria neither presented

a *mens rea* defense, nor did he seek to impeach the prosecution's clinical and forensic evidence of

rape.  (*See* claims 13, 15 and 16, *infra*.)  Particularly, as to defense counsel's failure to present

mental state defenses, Dr. Stewart has opined that petitioner's psychosocial history combined with his notable odd behavior "should have been enough to alert people . . . that we need to look in a little further [at his mental state]."  (EHRT 111; *see also* EH Ex. 2 at 56.)  Soria's stated belief that the rape defense was necessary in order "to find out whether [a Kern County jury] would be willing to listen to us [during the penalty phase] (*see* EHFRT 289-90) was not the result of a reasonable guilt phase investigation, for the reasons stated, and thus cannot be considered as evidence of a reasonable and knowledgeable decision as to trial tactics.

Predictably, trial counsel Soria's closing argument in support of his ill-conceived guilt phase defense theory was untethered from the law and facts before the jury, and deficient.   (*See e.g.,* EHRT 292-93.)

b.      Prejudice

As noted, an attorney's deficient performance in failing to seek a competency hearing is prejudicial under the *Strickland* standard when there is a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully and appropriately considered.  *Hibbler*, 693 F.3d at 1149–50; *see also Stanley*, 633 F.3d at 862 (quoting *Jermyn*, 266 F.3d at 283 ("[I]n assessing prejudice in the context of a determination regarding a defendant's competency, the question is whether there was a reasonable probability that he would have been found incompetent to stand trial."); (Doc. No. 96 at 151).

/////

Here, absent defense counsel's deficient conduct, the defense team could have developed then available evidence of petitioner's incompetence including:  (i) the findings of Dr. Benson that petitioner suffered organic personality syndrome coupled with partial seizure symptoms and related confusion (RT 3110–18, 3151; *see also* EH Ex. 6 at 2), (ii) the findings of Dr. Pierce that petitioner suffered an organic mental disorder manifested by organic personality disorder with partial complex seizures, some disturbance of consciousness, and a "fugue" (dreamy) state of mind (RT 3220–23, 3245–46; *see also* 1Inf. Reply Ex. 3 at 1–3), and (iii) the findings of Drs. Buchsbaum and Guisado that PET imaging and EEG evaluation indicated that petitioner suffered organic brain dysfunction possibly caused by damage to the brain during birth which

1   could manifest itself in impaired auditory processing and seizure activity, deficits in judgment,

2   cognition, planning, memory, and impulse control.  (RT 3011–21, 3056–81, 3092–93; *see also*

3   1SHCP Ex. 2 at 5–11; 1SHCP Ex. 128 at 3; 1SHCP Ex. 178 at 58; 1Inf. Resp. Ex. A at 4.)

4         The defense team could have also developed evidence of petitioner's [redacted].  (*See e.g.,*

5   EHRT 280, 314–15, 320; *see also* EH Ex. 77 at 29 [sealed]); 1SHCP Ex. 118.)  Then available

6   evidence from petitioner's family raising a history of epilepsy, depression, abuse, and seizure-

7   type symptoms could likewise have been developed by defense counsel.  (EHRT 293–94; 1SHCP

8   Ex.'s 8, 10, 12–15, 17–19, 21, 23.)  In this regard, both Drs. Stewart and Firestone agreed that

9   mental illness has a genetic component.  (EHRT 110–11, 221.)

10        The defense team also could have developed the noted evidence apparent in petitioner's

11   Kern County jail records indicating [redacted].  (EHRT 297–98; *see also* EH Ex. 77 at 41–43

12   [sealed]; 1SHCP Ex. 126.)

13        Significantly, Dr. Pierce averred in his 2008 Rule 26 report that the above noted habeas

14   proffer evidence, undeveloped at the time of trial, tended to further support incompetence, and

15   would have been considered by him and Dr. Benson had defense counsel provided it to them.

16   (1Inf. Reply, Ex. 3 at 2–3; *see also* EHRT 87–89.)  Relatedly, Dr. Stewart suggested the trial

17   experts engaged by the defense would not have pursued a competence defense absent defense

18   counsel's direction to do so.  (*See* EHRT 70–77.)  The developed record does not suggest that

19   trial counsel Soria ever so directed his trial experts.

20        For all of these reasons, there is a reasonable probability that petitioner would have been

21   found incompetent to stand trial had the issue been appropriately raised and properly considered

22   by his counsel.  Particularly, as discussed in claim 11 above, a preponderance of the evidence

23   before this court establishes that petitioner's mental impairments left him unable to: rationally and

24   factually perceive; recollect and relate the details of his crimes and understand the court

25   proceedings; converse with and assist his counsel regarding the same and his own defense at trial;

26   and knowingly and voluntarily waive rights and testify in his defense.  The noted unpresented but

27   then available evidence of petitioner's family and psychosocial history, expert findings and

28   opinions, and petition's aberrant behavior prior to and around the time of the capital crime and

trial - all indicia of incompetence - is substantial.  See *Jones v. Cate*, No. 3:09-cv-01896-JMM-SB, 2020 WL 353588 at *6 (S.D. Cal. Jan. 21, 2020), *report and recommendation adopted*, No. 2020 WL 6150039 (S.D. Cal. Oct. 19, 2020) (citing *Deere v. Cullen*, 718 F.3d 1124, 1145-46 (9th Cir. 2013)) (considering the following factors in determining whether there was a reasonable probability that the defendant would have been found incompetent: (1) the reports of all the mental health experts; (2) the nature of personal interactions between the defendant and the trial judge, to consider whether these showed lucid, appropriate responses to questions and established the defendant's understanding of the proceedings and ability to consult with counsel; (3) the actions of defense counsel, since competence is ultimately a "legal" question "that judges and lawyers deal with all the time"; (4) whether the prosecutor believed the defendant to be competent; (5) whether the facts of the crime suggested "someone out of touch with reality"; and (6) whether the trial transcripts illustrate the defendant "actually understood what was going on."); *cf. Stanley*, 633 F.3d at 862-63 (petitioner presented insufficient evidence of his incompetence during the guilt phase of the trial to justify a conclusion that defense counsel were ineffective in failing to move for competency proceedings); *Jermyn*, 266 F.3d at 298-303 (same).

In this case, petitioner's trial incompetence also denied him the ability to understand and waive his right not to take the stand during the guilt phase of his trial.  (*See* claim 14, *post*); *see also Hibbler*, 693 F.3d at 1150, n.5 (citing *Godinez* at 401, n.12) ("[A] defendant who lacked the ability to understand the proceedings would also not be able to understand the consequences of decisions made during the proceedings).

c.  Conclusion

Petitioner has demonstrated under the above noted evidence that his trial counsel's performance was constitutionally deficient by failing to reasonably investigate, develop, and present at the guilt phase a defense based upon petitioner's incompetency to stand trial. *Strickland*, 466 U.S. at 694.  Petitioner has also demonstrated that he suffered prejudice as a result of his counsel's deficient performance, having shown that there is a reasonable probability that he would have been found incompetent to stand trial had his counsel appropriately presented such a defense.  *Id.*

Particularly, the court's conclusions in this regard are supported by its findings that trial counsel Soria:  (1) lacked any reasonable strategic basis for curtailing the investigation and development of the widespread indicia of petitioner's incompetence to stand trial that has been cataloged above, (2) failed to direct his trial experts to pursue an incompetency defense notwithstanding the indicia of petitioner's incompetence, (3) disregarded the experts suggestion that he raise incompetence and mental state evidence at the guilt phase of the trial, (4) failed to acquaint himself with relevant law and norms, relying instead upon his own inaccurate perception of petitioner's competence to stand trial, (5) inadequately investigated the potential guilt phase defenses and thereupon presented guilt phase defenses that were wholly undeveloped, generally unsupported, and clearly unpersuasive.  Absent attorney Soria's noted deficiencies, there is a reasonable probability that petitioner would have been found incompetent to stand trial on the noted developed record.

Therefore, federal habeas relief will be granted with respect to petitioner's Claim 12.

C.    Petitioner's Claim 13 – Ineffective Assistance of Trial Counsel by Failing to Raise *Mens Rea* Defenses

Petitioner also claims that his trial counsel was ineffective by failing to investigate, develop and present *mens rea* defenses to the charged crimes, violating his rights under the Sixth and Fourteenth Amendments.[23]  (Doc. No. 29 at 76–80; *see also* Doc. No. 96 at 232–33.)

1.    Legal Standard

The standard applicable in assessing a claim that one received ineffective assistance of counsel is set out in section B.1.b, *ante*, and need not be repeated here.

2.    State Court Direct and Collateral Review

The California Supreme Court reviewed and rejected the allegations of this claim on the merits on direct appeal, stating that:

> Defendant also asserts that counsel's failures deprived him of specific intent
> defenses to the crimes with which he was charged when counsel withheld evidence

---

[23]  As noted, the court previously denied federal habeas relief as to petitioner's claim 13 to the extent that claim was based on allegations relating to the potential defenses of unconsciousness and insanity.  (*See* Doc. No. 96 at 269–71.)

of mental illness and brain dysfunction until the penalty phase of the trial ....

Many of defendant's contentions appear to represent nothing more than alternatives which present counsel, blessed with hindsight and aware of the failure of trial counsel's tactics, believes might have offered a stronger defense. We do not agree with defendant that the examples of what defendant identifies as inadequate performance are necessarily such or that there could be no plausible tactical justification for the tactics employed by trial counsel. For that reason, it is not possible to assess many of defendant's claims on an appellate record which does not reflect the reasons for the actions which defendant now claims fell below constitutional standards of competence. When the record does not shed light on why counsel acted or failed to act in a particular manner, claims of ineffective counsel based on that conduct must be presented by petition for writ of habeas corpus. [Citation.]

[…]

Contrary to defendant's assertion, the record does not reflect an absence of a focused trial strategy. Counsel's performance and tactical decisions must be viewed with recognition that he represented a defendant who had made a pretrial statement admitting many if not most of the elements of the charged offenses; further, the physical evidence that was to be offered, when coupled with defendant's statement, may well have convinced counsel that a jury would be more favorably disposed toward defendant at the penalty phase if he did not attempt to defend by offering the mental state evidence. Since the prosecutor might seek a first-degree murder verdict on a felony-murder theory based on the other felonies with which defendant was charged, and defendant had admitted entering Ms. Axtell's residence with the intent to commit theft, counsel could reasonably conclude that the mental state evidence defendant now claims should have been offered at the guilt phase was too weak to persuade a jury that defendant was not guilty of first-degree murder with special circumstances. We have recognized before the difficulties faced by counsel representing a defendant who has admitted the charged offenses and described them to the police. [Citation.] Second-guessing the trial strategy of counsel who, in that situation, focus their efforts on a penalty phase defense rather than risk losing credibility in an attempt to persuade the jury the defendant is not guilty, is rarely warranted. [Citation.]

*Holt*, 15 Cal. 4th at 704–05.

The California Supreme Court also considered these same allegations when raised in petitioner's first state habeas petition and summarily denied relief in part on procedural grounds and entirely on the merits, without explanation or issuance of an order to show cause. (Order, *In re Holt (John Lee) on H.C.,* Case No. S057078 (Cal. Oct. 22, 1997), Lod. Doc. No. 31.)

    3.    <u>Analysis</u>

Petitioner argues that his trial counsel was ineffective by failing to investigate, develop and present then available evidence that he lacked the *mens rea* required for the commission of

90

murder, burglary, robbery, rape, and sodomy.[24]

Under California law:

(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.  Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.

(b) As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action or juvenile adjudication hearing.

(c) This section shall not be applicable to an insanity hearing pursuant to Section 1026 or 1429.5.

(d) Nothing in this section shall limit a court's discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense.

Penal Code § 28.

In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged.  The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact.

Penal Code § 29.

        a.    <u>Deficient Performance</u>

As discussed above, defense counsel has a duty in connection with the guilt phase trial to promptly investigate evidence of a defendant's mental state if there is evidence to suggest that the defendant is mentally impaired.  *See Douglas*, 316 F.3d at 1085 (citing *Bean*, 163 F.3d at 078 ); *Rompilla*, 545 U.S. at 387 ("It is the duty of the lawyer to conduct a prompt investigation of the

---

[24]  Respondent's argument that the evidentiary hearing conducted in these federal habeas proceedings was limited to whether petitioner's counsel was ineffective for failing to present mental state defenses to rape (*see* Doc. No. 320 at 81) is unsupported in the record.  The court specifically granted evidentiary hearing as to "the issues of the lack of *mens rea* defense."  (Doc. No. 96 at 236–37.)

circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."); *see also Quintero*, 995 F.3d at 1059 (citing *Stanley*, 633 F.3d at 862) ("A failure to raise competency with the court may deprive a defendant of effective assistance of counsel."); *Miller v. Terhune*, 510 F. Supp.2d 486, 499-500 (E.D. Cal. 2007) (citing *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir.2002)) (counsel was ineffective in opting for weak and uncorroborated defenses over well supported *mens rea* defenses). In such a case,  counsel must at least conduct "a minimal investigation in order to make an informed decision regarding the possibility of a defense based on mental health." *Seidel v. Merkle,* 146 F.3d 750, 756 (9th Cir.1998) (citing *Sanders,* 21 F.3d at 1456 (holding that an attorney's choice to eliminate a certain defense cannot be viewed as "strategic" where counsel "failed to conduct even the minimal investigation that would have enabled him to come to an informed decision"); *cf. Clabourne v. Lewis,* 64 F.3d 1373, 1385 (9th Cir.1995) (counsel was not ineffective at the guilt phase for failing to develop and present a *mens rea* defense based solely upon evidence of impulsiveness).

In determining whether defense counsel made reasonable tactical decisions about whether to introduce certain evidence, a court focuses on whether the investigation supporting counsel's decision to introduce or omit certain evidence was itself reasonable. *See Bemore* 788 F.3d at 1165-66 (counsel's choice to not present a defense can "hardly be said to [be] a strategic choice" worthy of deference when "s/he has not yet obtained the facts on which such a decision could be made.") The same is true for counsel's selection of the theory of defense. *See Wiggins*, 539 U.S. at 522 ("Under *Strickland***,** counsel's investigation must determine trial strategy, not the other way around."); *see also Soffar,* 368 F.3d at 473 ("The scope of a defense counsel's pretrial investigation necessarily follows from the decision as to what the theory of defense will be."). The chosen defense must be reasonable before consideration of alternative defenses is obviated. *See Bean v. Calderon*, 163 F.3d 1073, 1081–82 (9th Cir.1998); *United States v. Chambers*, 918 F.2d 1455, 1461 (9th Cir. 1990). As the Ninth Circuit Has observed, "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable

attorney to investigate further." *Soffar,* 368 F.3d at 476 (quoting *Wiggins,* 539 U.S. 510).

More particularly, tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

When "counsel were not in a position to make a reasonable strategic choice as to whether to" present evidence "because the investigation supporting their choice was unreasonable" (*Wiggins*, 539 U.S. at 536), a court must consider whether there is "a reasonable probability that a competent attorney . . . would have introduced" the evidence the attorney's inadequate investigation failed to unearth (*id.* at 535).

Thus, the question under *Strickland* is whether, on the facts and circumstances known to defense counsel, the decision not to further investigate, develop and present a mental state defense was objectively reasonable or not.

> i.   Counsel Unreasonably failed to Investigate and Develop *Mens Rea* Defenses to the Charged Crimes

The court concludes that here trial counsel lacked any reasonable strategic basis for curtailing the investigation and development of the above noted evidence of petitioner's mental state at the time of the capital crime, and for failing to consider the presentation of defenses based upon petitioner's mental state. *See Porter v. McCollum*, 558 U.S. 30, 40 (2009) (in light of the potentially exculpatory psychological evidence, counsel's failure to investigate "ignored pertinent avenues for investigation of which he should have been aware."). "A preliminary psychological assessment does not constitute investigation into mental state defenses sufficient to support a reasonable decision not to pursue the possible defense further." *Jennings,* 290 F.3d at 1013. Like the defense counsel in *Jennings*, trial counsel Soria presented weak and uncorroborated guilt phase defenses notwithstanding developable mental health evidence suggesting a reasonable doubt as to petitioner's criminal intent. *See id.* at 1019; *see also Rios v. Rocha,* 299 F.3d 796 (9th Cir.2002) (finding ineffective assistance where counsel made the choice of defense theories based on police reports and one psychological report, without investigating whether there was factual

93

1    basis for an alternative theory of defense).

2          As noted, the breakneck pace of this capital prosecution itself is suggestive of an

3    inadequate investigation given the facts and circumstances known and knowable to trial counsel.

4    Again, the court notes that petitioner was convicted, sentenced, and incarcerated on death row a

5    mere 11 months after the assault upon and killing of Ms. Axtell.  (*See* Doc. No. 308 at 64, 108.)

6          Trial counsel Soria did not reasonably select the trial defenses because he inadequately

7    investigated petitioner's mental state despite knowledge that facts supporting *mens rea* defenses

8    might be or were available.  In this regard, Soria testified at the evidentiary hearing that he did not

9    consider relying upon mental state defenses.  (EHRT 304.)  Soria testified that he did not ask his

10   trial experts, Drs. Pierce and Benson, about mental state defenses other than incompetence and

11   insanity.  (EHRT 301.)  Soria acknowledged that both experts urged presentation of mental state

12   evidence at the guilt phase of the trial; Dr. Pierce ardently so.  (*Id.*)   Still, Soria simply relied

13   upon his stated belief that these experts "did not provide me with a legal theory which would have

14   made this evidence relevant at the guilt phase of the trial."  (EHRT 302.)

15         Soria observed his trial experts did not provide a "report" on such matters.  (*Id.*)

16   However, the noted record reflects that Dr. Pierce specifically told defense counsel that "[given

17   petitioner's] organic problems and his seizure condition, he would not have been fully mentally

18   aware during the commission of the crime."  (*See* EHRT 303.)   An objectively reasonably

19   attorney would have considered and developed this information as a possible *mens rea* defense.

20   Attorney Soria was deficient by doing neither.   Under the noted controlling legal standards,

21   Soria's belief that "Kern County juries did not like [mental state] defenses," is not alone a

22   reasonable tactical basis to forego investigation, development, and presentation of *mens rea*

23   defenses.  (*See* EHRT 303-04.)  This is especially so here since Soria had represented only two

24   capital defendants prior to his appointment to represent petitioner – suggesting his belief in this

25   regard was unsupported by relevant experience.  (*See* EHRT 322.)

26         Trial counsel was ineffective by "failing to obtain the essential facts" on whether to

27   present the defenses actually presented at trial, or mens rea defenses, or all such defenses.  *Rios*,

28   299 F.3d at 807.  As noted above, attorney Soria explained at the evidentiary hearing that he did

1    not even consider presenting any mental state defenses at the time of petitioner's trial.  (EHRT

2    304.)   This then is not a case where trial counsel perceived a potential conflict between the

3    defenses presented at trial and the unpresented mental state defense.  But even if it were, attorney

4    Soria still had a duty to "initially investigate the potential strengths of a mental state defense."

5    *Miller*, 510 F.Supp.2d at 500 (citing *People v. Mozingo,* 34 Cal.3d 926 (1983)); *see also Phillips*

6    *v. Woodford*, 267 F.3d 966, 980 (9th Cir. 2001) (concluding that counsel was deficient where she

7    failed to reasonably select the defense used at trial, even if the chosen defense is consistent with

8    the facts or defendant's testimony).

9         Trial counsel Soria knew or should have known of the noted evidence that petitioner

10   displayed organic and mental impairments at the time of the offense and thereafter including:  (i)

11   episodes of reality distortion, dissociation and hallucination, (ii) low intellectual abilities and

12   problems with memory, verbalization and auditory processing that had resulted in his referrals to

13   special education for both behavioral and learning impairments through age nineteen, and (iii)

14   treatment for these problems and impairments while institutionalized.

15        Particularly, at the time of trial, Soria was chargeable with knowledge that:

16   - Petitioner as a youth suffered "distortion of reality [that] pervade[d] all
     areas of [his] functioning."  (EHRT 305.)

18   - Petitioner tended to freeze up during sales calls and zone out during
     conversation.  (1SHCP Ex.'s 24 and 25.)

19   - Petitioner [redacted] (EH Ex. 44 at 4 , 9, 12–14 [sealed]); he did not know
     what he was going to do when he forced entry into her home (RT 2430);
20     although he intended to steal something, he was not sure what.  (RT 2430–
     31.)

21   - Petitioner, during pretrial interviews with Drs. Pierce and Benson,
     variously [redacted].  (EH Ex. 53 at 9–11 [sealed]; EH Ex. 69 at 10
22     [sealed]; EH Ex. 72 [sealed]; *see also* RT 2431.)

23   - Petitioner described [redacted].  (EH Ex. 53 at 12 [sealed].)

24   - Pretrial brain imagery evaluations by defense experts Drs. Guisado and
     Buchsbaum suggested right temporal lobe damage, seizure disorder
25     associated with temporal lobe epilepsy, and impaired ability to plan,
     organize and regulate behavior – implicating his ability to form the
26     required *mens rea*.  (*See* EHRT 282; EH Ex. 4 at 1–2, 4–5; RT 3014,
     3038–44, 3051, 3071–94; *see also* EH Ex. 6 at 10–11.)

27
     - Petitioner may have been in an altered or "fugue" state at times during the
28     commission of the capital crime.  (EHRT 316–18; *see also* EH Ex. 50 at 7

1  [sealed].)

2  • Defense trial experts Drs. Pierce and Benson urged defense counsel to present evidence of petitioner's mental state at the guilt phase of his trial.

3  (1Inf. Reply Ex. 3 at 1–2; 1SHCP Ex. 178 at 1–3.)

4  Despite knowledge of all of the above, attorney Soria did not consider the possibility of

5  asserting mental state defenses. (*See e.g.*, 1SHCP Ex. 31 at 2; *see also* EHRT 300–08; 1SHCP

6  Ex. 178 at 13.) Soria stated his belief that the prosecution evidence was overwhelming and that a

7  guilty verdict was likely inevitable. (EHRT 281.) Soria pointed to his trial experts' opinion that

8  petitioner was sane at the time of the crimes, and his expectation the case would move to the

9  penalty phase where a death verdict was probable. (1SHCP Ex. 31 at 3; 1Inf. Resp. Ex. A at 3–4,

10  8.) Soria pointed to his trial experts' failure to provide him with a "legal theory" or expert

11  "report" making the mental state evidence relevant at the guilt phase of the trial. (1SHCP Ex. 31

12  at 2–3; *see also* EHRT 302, 319.) Soria pointed to what he believed was evidence of [redacted].

13  (1Inf. Resp. Ex. A at 4; *see also* EH Ex. A at 2–7 [sealed]; EH Ex. H, Ex. L; EH Ex. O at 7;

14  EHRT 323.) For example, petitioner testified that he moved Ms. Axtell to the back bedroom of

15  the house because he did not want anyone to "see into the house and see what [he] was doing."

16  (RT 2436.)

17  The court finds that "[the evidence known to trial counsel in this case] would [have] le[d]

18  a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527*; see also Rompilla*, 545

19  U.S. at 387; *Douglas*, 316 F.3d at 1085; *cf. Babbit*, 151 F.3d at 1174 (if defense counsel conducts

20  a reasonable investigation, and nothing put counsel on notice of the existence of certain evidence,

21  counsel cannot be faulted for failing to locate and present such evidence); *Morgan v. Bunnell,* 24

22  F.3d 49, 52 (9th Cir.1994); *see also Hendricks,* 70 F.3d at 1038 (defense counsel was not

23  deficient in deciding not to present a mental-state defense when two mental-health experts had

24  found no evidence that the defendant was insane or diminished in mental capacity). For example,

25  facts available to the defense team at the time of trial suggested that petitioner's mental

26  impairments and disabilities would have prevented him from being fully aware during

27  commission of the crimes (1Inf. Reply Ex. 3 at  2), thereby affecting his capacity and ability to

28  form the specific intent necessary to be found guilty of the charged crimes (EH Ex. 2 at 4; EH Ex.

4 at 4).  Drs. Pierce and Benson declared in habeas proceedings that they would have testified in support of a mental state defense at the guilt phase of petitioner's trial had his counsel so requested.[25]  (EH Ex. 4 at 5; EH Ex. 6 at 10–11); *see Bemore v. Chappell*, 788 F.3d 1151, 1165–66 (9th Cir. 2015) (a failure to investigate potentially viable *mens rea* defense found to be ineffective assistance where only a weak defense was presented at trial).

Petitioner's statements, admissions, and denials prior to and during his trial were not inconsistent with the psychotic exacerbations, remissions and transient "fugue" symptoms noted by the defense mental health experts, for the reasons they stated.  Moreover, any prosecution response to a *mens rea* based defense would have been subject to rebuttal by the defense on the grounds discussed in addressing petitioner's incompetency to stand trial claim, above.  The mere likelihood of a prosecution response thereto would not alone have served as a reasonable basis for defense counsel to reject the presentation of *mens rea* based defenses at the guilt phase of the trial.  (*See* Doc. No. 320 at 81–82); *see also Clark*, 52 Cal. 4th at 936 (mental state evidence is subject to rebuttal).  In this regard, if evidence of petitioner's rape of Candeo Tresso had been presented to the jury by the prosecution, it could have supported rather than undermined defense evidence of petitioner's long-standing organic and mental impairments because the crimes were similar.

Attorney Soria acknowledged at the evidentiary hearing before this court that he did not ask Drs. Pierce and Benson about potential mental state defenses other than insanity and unconsciousness.  (EHRT 300–01.)  Indeed, Soria conceded that he did not even review Dr. Pierce's notes of his interviews with petitioner relating to mental state issues.  (EHRT 318–19.)  Moreover, Soria did not consult with or interview any experts other than those who testified at petitioner's trial.  (1SHCP Ex. 178 at 2.)

Respondent has not pointed to facts in the record, or legal authority that might suggest that attorney Soria's decision to forego *mens rea* defenses was somehow grounded in or dictated by the failure of his trial experts to opine that petitioner was insane or unconscious at the time of the

---

[25]  Dr. Benson acknowledged in a different capital case that it would not be possible to commit rape while having a seizure.  *See Berryman v. Wong*, 954 F.3d 1222, 1225 (9th Cir. 2020).

killing.  As discussed above, petitioner's cognitive capacity clearly was in issue at the time of the capital crime and his trial.  (See discussion of claims 11 & 12, *ante*.)

Soria was unable to recall discussing with his trial experts whether petitioner had formed or was capable of forming the requisite specific intent.  (1Inf. Resp. Ex. A at 4.)  Dr. Stewart testified at the evidentiary hearing before this court that information available to Soria should have alerted him to petitioner's combined borderline intellect, brain injury, seizure disorder, and psychological impairments including symptoms of schizophrenia and PTSD, all conditions likely to impair his ability to form the mental states required for the charged crimes.  (EH Ex. 2 at 2–4, 76–79; EHRT 77–79.)

Even if Penal Code §§ 28 and 29 might have limited the admissibility of expert opinion at trial regarding petitioner's capacity to form and the formation of criminal intent (*see e.g., People v. Samayoa*, 15 Cal. 4th 795, 834-37 (1997)), Soria declared in the state habeas proceedings that he did not even consider these limitations in formulating petitioner's trial defense.  (EH Ex. Q at 36; *see also* EH Ex. 77 at 36 [sealed]); *Jackson v. Calderon*, 211 F.3d 1148, 1158 (9th Cir. 2000) (finding that Penal Code § 29 precluded admission of expert testimony that the defendant did not premeditate, but not testimony regarding defendant's mental condition at the time of the crime); *see also Douprea v. Johnson*, No. 15-CV-06133-JST, 2018 WL 2387839 at *12 (N.D. Cal. May 25, 2018), *aff'd sub nom. Douprea v. Espinoza*, 809 F. App'x 410 (9th Cir. 2020) (counsel's investigation must determine trial strategy, not the other way around); *Weeden v. Johnson*, 854 F.3d 1063, 1066, 1073 (9th Cir. 2017) (granting a habeas petition where mental condition was a factor in deciding whether defendant had the required mental state to commit charged crime and counsel failed to obtain psychological evaluation).

Finally, attorney Soria's own survey of potential Kern County jurors suggested that a majority of potential jurors in this case placed some amount of trust in psychological and psychiatric testimony when considering whether or not to impose the death penalty.  (*See* 1SHCP Ex. 167 at 8.)  Soria reasonably should have questioned his personal belief that a Kern County jury would not be receptive to mental state defenses (*see* EHRT 303–04) given the then apparent indicia of petitioner's incompetence (*see* EHRT 305–15).

1

2

ii.    Counsel Failed to Understand the Availability of *Mens Rea*
       Defenses and Instead Presented Unreasonable Defenses

3

4

Trial counsel Soria's decision to present defenses based upon an asserted medical

misadventure and the insufficiency of the evidence of robbery and rape was neither reasonably

5

6

informed by adequate research and investigation of the then available evidence including mental

state defenses and evidence, nor justifiable as a tactical decision, for the reasons both already

7

8

stated by the court and those that follow.  *Wiggins*, 539 U.S. at 522; *see also Williams*, 529 U.S.

at 396.

9

10

Soria acknowledged in petitioner's state habeas proceedings that:

11

12

13

14

15

16

17

Evidence pertaining to the defendant's psychological and neurological condition
which was introduced by the defense at the penalty stage of the case was also
available to the defense during the guilt phase.  However, I decided not to utilize
that evidence during the guilt phase.  This decision was based upon my belief that
the psychological and neurological evidence did not give rise to any valid defenses
pursuant to California law … I did not consider presenting any defenses based
upon the defendant's failure to form particular mental states or specific intents due
to his brain dysfunction.  I did not consider the possibility of challenging the
admission of defendant's out of court confession based upon a lack of
voluntariness stemming from his brain dysfunction.  Although the doctors and
consultants who advised the defense team provided it with information pertaining
to the defendant's mental state at and after the time of the crime, they did not
provide me with a legal theory which would have made this evidence relevant at
the guilt phase of the trial.

18

(1SHCP Ex. 31 at 2–3; *see also* 1SHCP Ex. 178 at 3.)

19

But on the facts and circumstances of this case, *mens rea* defenses were available – and

20

were clearly superior to the weak defenses which trial counsel Soria ultimately presented at trial.

21

As the Supreme Court has recognized, "[c]riminal cases will arise where the only reasonable and

22

available defense strategy requires consultation with experts or introduction of expert

23

evidence[.]"  *Richter,* 562 U.S. at 106; *see also Stermer v. Warren,* 959 F.3d 704, 738 (6th Cir.

24

2020); *Thomas v. Clements*, 789 F.3d 760, 771 (7th Cir. 2015) (same).  This is such a case, for the

25

reasons stated.

26

As noted above, Soria conceded that he did not research the availability of *mens rea*

27

defenses in this case.  (*See* 1SHCP Ex. 31 at 2–3; 1SHCP Ex. 178 at 3); *see also Hinton v.*

28

*Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is

1  fundamental to his case combined with his failure to perform basic research on that point is a

2  quintessential example of unreasonable performance under *Strickland*.").  Soria suggested such

3  matters were the responsibility of his mental health experts.  Moreover, as discussed above, guilt

4  phase defenses based upon capacity to form *mens rea* were then available.  (*See* Penal Code §§

5  28, 29).  Soria simply failed to do his homework – abdicating his responsibility and blaming his

6  trial experts for failing to discover a valid defense legal theory.  *See Morris v. California*, 966

7  F.2d 448, 454–55 (9th Cir. 1991) (finding counsel's performance to be deficient because he had

8  not "done his homework" in researching the relevant law).

9      As a result,  Soria did not consult with his trial experts with respect to how mental state

10  defenses were available and would have been supported by their findings and opinions.  *See*

11  *Hernandez*, 923 F.3d at 550 (counsel's ignorance of a mental state defense based upon mental

12  illness that was defendant's best possible defense established the ineffective assistance provided

13  by counsel).  Soria disregarded the advice of his trial experts that he should present evidence of

14  petitioner's mental state in the guilt phase of his trial.  Instead, trial counsel presented thinly

15  supported medical misadventure and insufficiency of evidence defenses that were unlikely to

16  succeed.

17      Additionally, trial counsel Soria has never suggested that the presentation of *mens rea*

18  defenses would have been inconsistent with the guilt phase defenses presented at trial.  *Cf.*

19  *Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998) (counsel was not ineffective in failing to

20  present a *mens rea* defense that was in conflict with the primary defense presented).  Nothing

21  before the court suggests otherwise.  Also, the *mens rea* evidence was mitigating by nature and

22  seemingly could have been readily integrated into a coordinated penalty phase mitigation defense.

23      b.    Prejudice

24      As noted, counsel's deficient failure to investigate, develop and present a *mens rea*

25  defense is prejudicial under *Strickland* when there is a reasonable probability that, but for

26  counsel's unprofessional errors, the result of the proceeding would have been different.

27  *Strickland*, 466 U.S. at 694; *see Hernandez*, 923 F.3d at 551.  That is, "a probability sufficient to

28  undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  This determination requires

a comparison of "the evidence that was actually presented to the jury with the evidence that might have been presented had counsel acted differently." *Montiel v. Chappell*, 43 F.4th 942, 963 (9th Cir. 2022) (quoting *Clark*, 769 F.3d at 728); *see also Hernandez*, 923 F.3d at 551.

The Ninth Circuit has found counsel to be prejudicially deficient by failing to investigate and present a guilt phase mental impairment defense to a murder charge where there was some evidence of the defendant's mental impairments in the record. *Daniels*, 428 F.3d at 1208 . Under circumstances similar to those presented here, the Ninth Circuit has observed:

> [Attorney] Oliver was obliged to thoroughly investigate Mr. Jennings' case in order to determine whether a mental state defense might have been better than the alibi defense he had "settled on" early. Moreover, the record makes clear that Mr. Oliver was, in fact, on notice about Mr. Jennings' mental health and drug abuse problems.
>
> * * *
>
> We find that, even in 1983, the information Mr. Oliver acknowledges he possessed would have put a reasonable attorney on notice that he needed to investigate mental health and drug-related issues more thoroughly when defending a client against a charge-first degree, capital murder-for which raising a reasonable doubt as to intent could be crucial. See, e.g., Seidel, 146 F.3d at 755-56. We also hold that the district court clearly erred in finding that Mr. Oliver made a tactical decision not to conduct any investigation into possible mental defenses. It is within the realm of possibility-consistent with Hendricks-that it would not have been ineffective to make a tactical decision to eschew a mental defense had Mr. Oliver performed a thorough investigation and consulted with his client. But Mr. Oliver did not make such an informed, strategic choice. Because he settled on a very weak alibi defense before conducting any investigation that might have led to a reasoned tactical choice, Mr. Oliver was ineffective within the meaning of Strickland's first prong.

*Jennings*, 290 F.3d at 1015–16; *see also Daniels,* 428 F.3d at 1206-07 (and cases cited therein).

A court is particularly likely to find prejudice stemming from counsel's failure to present a mental defense "where the defense that was presented at trial was weak or meritless." *Daniels,* 428 F.3d at 1207; *accord Jennings*, 290 F.3d at 1019.

Here, the prosecution sought a first-degree murder conviction both on grounds that the killing was willful, deliberate, premeditated, and with malice; and on grounds petitioner had the specific intent to commit the predicate felony murder crimes of rape, robbery, and burglary. (CT

101

1   690–712; *see also* RT 2480–88; Doc. No. 29 at 79–80); *Holt,* 15 Cal. 4th at 671.  Therefore,

2   petitioner must show a reasonable probability of a different outcome as to both first-degree

3   murder theories that were argued to the jury.[26]

4        The jury at petitioner's trial was instructed that each element of the crimes charged must

5   be proved beyond a reasonable doubt.  (CT 685–688; *see also* RT 2568–88.).  The jury was also

6   instructed on the requirement for malice aforethought as to the murder charge (CT 691);

7   concurrence of act and general criminal intent as to the rape charge (CT 689); concurrence of act

8   and specific criminal intent as to the robbery and burglary charges (CT 690); and the requirement

9   of specific intent to commit the predicate felonies of rape, robbery, and burglary as to felony

10   murder (*id.*).

11        This court has previously found that the mental state evidence proffered by petitioner in

12   this federal habeas proceeding, if established at an evidentiary hearing, could establish prejudice

13   under *Strickland*.  (*See* Doc. No. 96 at 232.)  As discussed above, petitioner's counsel performed

14   deficiently by failing to develop and present evidence that petitioner lacked the *mens rea*

15   necessary for the charged offenses, including evidence that:

- Petitioner suffered organic mental disorder manifested by organic personality syndrome with a borderline personality, and partial complex temporal lobe seizure disorder, possibly disturbing his conscious thought process and resulting in a confused, dreamy or "fugue" state, leading to possible confabulation to fill-in memory gaps.  (RT 3220–23.)

- At the time of the capital crime petitioner was in a psychotic and dissociative state and lacked the intent to do what he did; he suffered impaired ability to premeditate, deliberate, or harbor malice aforethought including altered consciousness, thought disruption, confusion and confabulation, and partial seizure syndrome with subsequent amnesia.  (*See* EH Ex. 2 at 4, 78–79.)

- Petitioner's confession to detective Boggs was the result of confabulation and was unreliable.  (*See e.g.*, 1SHCP Ex. 1 at 47.)

24        The persuasive value of this undeveloped and unpresented evidence is apparent.  Drs.

25   Benson and Pierce stated on habeas that they would have considered then available but

26   undeveloped evidence suggesting petitioner's impaired ability to form the required *mens rea* for

---

[26]  At the time of petitioner's trial, sodomy supported only second-degree murder.  (*See* CT 700–701; RT 2467, 2577.)  The jury was instructed on second-degree murder.  (RT 2576.)

the charged crimes.  (*See e.g.*, 1Inf. Reply Ex. 3 at 2–3; *see also* EHRT 87–89.)  The rebuttal by prosecution experts Drs. Missett and Firestone, neither of whom examined petitioner, that he committed the capital crime purposefully and with criminal intent lack persuasive weight for the reasons already stated above.  The court also notes Dr. Firestone's concession that frontal lobe damage found by the defense experts could have resulted in impulsivity, angry outbursts, and impaired abstract thinking.  (EHRT 235–38.)  The court recognizes Dr. Stewart's opinion that during the commission of the crime and at trial petitioner was intermittently and incipiently psychotic and suffering from a seizure disorder; that petitioner's actions were impulsive and not planned; and that petitioner' mental impairments interfered with his ability to form the mental state necessary for the crimes of which he was convicted.  (*See* EHRT 70, 82–83; EH Ex. 2 at 2–4.)

Although the jury at petitioner's trial was instructed on second-degree murder (RT 2576; *see also* RT 2467), petitioner's trial counsel did not present any evidence casting doubt on petitioner's ability to form the required intent.  Instead of opting to pursue a trial strategy based upon presentation of a mental defense, petitioner's counsel presented only weak and thinly supported defenses.  *See Hill v. Lockhart*, 28 F.3d 832, 843 (8th Cir. 1994) (trial counsel found to be deficient for presenting a "barely believable" defense combined with failure to present an available viable defense); *accord Hart v. Gomez*, 174 F.3d 1067, 1070-71 (9th Cir. 1999); *see also Howard v. Clark*, 608 F.3d 563, 1069-70 (9th Cir. 2010); *Duncan v. Ornoski*, 528 F.3d 1222, 1234 (9th Cir. 2008); *Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir. 2002); *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999) (rejecting trial counsel's claimed rationale for not presenting witnesses in support of an alibi defense because it was unsupported by the evidence).

The record before this court reflects that the jury deliberated nearly a full day before convicting petitioner on all counts and finding the special circumstance allegations to be true.  (CT 629–630; *see also* Doc. No. 29 at 83.)  Given the amount of time the jury spent deliberating notwithstanding petitioner's admissions prior to and during trial, there is a reasonable probability that had the noted mental state evidence been presented to the jury at the guilt phase of petitioner's trial, it would have found a reasonable doubt as to *mens rea*.

1    Instructive in this regard by way of contrast is the capital case *Berryman v. Wong*, 954

2    F.3d 1222 (9th Cir. 2020) in which, as it happens, attorney Soria was one of the petitioner's trial

3    attorneys and he again engaged Drs. Pierce and Benson to testify at the penalty phase of the trial

4    with respect to the petitioner's mental health and development.  *Berryman*, 954 F.3d  at 1224-

5    1225.  On appeal from the death sentence imposed and in state habeas proceedings, Berryman

6    unsuccessfully asserted that attorney Soria had provided him ineffective assistance at trial,

7    including based upon Soria's failure to raise mental state defenses.  *Id*. at 1226.  In the subsequent

8    federal habeas proceedings, the district court denied relief as to all claims asserted, including the

9    ineffective assistance of counsel claim.  *Id*.  On appeal from the denial of federal habeas relief the

10   Ninth Circuit affirmed, noting the viability of the defense presented at trial that Berryman was not

11   the perpetrator and that police had arrested the wrong person, and that Berryman denied he was

12   the killer.  *Id*. at 1230.  The Ninth Circuit rejected the contention that Berryman was prejudiced

13   by Soria's failure to obtain and introduce evidence in support of a *mens rea* defense, stating that:

> The California Supreme Court's conclusion that the [neurological] tests lacked the capacity to produce results that might have moved a juror to vote to acquit (or to vote for life in prison) was reasonable.  *See* 28 U.S.C. § 2254(d)(1).  Berryman had been convicted of the rape and murder of a teenage girl.  In the best-case scenario, the tests his experts wanted to conduct would have confirmed their diagnosis that he had brain damage.  (The jury did hear Berryman's experts opine that he suffered from organic brain disease.)  This argument hinges on Berryman's assumption that the tests could have confirmed that he had a seizure disorder, and that those seizures could have caused him to become violent.  Even assuming the efficacy and admissibility of the testing, the tests were not capable of showing that Berryman had actually experienced seizures at any time in the past, much less that he was having a seizure when he killed Florence Hildreth.  *See Pizzuto v. Arave*, 280 F.3d 949, 964 (9th Cir. 2002), *as amended*, 385 F.3d 1247 (9th Cir. 2004).

> What's more, as Dr. Benson acknowledged, it would not have been possible for Berryman to commit rape if he were having a seizure.  This theory therefore would have required a jury to believe that Berryman first engaged in sex with Hildreth and then had a seizure that caused him to lose control and kill her.  The evidence showed, however, that she was killed by a relatively shallow cut, not by "thrashing out" or other especially violent activity that Dr. Benson described as possible in the course of a seizure.  *Berryman*, 25 Cal.Rptr.2d 867, 864 P.2d at 49.  As discussed above with respect to Claims 15 and 16, Berryman's lawyers would likely have had great difficulty persuading the jury to accept this version of events,

no matter what the test results showed. It was reasonable for the California Supreme Court to conclude that Berryman suffered no prejudice from his defense counsel's failure to seek out these tests and press this argument, either at the guilt phase or during the penalty phase.

As for the argument that obtaining conclusive proof of Berryman's alleged brain injuries might have persuaded the jury to show Berryman more leniency in sentencing, Berryman's lawyers would have faced similar challenges. The fact remains that neither Berryman nor anyone else reported that he had ever suffered a seizure, a blackout, or disorientation. And while brain damage could have manifested itself in other ways, the jury was already well acquainted with Berryman's trouble in school, alcohol abuse, head trauma, and other difficulties. Jurors knew that he had areas of relative strength: He had married, held jobs, and had a year-long period of stability in which he functioned as a good father, good husband, and dedicated member of his church. The state court reasonably concluded that, even if testing could have made the expert diagnoses invulnerable to attack by the prosecution, the fact of brain damage without further evidence of actual manifestations or identifiable impact on Berryman's life was not reasonably likely to have made a difference in the jury's sentence.

Claims 63 and 64 are further undermined by the neurological testing that Berryman eventually obtained in 2001. In the course of his federal habeas proceeding, the district court granted permission for Berryman to receive the specialized neurological testing that Drs. Pierce and Benson requested. The 2001 test results confirm our conclusion that the California Supreme Court did not unreasonably determine that Berryman was not prejudiced by the omission of these tests at trial . . . .

[E]ven if the neurological test results would have been admissible, Berryman cannot establish a reasonable probability that they would have changed the outcome. Berryman's experts stated that the test results reinforced their penalty-phase testimony that Berryman had an organic brain disorder, but the state's experts strongly disagreed with their interpretation. Dr. Waxman stated that the PET scan results did not indicate temporal lobe epilepsy and went on to suggest that Berryman's expert had presented an interpretation designed to "mislead the reader." Dr. Nuwer stated that the EEG tests indicated "normal EEG brainwaves as seen in someone who is intoxicated and drowsy." The disputed results from these neurological tests reinforce our conclusion that Berryman was not prejudiced by his counsel's failure to authorize these tests during the guilt or penalty phase.

*Id.* at 1231–32.

This case stands in stark contrast to that presented in *Berryman*. Here, at the time of trial, attorney Soria knew that: as a youth, petitioner suffered "distortion of reality [that] pervade[d] all

105

1   areas of [his] functioning" (EHRT 305); pretrial brain imagery evaluations by defense experts

2   suggested petitioner suffered from right temporal lobe damage, seizure disorder associated with

3   temporal lobe epilepsy, and impaired ability to plan, organize and regulate behavior – implicating

4   his ability to form the required *mens rea* (EHRT 282; EH Ex. 4 at 1–2, 4–5; RT 3014, 3038–44,

5   3051, 3071–94; *see also* EH Ex. 6 at 10–11); petitioner denied to Drs. Pierce and Benson

6   [redacted]  (EH Ex. 53 at 9–11 [sealed]; EH Ex. 69 at 10 [sealed]; EH Ex. 72 [sealed]; EH Ex. 53

7   at 12 [sealed]; *see also* RT 2431); petitioner may have been in an altered or "fugue" state at the

8   time in question (EHRT 316–18; *see also* EH Ex. 50 at 7 [sealed]); and that Drs. Pierce and

9   Benson had urged him to present evidence of petitioner's mental state at the guilt phase of the

10   trial (1Inf. Reply Ex. 3 at 1–2; 1SHCP Ex. 178 at 1–3).  As Dr. Stewart persuasively testified in

11   these proceedings, information available to attorney Soria at the time of trial made clear that

12   petitioner's documented and combined borderline intellect, brain injury, seizure disorder, and

13   psychological impairments, including symptoms of schizophrenia and PTSD, likely impaired his

14   ability to form the mental states required for the charged crimes.  (EH Ex. 2 at 2–4, 76–79; EHRT

15   77–79.)   In short, as Justice Werdegar observed in concurring and dissenting on direct appeal in

16   this case:

17   
18   
> [T]he entire point of defendant's mitigating evidence was that, as a
> result of brain damage occurring during birth, [petitioner] did not
> respond to external stimuli and stressors as would a reasonable
> person with an undamaged brain.

19   

20   *Holt*, 15 Cal. 4th at 711.

21          At the end of the day, trial counsel Soria's deficient conduct left the guilt phase jury

22   unaware of petitioner's organic and mental impairments and borderline intellect and functionality.

23   (*See e.g.,* 1SHCP Ex. 1 ¶ 168.)  Even if a *mens rea* defense might have led to the prosecution's

24   discovery of the pre-trial interview notes of Drs. Pierce and Benson and evidence countering a

25   *mens rea* defense, that alone is not a basis to discount the noted prejudice arising from Soria's

26   deficient failure to develop and present mental state evidence at the guilt phase trial.  In this

27   regard, respondent has not established that Drs. Pierce and Benson interview notes would have

28   been admissible at the guilt phase, but rather only speculate that they would have been.  Even if

the notes were found to be admissible evidence, it may well have been persuasively argued that petitioner was not competent to make any damaging admissions reflected therein. Similarly, whether or not petitioner's rape of Candeo Tresso when he was a juvenile would have been admissible as rebuttal evidence at the guilt phase of petitioner's trial is a matter of speculation, and not evidence discounting the prejudice from counsel's deficient performance that is set out above. *See e.g.,* Evid. Code § 1101 (regarding admissibility of character evidence).

Moreover, "in a capital case, the choice of guilt phase defense involves strategic decisions as to both the guilt and penalty phases." *Bemore*, 788 F.3d at 1165. Counsel's failure to develop and present *mens rea* defenses at the guilt phase also prevented the jury from considering the full mitigating value of that evidence as a basis for lingering doubt. As noted above, in this case trial counsel commissioned a pretrial survey of potential Kern County jurors which showed 64% of respondents had a great deal or some trust in psychologists' and psychiatrists' testimony when considering whether or not the death penalty is appropriate in this case. (*See* Kern County Attitude Survey, re People v. John Lee Holt, 1SHCP Ex. 167 at 8; *cf.* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (February 2003), Guideline 10.10.1 (trial counsel should seek a theory that will be effective in connection with both guilt and penalty and should seek to minimize any inconsistencies).

The court finds a reasonable probability that absent defense counsel's deficient performance, at least one juror would have harbored reasonable doubt regarding petitioner's capacity to form the requisite intent for first-degree murder on the available theories, thus undermining confidence in the verdict rendered against petitioner. *Strickland,* 466 U.S. at 69. Therefore, the undersigned concludes that petitioner was prejudiced by his counsel's deficient performance.

        c.    Conclusions

Petitioner has demonstrated on the above noted evidence that his trial counsel's performance was constitutionally deficient by failing to reasonably investigate, develop, and present at the guilt phase a defense that petitioner lacked the requisite *mens rea* for the charged crimes. Moreover, petitioner has also demonstrated that he suffered prejudice as a result of that

107

1  deficient performance, having shown that there is a reasonable probability of a different guilt

2  phase outcome absent his counsel's deficient performance.

3      The court's conclusions in this regard are supported by its findings that trial counsel Soria:

4  (1) lacked any reasonable strategic basis for curtailing the investigation and development of *mens*

5  *rea* defenses to the charged crimes, (2) instead presented inferior guilt phase defenses based upon

6  an asserted medical misadventure and the insufficiency of the evidence of robbery and rape, that

7  were neither reasonably informed by adequate research and investigation of the applicable law

8  and developable evidence, nor tactically sound, and (3) failed to present superior guilt phase

9  defenses based upon absence of *mens rea*.

10     Additionally, the court finds that trial counsel's deficient conduct was prejudicial because

11  absent that deficient conduct, there is a reasonable probability that at least one juror would have

12  harbored reasonable doubt regarding petitioner's capacity to form the requisite intent for

13  commission of the charged crimes including first-degree murder on the available theories, thus

14  undermining confidence in the verdict rendered against petitioner.

15     Accordingly, federal habeas relief will be granted as to petitioner's claim 13.

16  D.   Review of Claim 14 – Ineffective Assistance of Trial Counsel by Calling Petitioner to
        Testify at Trial

17

18     Petitioner claims that his trial counsel was ineffective in calling him to testify during the

19  guilt phase of his trial despite his incompetency to do so, violating his rights under the Sixth and

20  Fourteenth Amendments.  (Doc. No. 29 at 80–84.)

21     1.   Legal Standards

22          a.   Ineffective Assistance of Counsel

23     The applicable legal standard with respect to consideration of a claim of ineffective

24  assistance of counsel is set out above and will not be repeated here.  (*See* section B.1.b, *ante*.)

25          b.   Competence to Testify

26     "The right of an accused to testify in his own defense is well established and is a

27  constitutional right of fundamental dimension."  *United States v. Pino–Noriega,* 189 F.3d 1089,

28  1094 (9th Cir. 1999) (quoting *United States v. Joelson,* 7 F.3d 174, 177 (9th Cir.1993)); *accord*

1    *Rock v. Arkansas,* 483 U.S. 44, 51 (1987); *see also United States v. Orozco*, 764 F.3d 997, 1001

2    (9th Cir. 2014).

3            The decision whether to testify ultimately falls to the defendant; it is not counsel's

4    decision to make.  *See Jones v. Barnes,* 463 U.S. 745, 751 (1983) ("the accused has the ultimate

5    authority to make certain fundamental decisions regarding the case" including whether to "testify

6    in his or her own behalf"); *see also Rock*, 483 U.S. at 52-53; *Harris v. New York*, 401 U.S. 222,

7    230 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to

8    do so."); *United States v. Kaczynski*, 239 F.3d 1108, 1118 (9th Cir. 2001).  However, a

9    defendant's relinquishment of the right must be knowing, intentional, and voluntary.  *Pino–*

10   *Noriega,* 189 F.3d at 1094 (citing *Joelson*, 7 F.3d at 177); *see also United States v Gillenwater*,

11   717 F.3d 1070, 1079 (9th Cir. 2013).

12          It has long been recognized that to be competent to testify one must have "a sufficient

13   understanding to apprehend the obligation of an oath and to be capable of giving a correct

14   account of the matters which he has seen or heard in reference to the questions at issue."  *District*

15   *of Columbia v. Arms*, 107 U.S. 519, 521–22 (1883); *see also United States v. Benn,* 476 F.2d

16   1127, 1130 (D.C. Cir. 1972) (Competency to testify "depends upon the witness' capacity to

17   observe, remember, and narrate as well as an understanding of the duty to tell the truth.");

18   California Evid. Code § 701 ("A person is disqualified to be a witness if he or she is: (1)

19   Incapable of expressing himself or herself concerning the matter so as to be understood, either

20   directly or through interpretation by one who can understand him; or (2) Incapable of

21   understanding the duty of a witness to tell the truth. . . .").

22           2.      State Court Direct and Collateral Review

23          Petitioner alleged in his first state habeas petition that he received ineffective assistance

24   from his trial counsel based upon his allegation that he was called as a witness at the guilt phase

25   of his trial even though his counsel knew or should have known that he was incompetent to

26   testify.  The California Supreme Court summarily denied this claim on the merits without

27   explanation or issuance of an order to show cause.  (Order, *In re Holt (John Lee) on H.C.,* Case

28   No. S057078 (Cal. Oct. 22, 1997), Lod. Doc. No. 31.)

3.   <u>Analysis</u>

In these federal habeas proceedings petitioner argues that his counsel was ineffective by calling him as a witness when counsel knew or should have known petitioner was incompetent to testify and that calling him to testify would favor the prosecution and harm the trial defense. (Doc. No. 29 at 80–82.)  For the reasons explained below, the court agrees.

a.   <u>Deficient Performance</u>

Petitioner argues that trial counsel Soria knew or should have known of the evidence of his organic and mental impairments, borderline intellectual and adaptive functioning, as well as his inappropriate affect, and that those disorders, deficiencies, and impairments would lead to him giving inaccurate and unreliable testimony if called as a witness at the guilt phase of his trial. (Doc. No. 29 at 80–84; *see also* Doc. No. 57 at 74–76); *Dean v. Lopez*, No. C 10-2465 PJH PR, 2013 WL 1190289 at *6 (N.D. Cal. Mar. 21, 2013) (citing *People v. Anderson* 25 Cal.4th 543, 572–73 (2001), Evid. Code § 701) ("[U]nder California law, anyone is qualified to be a witness, and a witness can be disqualified only if she is incapable of expressing herself understandably concerning the testimonial matter, or incapable of understanding the duty to tell the truth.").

As already noted, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Ross*, 29 F.4th at 1053 (quoting *Strickland*, 466 U.S. at 690).  It is also the case that " [a] lawyer may make a reasonable decision that particular investigations are unnecessary." *Babbit*, 151 F.3d at 1173–74.  Of course, as also noted above, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Ross*, 29 F.4th at 1053 (quoting *Strickland*, 466 U.S. at 691).

i.   <u>Counsel Unreasonably Failed to Investigate Petitioner's Testimonial Competence</u>

For the reasons explained in addressing petitioner's claims 11–13 above and summarized below, attorney Soria was chargeable with knowledge of evidence of petitioner's limited ability to:  factually and rationally perceive and recollect events; to testify accurately and truthfully thereto; and knowingly and intelligently waive rights not to testify at his trial.  Attorney Soria

1    failed to investigate and adequately consider that extensive evidence of petitioner's limitations.

2    (*See e.g.,* 1SHCP Ex. 31 at 1; Doc. No. 96 at 224–25.)

3         Attorney Soria knew or should have known of the evidence that petitioner suffered

4    organic, mental, intellectual, and functional impairments and occasional related problems

5    discerning reality, remembering and relating perceptions, confabulating, and controlling his

6    inappropriate affect.  Soria knew or should have known that petitioner tended to conceal his low

7    intellectual and functional abilities, pretending to understand and have the ability to perform,

8    when in fact he did not.  (*See e.g.,* EH Ex. 23 at 3–6.)  On these facts, "the known evidence would

9    [have] le[d] a reasonable attorney to investigate further" to determine whether petitioner was

10   competent to waive rights and testify at his trial.  *Wiggins*, 539 U.S. at 527.

11                    ii.    Counsel Unreasonably Presented Petitioner to Testify

12        As explained below, Soria's failure to investigate and consider petitioner's impaired

13   mental state and related disabilities prevented him from making an informed tactical decision

14   whether to call petitioner to testify as a witness at trial.  *Wiggins*, 539 U.S. at 522; *see also*

15   *Williams*, 529 U.S. at 396.

16        Petitioner's trial testimony did not measurably advance either the guilt phase or the

17   penalty phase defenses presented on his behalf.  Soria testified in these federal habeas

18   proceedings that it was his decision to have petitioner testify at the guilt phase in order to deny

19   the rape allegation, humanize him and allow him to show remorse, and to gauge the possibility of

20   avoiding a death sentence at the penalty phase of the trial.[27]  (EHRT 281–89, 328; *see also*

21   1SHCP Ex. 178; EH Ex. Q at 35–37.)  As discussed above, attorney Soria appeared to implicitly

22   concede that petitioner's testimony did not advance or relate to the primary trial defense of

23   medical misadventure.  The fact that petitioner's testimony was not relevant to the primary

24   defense is alone reason to seriously question counsel's decision to call him to testify in the guilt

25   phase of the trial.

26

27   ───────────────────
     [27]  The court observes Soria's contradictory statement in his 1995 habeas questionnaire that one
     purpose of having petitioner testify at the guilt phase of the trial was to deny sodomy.  (1SHCP
28   Ex. 178 at 42.)  Soria [redacted].  (EH Ex. 77 at 37–38 [sealed].)

As to the secondary trial defense of insufficiency of the evidence of rape, robbery and burglary, any benefit from presenting petitioner's trial testimony denying the rape allegation was outweighed by his damaging testimony and admissions from the witness stand.  This is especially so in that the prosecution's circumstantial rape case was arguably not strongly supported by the forensic evidence and expert testimony.  (*See* claims 15 and 16, *infra*.)  Notably, trial counsel Soria did not make any significant effort to investigate and refute the prosecution's evidence and expert testimony supporting rape.  Even when granted funding by the trial court to have the "rape kit" independently analyzed, attorney Soria's failure to transmit the funding to the retained expert ultimately prevented any such defense analysis from being undertaken.  (*See* EHRT 291-92.)

Petitioner's testimony also unreasonably placed his credibility issue, and more importantly, resulted in a graphic narration of his crimes to the jury which was certainly damaging to the defense.  Petitioner's admissions of his criminal intent and actions during his guilt phase testimony, in short, provided a windfall to the prosecution.  Remarkably, attorney Soria testified at the evidentiary hearing in these proceedings that he was well aware of the damaging admissions petitioner would make on the withstand stand, stating there were "no surprises" in petitioner's testimony.  (EHRT 323.)

Moreover, any perceived penalty phase benefit from petitioner's guilt phase testimony was illusory at best.  Attorney Soria knew or should have known that petitioner's graphic testimony describing his crimes likely would not demonstrate either his remorse or his humanity.  While Soria testified that petitioner's testimony was necessary "to gauge the possibility of avoiding a death sentence at the penalty phase of the trial,"  Soria himself undermined this rationale by testifying that he intended to present the same defense theme in the penalty phase defense whether or not the jury convicted petitioner on the rape charge.  (*See* EHRT 282, 289; 1Inf. Resp. Ex. A at 7.)

Additionally, the record does not affirmatively reflect petitioner's knowing and intentional waiver of right not to testify in his own defense.  It does not appear that petitioner discussed with his trial counsel and understood:  (i) the prosecution case, the trial defenses and how his testimony might relate thereto, (ii) the risks and benefits of him testifying at trial, and (iii) his

112

1  option to elect not to testify and thereby avoid making the very incriminating statements he made

2  from the witness stand.  (*See* e.g., Doc. No. 29 at 82).  Of course, as previously stated, a

3  defendant is not competent to stand trial or "to waive constitutional rights if mental illness has

4  substantially impaired his or her ability to make a reasoned choice among the alternatives

5  presented and to understand the nature and consequences of the waiver."  *Chavez*, 656 F.2d at 518

6  (citing *United States v. Moore*, 599 F.2d 310 (9th Cir. 1979), *Sailer v. Gunn*, 548 F.2d 271, 275

7  (9th Cir. 1979), and *Sieling v. Eyman*, 478 F.2d 211, 214-15 (9th Cir. 1973)).

8         As noted above, the decision that petitioner would testify at the guilt phase of his trial was

9  made by trial counsel Soria.  (1SHCP Ex. 31 at ¶ 3.)  Soria testified at the evidentiary hearing

10  before this court that he had explained the risks of testifying to petitioner and that the decision to

11  testify was "up to him."  (EHRT 290; *see also* EH Ex. 77 at 35–37 [sealed].)  Still, Soria could

12  not remember specifically what he said to petitioner regarding the decision to testify.  (*Id.*)

13         The rest of the record before the court is no more enlightening on this issue.  The trial

14  court, with attorney Soria's acquiescence, did not place on the record any waiver by petitioner of

15  his right not to testify at trial.  Instead, the trial judge relied solely upon the presumption that

16  petitioner had waived his rights after his counsel's full advisement of those rights.  (RT 2407–08.)

17  Even if petitioner was properly advised, the mental state evidence discussed above suggests that

18  petitioner would not have understood and been able to make a fully informed decision to waive

19  his rights, to tell the truth under oath, and to testify based upon a rational and factual

20  understanding of events at issue, perceived and recollected.  (*See e.g.*, EH Ex. 2 at 2–4, 79.)

21         Unsurprisingly, Dr. Pierce stated that had attorney Soria raised with him the possibility of

22  having petitioner testify at trial, he would have advised against it.  (EH Ex. 4 at 3.)  Dr. Pierce felt

23  that given petitioner's below-average intellect, mental illness and organic brain injury and

24  resultant difficulties with abstract thought, petitioner likely could not make an informed decision

25  to testify and would have difficulty responding to cross-examination in any predictable manner.

26  (*Id.*)

27         Dr. Benson, in his Rule 26 report agreed with Dr. Pierce, noting petitioner's medical and

28  psychological impairments.  (EH Ex. 6 at 9–10.)  Particularly, Dr. Benson cited petitioner's

impaired ability to think abstractly and respond to cross-examination in a manner consistent with attorney Soria's theories of defense.  (*Id.*)  Dr. Benson also cited petitioner's apparent complex seizures and/or episodic psychosis impairing his memory of the capital crime, as providing a basis for his conclusion that petitioner should not have testified.  (*Id.*)

Dr. Kim, petitioner's expert in connection with his second state habeas (*Atkins*) petition, agreed that petitioner's mental and organic impairments likely left him unaware of the full impact of waiving his right not to testify in his own defense.  (EH Ex. 7 at 22–23.)  Dr. Kim opined that while petitioner denied suffering any mental impairments, he was nonetheless incompetent to testify because he was unable to fully and rationally understand questions posed to him.  (2SHCP Ex. 2 ¶ 76.)

At the evidentiary hearing in these proceedings, Dr. Stewart also concluded that petitioner's mental impairments and resultant confusion, paranoia and psychosis left him unable to understand the risks and benefits of taking the stand in his own defense.  (EH Ex. 2 at 2, 79.)

Although respondent's expert Dr. Firestone found no evidence of petitioner's impaired memory, thinking, or ability to communicate (EH Ex. O at 4–5), he did not expressly opine whether petitioner was able to understand the risks and benefits of testifying at trial.  (*See* EH Ex. O.)  In any event, Dr. Firestone's opinions are otherwise subject to serious question and lack credibility for the reasons discussed above.

b.    Prejudice

Trial counsel's deficient decision to call petitioner to testify at the guilt phase of a capital case trial is prejudicial under the *Strickland* standard if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Hernandez*, 923 F.3d at 551.  That is, "a probability sufficient to undermine confidence in the outcome," but "less than the preponderance more-likely-than-not standard."  *Strickland*, 466 U.S. at 693-94.  This determination requires a comparison of the evidence presented at trial with the evidence that might have been presented had counsel acted differently.  *Clark*, 769 F.3d at 728.  As discussed above, petitioner must show a reasonable probability of a different outcome as to both first-degree murder theories that were available to

114

1   the jury, i.e. willful, deliberate, and premeditated murder, and felony murder with rape, sodomy,

2   robbery and burglary as the predicate felonies.

3        The court finds that petitioner has demonstrated prejudice under the *Strickland* standard

4   here.  Petitioner's guilt phase testimony provided facts supporting the prosecution case and

5   lessened the prosecution's burden of proof at both phases of the trial.  For example, petitioner

6   gave detailed testimony of his crimes committed against Ms. Axtell including as to his forced

7   entry with criminal intent; his physical and sexual assault with manual and ligature strangulation

8   and sodomy; his threats that he would "really hurt" Ms. Axtell if she continued to resist him; his

9   theft of items in Ms. Axtell's home; and his departure from the home while the ligature was still

10  tied tightly around Ms. Axtell's neck.  (RT 2409–54.)

11       Counsel's deficient conduct in presenting petitioner's testimony, which was the only

12  direct evidence the defense presented to the jury in the guilt phase of the trial (*see* Doc. No. 29 at

13  82–83; *see also* 1SHCP Ex. 26), undermines confidence in the jury's verdicts.  As the state

14  supreme court observed, petitioner's admission from the witness stand that he entered Ms.

15  Axtell's home "with the intent to commit theft" and his further testimony regarding his criminal

16  conduct limited the guilt phase defense.  *See e.g., Holt*, 15 Cal. 4th at 704–05.  Petitioner's

17  testimony provided the prosecution with otherwise unavailable first-hand evidence supporting the

18  charged offenses.  The prejudicial weight of petitioner's testimony is apparent in the relative

19  speed with which a guilt verdict was reached - the jury deliberated less than a full day before

20  convicting petitioner on all counts and finding the special circumstances true.  (CT 629–630; Doc.

21  No. 29 at 83.)  Absent petitioner's testimony, there is a reasonable probability at least one juror

22  would have harbored reasonable doubt regarding the commission of the charged offenses.

23       Additionally, defense counsel's deficient conduct in presenting petitioner's guilt phase

24  testimony undermines confidence in the penalty phase verdict, as petitioner has alleged in this

25  claim.  (*See* Doc. No. 29 at 83 n.6.)  Petitioner's testimony provided direct evidence and harmful

26  details in aggravation under Penal Code § 109.3(a).  For example, in his 1996 habeas declaration

27  juror Charles Mandl stated that "[b]ecause of petitioner's testimony, I did not understand why he

28  had not pled guilty."  (1SHCP Ex. 26 at 1; *see also* Doc. No. 29 at 83.)  Absent petitioner's

1   testimony, there is a reasonable probability that at least one juror would have voted for a sentence

2   other than death.

3           c.      Conclusions

4           Petitioner has demonstrated under the above noted evidence that his trial counsel's

5   performance was constitutionally deficient by calling him as a witness when counsel knew or

6   should have known he was incompetent to testify and that calling him as a witness would favor

7   the prosecution and harm the trial defense.  Petitioner has also demonstrated that he suffered

8   prejudice as a result of that deficient performance, having shown that there is a reasonable

9   probability of different guilt and penalty phase outcomes absent counsel's deficient conduct.

10          Particularly, these conclusions are supported by the court's findings that trial counsel

11  Soria:  (1) knew or should have known of petitioner's limited ability to factually and rationally

12  perceive and recollect events and to testify accurately and truthfully thereto, (2) knew or should

13  have known of petitioner's limited ability to knowingly and intelligently waive rights not to

14  testify at his trial, (3) failed to investigate and develop the evidence of these limitations, and (4)

15  unreasonably called petitioner to testify at this trial.

16          Additionally, the court finds that trial counsel's deficient conduct was prejudicial because

17  absent that deficient conduct, there is a reasonable probability that at least one juror would have

18  harbored a reasonable doubt regarding the charged offenses and the aggravating value of the facts

19  and circumstances surrounding the capital crime, thus undermining confidence in the guilt and

20  penalty phase verdicts rendered against petitioner.

21          Accordingly, federal habeas relief will be granted as to petitioner's claim 14.

22  E.      Claim 15 – Ineffective Assistance of Trial Counsel and Trial Court Error regarding Lesser
            Included Instructions of Rape
23

24          Petitioner alleges that his trial counsel was ineffective by failing to request jury

25  instructions with respect to lesser included offenses of rape, and that the trial court erred by *sua*

26  *sponte* failing to give these lesser included instructions, violating his rights under the Fifth, Sixth

27  and Fourteenth Amendments.  (Doc. No. 29 at 84–87.)

28  /////

1          1.      Legal Standard

2                  a.      Ineffective Assistance of Counsel

3          The applicable legal standard in reviewing ineffective assistance of counsel claims is set

4   out in section B.1.b, *supra* and will not be repeated.

5                  b.      Trial Court Instructional Error

6          Trial court error violates due process where it renders the resulting criminal trial

7   fundamentally unfair. *Chambers v. Mississippi*, 410 U.S. 284, 294, 303 (1973).

8          "Federal habeas petitioners are not entitled to habeas relief based on trial error unless they

9   can establish that it resulted in actual prejudice." *Davis v. Ayala*, 576 U.S. 257, 267 (2015)

10  (quoting *Brecht*, 507 U.S. at 637). "Under this test, relief is proper only if the federal court has

11  grave doubt about whether a trial error of federal law had substantial and injurious effect or

12  influence in determining the jury's verdict." *Id.* at 267–68 (quoting *O'Neal v. McAninch*, 513

13  U.S. 432, 436 (1995)); *see also Sansing v. Ryan*, 41 F.4th 1039, 1050 (9th Cir. 2022) (citing

14  *Brecht*, 507 U.S. at 637) ("To establish prejudice, a federal habeas petitioner must demonstrate

15  that a constitutional error resulted in "actual prejudice" - that is, a "substantial and injurious effect

16  or influence" on the outcome.).

17         The Supreme Court recently clarified that, "[w]hen a state court has ruled on the merits of

18  a state prisoner's claim, a federal court cannot grant relief without first applying both the test this

19  Court outlined in *Brecht* and the one Congress prescribed in AEDPA." *Brown v. Davenport*,

20  __U.S.__, 142 S. Ct. 1510, 1517 (2022); *see also Sansing*, 41 F.4th at 1050 (recognizing the

21  holding in *Brown* and noting, "So when, as here, the state court has determined on direct appeal

22  that an error was harmless beyond a reasonable doubt - the standard required for review of non-

23  structural constitutional errors under *Chapman* [citation omitted] - a petitioner must demonstrate

24  that the court 'applied *Chapman* in an objectively unreasonable manner.'")

25         To obtain federal habeas relief for instructional error, a petitioner must show that the

26  instruction given the jury so infected the entire trial that the resulting conviction violates due

27  process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147

28  (1973)). The omission of an instruction is less likely to be prejudicial than a misstatement of the

1  law.  *Walker v. Endell*, 850 F.3d 470, 475-76 (9th Cir. 1987).  Thus, a habeas petitioner whose

2  claim involves a failure to give a particular instruction bears an "especially heavy burden."

3  *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S.

4  145, 155 (1977)).

5      In determining whether a petitioner pursuant to § 2254 suffered prejudice from an

6  instructional error, a federal court must determine if actual prejudice was suffered by assessing

7  whether, in light of the record as a whole, the error had a substantial and injurious effect or

8  influence in determining the jury's verdict.  *Hedgpeth v. Pulido,* 555 U.S. 57, 62 (2008); *see also*

9  *Brecht,* 507 U.S. at 637-38.  A "substantial and injurious effect" means a "reasonable probability"

10  that the jury would have arrived at a different verdict absent the instructional error.  *Clark v.*

11  *Brown*, 450 F.3d 898, 916 (9th Cir. 2006).

12      Of course, "that a jury instruction violates state law is not, by itself, a basis for federal

13  habeas corpus relief." *Clark,* 450 F.3d at 904; *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)

14  ("[F]ederal habeas corpus relief does not lie for errors of state law.").

15      2.    State Court Direct and Collateral Review

16      The California Supreme Court considered on direct appeal petitioner's claim that the trial

17  court erred by failing to give lesser included jury instructions regarding rape.  That court rejected

18  the allegation on the merits, stating that:

19
20  Defendant contends that the trial court erred in failing to instruct the jury *sua
   sponte* on attempted rape (§§ 664/261), assault with intent to commit rape (§ 220),
   assault (§ 240), and battery (§ 242), all of which he claims are lesser included
21  offenses of rape by means of force or fear, and on assault with intent to commit
   sodomy, attempted sodomy, assault, and battery as offenses included in sodomy.

22  Relying on *Beck v. Alabama* (1989) 447 U.S. 625 [100 S. Ct. 2382, 65 L.Ed.2d
   392] (*Beck*), and *People v. Geiger* (1984) 35 Cal.3d 510 [199 Cal. Rptr. 45, 674
23  P.2d 1303, 50 A.L.R.4th 1055] (*Geiger*), he contends that such instructions are an
   incident of due process.  Absent instructions on lesser included offenses, the all-or-
24  nothing choice given the jury creates impermissible pressure to convict.

25  *Beck* seeks to "eliminate the distortion of the factfinding process that is created
   when the jury is forced into an all-or-nothing choice between capital murder and
26  innocence."  (*Schad v. Arizona* (1991) 501 U.S. 624, 646–647 [111 S. Ct. 2491,
   2504–2505, 115 L.Ed.2d 555].)  When jury instructions were discussed before trial
27  in this case and the court indicated that an instruction defining attempt would have
   to be given, defendant objected.  That objection appears to have been directed to
28  any instruction on lesser included offenses.[17]  Even were this not so, defendant

concedes that the duty to instruct on lesser offenses exists only if there is evidence that the offense was less than that charged. (*People v. Ghent*, *supra*, 43 Cal.3d 739, 757; *People v. Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal. Rptr. 1, 518 P.2d 913].) For that reason there was no error in failing to instruct on assault with intent to commit rape or attempted rape.

An assault with intent to commit rape is a form of attempted rape. (*People v. Ghent*, *supra*, 43 Cal.3d at p. 757.) There was no evidence that defendant intended to commit rape but was unsuccessful in the attempt. He admitted a sexual assault on Ms. Axtell during which he committed sodomy and in so doing may have committed an assault[18] and a battery.[19] He denied raping the victim. There was no evidence of a separate assault or battery during an unsuccessful attempt to commit rape.[20] This is not a case like *Beck* or *Geiger* in which the jury may have felt undue pressure to convict defendant of rape rather than acquit him because the evidence suggested to the jury that he committed some form of sexual assault, but was not sufficient to satisfy the jury beyond a reasonable doubt that the offense was rape.

----------------------------------------FOOTNOTE----------------------------------------

n.17 After the judge read the numbers of the CALJIC instructions he planned to give, the judge stated that No. 600, defining attempt, would have to be included. This colloquy between the court and defense counsel followed:
"Mr. Soria: Your Honor, as the court recalls, the defense is objecting to that instruction at this time.
"The Court: What's the point?
"Mr. Soria: Just registering an objection your honor.
"The Court: Well, are you objecting to the-
"Mr. Soria: Lesser included, your Honor, I believe is our position.
"The Court: Are you objecting to it because you don't want lesser included or are you objecting to the special circumstances of-in each case of saying that in the commission or attempted commission or rape, commission of or attempted commission of robbery, in the commission or attempted commission or robbery [*sic*], or commission or attempted commission of sodomy?
"Mr. Soria: Your Honor, I think we will take-defense at this point will take the broadest objection which will include the special circumstances of commission and attempted commission of the specific crimes. That will be our position at this point."
The parties and the court agreed that the court would have to hear the evidence before ruling, and that the instructions would be discussed again. Defendant does not indicate that he changed his position or withdrew his objection to instructions on lesser included offenses at any later time, however. When the final jury instructions were discussed, and the court asked if there were any objections that counsel wanted to put on the record, defendant's attorney stated that everything that was objected to had been withdrawn.

----------------------------------------END FOOTNOTE----------------------------------------

----------------------------------------FOOTNOTE----------------------------------------

n.18 Section 240: "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."

----------------------------------------END FOOTNOTE----------------------------------------

----------------------------------------FOOTNOTE-------------------------------------------

n.19  Section 242:  "A battery is any willful and unlawful use of force or violence upon the person of another."

----------------------------------------END FOOTNOTE-------------------------------------

----------------------------------------FOOTNOTE-------------------------------------------

n.20  Section 664: " Every person who attempts to commit any crime, but fails, or is prevented or intercepted in the perpetration thereof, is punishable ...."

----------------------------------------END FOOTNOTE-------------------------------------

The same reasoning leads us to reject the claim that instructions on offenses included within sodomy were necessary.  Defendant admitted committing sodomy. His claim that he did not penetrate both the vagina and the anus was a denial of rape and did not, as defendant argues, raise an issue as to whether he committed sodomy.[21]  There was no evidence from which the jury could have concluded that he committed an assault on Ms. Axtell with the intent to commit sodomy, but was unsuccessful in the attempt.

----------------------------------------FOOTNOTE-------------------------------------------

n.21  Defendant testified at trial:  "Well, I got behind her, and I pulled down my pants and my shorts, and I proceeded as far as penetrating from the-from the rear end.  And it was-it was anal."  In his pretrial statement he admitted making penetration and ejaculation, but said he did not know whether the penetration was anal or vaginal.

----------------------------------------END FOOTNOTE-------------------------------------

*Holt*, 15 Cal. 4th at 673–74; (*see also* Doc. No. 44 at 20–21).

The California Supreme Court considered petitioner's jury instruction challenge framed as an ineffective assistance of counsel claim in petitioner's first state habeas petition (*see* 1SHCP at 167) and summarily denied relief on the merits of that claim without explanation or issuance of an order to show cause.  (Order, *In re Holt (John Lee) on H.C.,* Case No. S057078 (Cal. Oct. 22, 1997), Lod. Doc. No. 31; *see also* Doc. No. 44 at 20–21.)

3.      Analysis

a.      Ineffective Assistance of Counsel

Petitioner argues that his trial counsel rendered ineffective assistance by objecting to the "attempt" instructions prior to the presentation of evidence, and by failing to request jury

/////

/////

120

1   instructions on lesser included offenses to rape following the close of evidence.[28]  (Doc. No. 29 at

2   84–87; RT 1579–1601, 2465); *Holt*, 15 Cal. 4th at 673 n.17; (*see also* Doc. No. 57 at 77; Doc.

3   No. 96 at 256, citing *People v. Stewart*, 77 Cal. App. 4th 785, 795 (2000)) (an offense is a lesser

4   included offense if it satisfies either the "legal elements" test or the "accusatory pleadings" test).

5          The record before this court reflects that during petitioner's trial, attorney Soria objected

6   to the trial court's proposed instruction to the jury on "attempt" including as to the special

7   circumstance felonies of rape, robbery, burglary, and sodomy.  (RT 1579–1600.)  The prosecutor

8   disagreed, stating the evidence could show attempted rape and/or attempted sodomy as lesser

9   included offenses.  (RT 1582–83.)  Following off-the-record jury instruction conferences with

10  counsel after the close of the evidence (RT 2462–63, 2558), and a review of the instructions on

11  the record (RT 2465–72), the trial court instructed the jury without giving them any instruction on

12  attempt or lesser-included offenses (RT 2558–90; CT 824–826).  Petitioner's counsel did not

13  object or request additional instructions.

14         Petitioner now argues that jury instructions on lesser included offenses to rape were

15  warranted because the evidence showed that he did not intend the assault Ms. Axtell but rather

16  just "snapped" during the crimes (RT 2415–16); that he did not rape Ms. Axtell (RT 2421); and

17  that the prosecution's case was insufficient to support his conviction on the rape charge.  (Doc.

18  No. 29 at 86; *see* claim 16, *infra*); *see also Crace v. Herzog*, 798 F.3d 840, 852 (9th Cir. 2015)

19  (defense counsel found to be deficient where there was a failure to request a lesser included

20  offense instruction which was not the result of a strategic decision, but rather due to counsel's

21  failure to consider requesting the instruction).

22                        i.     Defense Counsel's Performance was not Prejudicially Deficient

23         Petitioner argues that as a result of Soria's allegedly deficient performance:  (i) petitioner

24  was convicted of rape, (ii) the jury found the murder-rape special circumstance allegation to be

25  true, and (iii) the rape conviction was considered as aggravating evidence at the penalty phase of

26

27  _____

    [28]  Petitioner identifies the lesser included offenses of rape as:  (i) assault with intent to commit
    rape (Penal Code § 220), (ii) simple assault (Penal Code § 240), (iii) battery (Penal Code § 242),
28  and (iv) attempt to commit rape (*People v. Ramirez*, 2 Cal. App. 3d 345, 353 (1969)).

1  petitioner's trial.  Petitioner argues that absent his counsel's allegedly deficient conduct, there is a

2  reasonable probability of a different outcome at his trial because:  (i) at the time of the crime, the

3  sodomy conviction would have supported only a second-degree felony murder conviction, (ii) the

4  eight-year rape conviction sentence would not have been imposed, and (iii) the penalty phase

5  determination of the jury might have been different as alleged in petitioner's penalty phase claim

6  38.[29]  (*See* Doc. No. 57 at 83 n.22, citing CT 703; *see also* CT 890; Doc. No. 51 at 13; Doc. No.

7  323 at 98); *Strickland*, 466 U.S. at 694.  For example, petitioner points out that during the post-

8  conviction state habeas proceedings, Billy Ross, who served as a juror at petitioner's trial,

9  provided his 1996 declaration stating that "I do not believe based upon the evidence presented

10  that [petitioner] raped the victim."  (1SHCP Ex. 28 at 2.)

11      The court need not determine whether attorney Soria performed deficiently as alleged

12  because petitioner has not shown a reasonable probability of a different guilt phase outcome

13  entitling him to the relief sought in the instant petition.  *See Strickland*, 466 U.S. at 697 (a court

14  need not determine whether counsel's performance was deficient before examining the prejudice

15  suffered by the petitioner because of the alleged deficiencies); *Crace*, 798 F.3d at 849 (a finding

16  of prejudice arising from counsel's failure to request lesser included offense instructions requires

17  showing a reasonable probability that the jury would have convicted only on the lesser-included

18  offense and not the charged offense).

19      As discussed above, petitioner must show a reasonable probability of a different outcome

20  as to both first-degree murder theories that were presented to the jury by the prosecution, i.e.

21  willful, deliberate, and premeditated murder, and felony murder with rape, sodomy, robbery and

22  burglary as the predicate felonies.[30]  "[The] [f]ailure to give [a jury] instruction which might be

23  proper as a matter of state law, by itself, does not merit federal habeas relief."  *Menendez v.*

24  *Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (quoting *Miller v. Stagner*, 757 F.2d 988, 993 (9th

25

---

26  [29]  In his Claim 38 petitioner challenges the death sentence imposed upon him on the ground that at least one special circumstance finding was invalid.  (Doc. No. 29 at 175–76.)

27  [30]  As noted, at the time of petitioner's trial, sodomy supported only a conviction for second-degree murder.  (*See* CT 700–701; RT 2467, 2577.)  Petitioner's jury was instructed on second-

28  degree murder.  (RT 2576.)

Cir. 1985)); *see also United States v. Bosch,* 914 F.2d 1239, 1247 (9th Cir. 1990) (finding no ineffective assistance by defense counsel based upon a non-prejudicial failure to request a jury instruction).

The court has previously observed that an "attempted rape" conviction would have been sufficient to support first-degree felony rape-murder and the special circumstance finding based thereon. (Doc. No. 96 at 267) (citing Penal Code § 190.2(a)(17)); *see also* CT 700, 710 (CALJIC No.'s 8.21 & 8.81.17.) The court also previously rejected petitioner's contention that a conviction for attempt to commit rape would not have provided a basis for first-degree felony rape-murder and the rape-murder special circumstance, as being based upon a mischaracterization of California law. (Doc. No. 29 at 86–87; Doc. No. 96 at 257 n.166, 267). Petitioner's repetition of that rejected argument is unavailing. (*See e.g.,* Doc. No. 319 at 91-94.)

In addition, the jury at petitioner's trial found the burglary and robbery special circumstance allegations to be true. (CT 630–631 741–751; RT 2609–12.) As a result, petitioner was found to be death eligible pursuant to his guilt phase first degree murder conviction even absent the rape-murder special circumstance being found to be true. Even if petitioner's jury considered an invalid rape special circumstance at the penalty phase, as petitioner contends (*see* claim 38), that would not have impacted his death penalty eligibility. (*See* e.g., Doc. No. 51 at 13–16.)

The court also previously observed in this case that the separately imposed and subsequently stayed eight-year prison sentence on petitioner's rape conviction does not serve as a basis for a finding of prejudice stemming from this claimed instance of ineffective assistance of counsel. (Doc. No. 51 at 13–16.) The fixed term sentence imposed on petitioner's rape conviction does not impact death eligibility. (*Id.*) In any event, in his claim 15 petitioner does not seek relief from the ancillary rape conviction sentence. (Doc. No. 29 at 84-87.)

Turning to alleged cumulative guilt phase prejudice stemming from the claimed deficient performance of counsel, petitioner has not demonstrated that he is entitled to federal habeas relief on that ground. The court previously left open the possibility that the deficiencies of counsel's performance alleged by petitioner in his claims 15 and 16 might support a cumulative prejudice

1 finding. (Doc. No. 96 at 268, 271; *see also* Doc. No. 51 at 12.)  However, petitioner does not now

2 argue, much less demonstrate, that is the case based on the now fully developed record.

3       In his claim 38, a penalty phase claim, petitioner alleges that the death sentence imposed

4 against him is unlawful and unconstitutional because of the invalidity of one or more of the

5 special circumstance allegations being found to be true.  (Doc. No. 29 at 175–76.)  The court

6 previously observed that prejudice arising at the penalty phase from any invalid ancillary

7 conviction and special circumstance finding would be considered in its analysis of claim 38.

8 (Doc. No. 323 at 98 citing Doc. No. 51 at 13.)  However, the court also previously held that

9 petitioner's penalty phase claims including claim 38 will be moot, and not addressed on that

10 basis, if as here, relief were to be granted on his guilt phase claims.  (*See* Doc. No. 104 at 6-7.)

11 Therefore, petitioner's claim 38 is not now before the court and may not serve as a basis upon

12 which to find that petitioner suffered prejudice as a result of the alleged ineffective assistance

13 asserted in his claim 15.  Petitioner has certainly not established that his claim 38 was

14 incorporated into his claim 15.  (Doc. No. 29 at 84–87); *see also* Rule 2 of the Federal Rules

15 Governing § 2254 Cases.

16       In any event, in his claim 38 petitioner has not alleged any prejudice arising from the

17 jury's guilt phase verdict and death eligibility findings.  (Doc. No. 29 at 175–76); *see also*

18 *Beardslee v. Brown*, 393 F.3d 1032, 1037 (9th Cir. 2004) (in a "weighing" death penalty state like

19 California, there is no federal constitutional error when an invalid aggravating circumstance

20 weighed during sentence selection did not have a substantial and injurious effect on the verdict).

21       b.    Trial Court Instructional Error

22       i.    Failure to *Sua Sponte* Give a Lesser Included Instructions of Rape

23       Petitioner alleges the trial court, as a matter of due process, was required to instruct the

24 jury on the potential lesser included offenses as to the rape charged raised by the evidence.  (Doc.

25 No. 29 at 86.)

26       Petitioner argues that lesser included instructions with respect to rape were warranted by

27 his testimony that he sexually assaulted Ms. Axtell (RT 2321-22); that he did not rape her (RT

28 2421); and that he so acted because he just "snapped" (RT 2415-16).  (*See* Doc. No. 29 at 86; *see*

1   *also* Doc. No. 57 at 77-78).  He also argues lesser included instructions were required because the

2   jury was presented with the type of "all or nothing" decision condemned by the Supreme Court in

3   *Beck v. Alabama*, 447 U.S. 625 (1980).  (*Id.*)

4       Respondent counters that the prosecution presented sufficient evidence of a completed

5   rape to support petitioner's conviction on that charge under the controlling standard of *Jackson v.*

6   *Virginia*, 443 U.S. 307, 319 (1979).  (*See* Doc. No. 61 at 57 citing *Holt,* 15 Cal. 4th at 667, citing

7   *Jackson.*)  Respondent argues that *Beck* is inapplicable because the jury in this case was not

8   presented with an all-or-nothing choice between death and acquittal, but rather had the option of

9   finding petitioner guilty of non-capital homicide.  (*See* Doc. No. 61 at 57, 61.)

10      Respondent also argues that under state law there is no evidence that the offense was less

11  than that charged.  (*Id.*)  Respondent observes that trial counsel Soria did not withdraw his

12  objection to lesser included instructions following the presentation of the prosecution's case.

13  (Doc. No. 61 at 62 citing *Holt*, 15 Cal. 4th at 673, n.17.)  Therefore, according to respondent,

14  petitioner has not identified any requirement under federal or state law that the trial court instruct

15  the jury *sua sponte* on the lesser included offenses of rape.  (Doc. No. 61 at 61.)

16      As discussed above, a claim that a trial court erred in omitting an instruction requires a

17  showing that the error so infected the entire trial that the resulting conviction violated due

18  process.  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  In such cases, the petitioner's burden is

19  especially heavy, as the omission of an instruction is less likely to be prejudicial than an

20  affirmative misstatement of the law.  *Id.* at 155.  Also, "[i]t is the rare case in which an improper

21  instruction will justify reversal of a criminal conviction when no objection has been made in the

22  trial court."  *Id.*

23      Here, the court finds that the California Supreme Court was not unreasonable in its denial

24  of petitioner's claim 15 allegations of trial court error on the merits, for the reasons stated by that

25  court and those that follow.

26      Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

27  barred unless a petitioner can show that the state court's adjudication of his claim:

28  /////

125

> (1) [R]esulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) [R]esulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Patsalis v. Shinn*, 47 F.4th 1092, 1097 (9th Cir. 2022) (citing *Johnson v. Williams*, 568 U.S. 289, 292 (2013)) (quoting 28 U.S.C. § 2254(d)); *Richter*, 562 U.S. at 98; *Lockyer,* 538 U.S. at 70-71.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101.  In this regard, the Supreme Court has stated that:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.

*Id.* at 103.  In other words, so long as fair-minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable.  *Id.* at 101.  In applying this standard, "a habeas court must determine what arguments or theories supported . . .  or could have supported the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]."  *Id.* at 102.  This objective standard of reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d).  *Hibbler*, 693 F.3d at 1146-47.

As stated above, if the court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict under *Brecht*, and the petitioner meets the requirements of AEDPA.

AEDPA requires considerable deference to the state courts.  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," *Pinholster*, 563 U.S. at 181, and "evidence introduced in federal court has no bearing on 2254(d)(1) review."  *Id.* at 185.  "Factual determinations by state courts are presumed correct

126

1    absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340

2    (2003) (citing 28 U.S.C. § 2254(e)(1)).

3          Here, the California Supreme Court reasonably could have found on the record before it,

4    that the trial court's failure *sua sponte* to instruct on lesser included offenses was not federal

5    constitutional error.  *See Holt*, 15 Cal. 4th at 673-74.  Particularly, as that court observed,

6    petitioner's trial counsel Soria did not withdraw his objection to lesser included instructions after

7    the prosecution's presentation of evidence to the jury.  *Id.* at 673 n.17.  That court could have also

8    reasonably found that petitioner failed to overcome the presumption that attorney Soria's

9    continuing objection to jury instructions on lesser included offenses of rape, informed by the case

10   presented to the jury by the prosecution, was a reasonable trial strategy.  *See Richter*, 562 U.S. at

11   104  (quoting *Strickland*, 466 U.S. at 689); *see also Sanders*, 21 F.3d at 1456.

12         Moreover, the California Supreme Court could have reasonably found the evidence

13   admitted at petitioner's trial insufficient to support lesser included offenses of rape.  *Id.* at 673-75.

14   The prosecution's forensic case, including the testimony of Dr. Farber, supported a finding of

15   vaginal penetration.  (See RT 2287-88.)  Petitioner admitted his sexual assault upon Ms. Axtell

16   and that he ejaculated in the course thereof.  Petitioner's denial of rape during trial was

17   inconsistent both with his pretrial statement to authorities that he was unsure whether he

18   penetrated Ms. Axtell's vagina, and with Dr. Farber's testimony supporting such penetration - and

19   was reasonably subject to being discounted on that basis.  *See Holt*, 15 Cal. 4th at 668-74; (RT

20   2288-99; CT 718–19).

21         Finally, even if the trial court erred as a matter of state law by failing *sua sponte* to give

22   lesser included instructions of rape, that alone is not a basis for the granting of federal habeas

23   relief.  *See McGuire*, 502 U.S. at 71.  Claims of error in state court jury instructions generally are

24   a matter of state law unless they amount to a deprivation of due process.  *See Cooks v.

25   Spalding*, 660 F.2d 738, 739 (9th Cir.1981).  The California Supreme Court reasonably could

26   have found that there was no due process violation in this regard, as discussed below.

27   /////

28   /////

1                 ii.     <u>Harmless Error</u>

2       Even if the trial court committed federal constitutional error, the California Supreme

3 Court reasonably could have found such error to be harmless.

4       Petitioner argues otherwise - that the trial court's failure to instruct on lesser included

5 offenses was more than harmless because his conviction of a lesser offense would not have

6 supported a felony murder-rape conviction and the rape special circumstance finding.  (Doc. No.

7 29 at 86-87.)  He argues the error therefore had a substantial and injurious effect on the rape

8 verdict.  ((Doc. No. 57 at 78.)

9       However, the California Supreme Court's rejection of petitioner's arguments on this claim

10 on the merits was not unreasonable under § 2254(d).  That court reasonably could find that

11 petitioner's reliance upon *Beck* was misplaced for the reasons stated by that court.  The record

12 here reflects that petitioner's jury was not presented with the type of all-or-nothing capital

13 decision that precipitated the decision in *Beck*.  Even if, as petitioner argues, *Beck* could apply to

14 an all-or-nothing jury decision regarding the rape charge, the state supreme court reasonably

15 could find the sparse evidence supporting lesser included offenses of rape did not provide a

16 sufficient basis upon which to find petitioner's trial was rendered fundamentally unfair on that

17 basis.

18       The California Supreme Court also reasonably could find any federal constitutional error

19 in this regard to be harmless under *Brecht*.  "[Federal] habeas petitioners are not entitled to habeas

20 relief based on trial error unless they can establish that it resulted in actual prejudice."  *Ayala*, 576

21 U.S. at 267 (quoting *Brecht*, 507 U.S. at 637).  "Under this test, relief is proper only if the federal

22 court has grave doubt about whether a trial error of federal law had substantial and injurious

23 effect or influence in determining the jury's verdict."  *Id.* at 267–68 (quoting *O'Neal,* 513 U.S. at

24 436); *see also Beardslee*, 393 F.3d at 1041–44 (applying *Brecht's* harmless error test to an Eighth

25 Amendment error based on the improper consideration of invalid aggravating factors).  Here,

26 petitioner's claim of *Beck* error falls short, for the reasons already stated.

27       Additionally, as this court previously observed, invalidity of the rape conviction or a

28 conviction of only attempted rape would not provide a basis for relief from the guilt phase verdict

1   of first degree murder with special circumstances, which is the subject of petitioner's claim 15.

2   (*See* Doc. No. 29 at ¶ 432; Doc. No. 51 at 14-16; Doc. No. 96 at 265-67.)

3                 c.     Conclusions

4       As to petitioner's claim 15 allegation of ineffective assistance of counsel, petitioner has

5   not shown a reasonable probability of a different guilt phase outcome entitling him to the relief

6   sought in the instant petition. *See Strickland*, 466 U.S. at 697; (Doc. No. 29 at ¶ 432).

7       As to petitioner's claim 15 allegation of trial court error, a fair-minded jurist could find

8   the state supreme court's denial of relief on the merits as to that contention was not contrary to, or

9   an unreasonable application of, clearly established federal law, as determined by the Supreme

10   Court, nor was it based on an unreasonable determination of the facts in light of the evidence

11   presented in the state court proceeding.  28 U.S.C. § 2254(d).

12       Accordingly, this court will deny relief as to petitioner's claim 15.

13   F.     Claim 16 – Ineffective Assistance of Trial Counsel by Failure to Investigate and Defend
14         against the Rape Charge

15       Petitioner alleges that his trial counsel was ineffective by failing to investigate, develop

16   and present evidence refuting the rape charge and the murder-rape special circumstance, violating

17   his rights under the Sixth and Fourteenth Amendments.  (Doc. No. 29 at 87–91; *see also* Doc. No.

18   51 at 11–12.)

19          1.     Legal Standard

20       The applicable legal standard in reviewing an ineffective assistance of counsel claim is set

21   out in section B.1.b, above and will not be repeated here.

22          2.     State Court Direct and Collateral Review

23       Petitioner raised on direct appeal his allegation that the evidence introduced at his trial

24   was insufficient to support a finding of sexual penetration of the vagina, the rape conviction, and

25   the jury's finding true the murder-rape special circumstance.  The California Supreme Court

26   rejected petitioner's argument on the merits, stating that:

27         Defendant does not dispute the sufficiency of the evidence to establish that some
          form of unlawful sexual conduct occurred.  Semen on the clothing of both the
28         victim and defendant makes that clear.  Defendant relies on the laboratory analysis

which found no traumatic evidence of penetration and the absence of semen in either the vagina or anus and of blood on the vaginal swabs taken during the examination performed when Ms. Axtell was transported to the hospital.

Defendant acknowledges the testimony of Dr. Farber, the emergency room physician who examined Ms. Axtell, that he observed that the vaginal area was red and that this could be consistent with either bruising and penetration by an adult penis or an infection. Dr. Farber also testified that he found no other evidence of infection. Defendant speculates that the redness could have been caused by any low-grade infection or atrophic vaginitis for which one of the medications the victim was taking is sometimes prescribed. This, coupled with the finding of apparent blood in the anus, suggested that if a sexual assault took place only sodomy occurred.

That the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1084 [25 Cal.Rptr.2d 867, 864 P.2d 40].) The evidence of penetration in this case was circumstantial-redness in the vaginal area, the absence of evidence of an infection that might account for it, and expert testimony that the redness was consistent with penetration. Other circumstantial evidence-the medication and absence of blood or semen-could support an inference that the redness had a different cause.

When, as here, the trier of fact has relied on inferences, those inferences must be reasonable. An inference is not reasonable if it is based only on speculation. (*People v. Raley* (1992) 2 Cal.4th 870, 891 [8 Cal.Rptr.2d 678, 830 P.2d 712].) The jury verdict in this case was not, as defendant argues, based only on speculation. It was based on evidence that the redness present in the victim's vagina was consistent with penetration by an adult male penis. The inference that defendant accomplished penetration, apparently drawn by the jury on the basis of this evidence and defendant's admission that he sexually assaulted the victim, is reasonable.[15]

---------------------------------------FOOTNOTE-------------------------------------------

n.15 That the jury considered the rape charge and evidence with particular care is confirmed by its request that defendant's testimony, that of Dr. Farber, and the rape instructions be reread.

--------------------------------------END FOOTNOTE------------------------------------

The evidence is sufficient under the due process guarantees of both the state and the federal Constitutions.

*Holt*, 15 Cal. 4th at 668–69; (*see also* CT 718–19).

The California Supreme Court considered these same allegations framed as ineffective assistance of counsel in petitioner's first state habeas petition and summarily denied habeas relief in part on procedural grounds and entirely on the merits, without explanation or issuance of an order to show cause. (Order, *In re Holt (John Lee) on H.C.,* Case No. S057078 (Cal. Oct. 22,

1    1997), Lod. Doc. No. 31.)

2        3.        Analysis

3        Petitioner argues that his trial counsel provided ineffective assistance by failing to retain

4    and utilize forensic and clinical medical expertise to further investigate, develop, and present then

5    available evidence refuting the rape charge and related special circumstances allegation brought

6    against him.  (Doc. No. 29 at 87–91; *see also* Doc. No. 57 at 79.)

7            a.        Counsel's Performance was not Prejudicially Deficient in This Regard

8        Petitioner argues that his counsel failed to uncover substantial evidence corroborating his

9    denial of rape and refuting the insubstantial and circumstantial evidence of vaginal penetration

10    presented by the prosecution at his trial.  (*Id.; see also* RT 2421.)  In this regard, petitioner

11    contends that his counsel did not retain independent medical experts to review and impeach the

12    state's clinical evidence of rape.  (Doc. No. 29 at 87–91, citing 1SHCP Ex.'s. 137–138; 1SHCP

13    Ex. 3 at 1–5; *see also* EHRT 291–92, 324; 1SHCP Ex. 4 at 1–2; 1SHCP Ex. 7 ¶ 3; 1SHCP Ex. 31

14    at 3–4; 1SHCP Ex. 168; 1SHCP Ex. 178 at 29–30; EH Ex. 1 at 2.)

15        Petitioner also argues that his counsel failed to investigate, develop and present *mens rea*

16    defenses as discussed by this court in addressing petitioner's claim 13 above.  (Doc. No. 29 at 87–

17    91; *see also* EH Ex. 2 at 76–79; EH Ex. 4 at 4–5*;* EH Ex. 6 at 10–11; 1SHCP Ex. 31 at 2–3;

18    EHRT 69–83, 304; 1SHCP Ex. 178 at 13; 1Inf. Resp. Ex. A at 2–7.)

19        Of course, as recognized above, "counsel has a duty to make reasonable investigations or

20    to make a reasonable decision that makes particular investigations unnecessary."  *Ross*, 29 F.4th

21    at 1053 (quoting *Strickland*, 466 U.S. at 691); *see also Elmore,* 661 F.3d at 804–29, 861–62

22    (defense counsel found to have rendered ineffective assistance by failing to investigate

23    exculpatory forensic evidence potentially consistent with the defendant's statements that he did

24    not commit the crimes); *Stankewitz v. Wong,* 698 F.3d 1163, 1172–73 (9th Cir. 2012) (counsel's

25    failure to investigate and present evidence could not be rationalized on any tactical ground).

26        However, in support of this claim, petitioner merely revisits his argument in support of his

27    claim 15 that absent the allegedly deficient conduct of his trial counsel, there is a reasonable

28    probability that:  (i) his sodomy conviction would have supported only a conviction for second-

1  degree felony murder; (ii) the eight-year rape conviction sentence would not have been imposed;

2  and (iii) the jury's sentence selection might have been different as he has asserted in his claim 38.

3  (*See* Doc. No. 57 at 83 n.22 citing CT 703; *see also* CT 890; Doc. No. 51 at 13; Doc. No. 323 at

4  98); *Strickland*, 466 U.S. at 694.

5       The record before this court reflects that the defense to the rape charge presented on

6  petitioner's behalf at trial consisted only of:  (i) petitioner's testimony denying rape; and (ii)

7  attorney Soria's argument to the jury that the prosecution had failed to prove the rape charge

8  beyond a reasonable doubt.  Even so, for the same reasons discussed above in addressing

9  petitioner's claim 15, the court need not determine whether trial counsel was deficient as alleged

10  here in claim 16 because petitioner has not established a reasonable probability of a different

11  outcome at trial as to both first-degree murder theories that were available to the jury, i.e. (i)

12  willful, deliberate, and premeditated murder, and (ii) felony murder with rape, robbery and

13  burglary as the predicate felonies.  *Strickland*, 466 U.S. at 697.

14       Petitioner's jury found the burglary and robbery special circumstances allegations to be

15  true.  (CT 630–631, 741–751; RT 2609–12.)  Therefore, petitioner was found to be death eligible

16  as to his guilt phase conviction even absent the rape-murder special circumstance true finding.

17  The jury's consideration of any invalid rape special circumstance would not have changed that

18  result.  Nor is the separately imposed and stayed sentence on the rape conviction a basis for the

19  finding of prejudice stemming from any alleged ineffective assistance of counsel as would be

20  necessary to entitle petitioner to the habeas relief sought in the pending federal petition, i.e., relief

21  from the judgment of conviction and death sentence and release from confinement.  (*See* Doc.

22  No. 29 at ¶ 455; *id.* at 195-96.)   This court previously so stated.  (*See* Doc. No. 51 at 14-16.)

23       In addition, and as discussed above, petitioner has not established that he is entitled to

24  habeas relief on the grounds of cumulative guilt phase prejudice.  While the court previously left

25  open that possibility (*see* Doc. No. 96 at 268, 271; Doc. No. 51 at 11-12), petitioner does not now

26  advance that argument in connection with this claim.  In any event, the now fully developed

27  record before this court does not support relief based upon cumulative guilt phase prejudice, for

28  the reasons stated.

1          b.      Conclusions

2          Petitioner has not shown prejudice as required under the *Strickland* standard stemming

3   from his trial counsel's allegedly deficient performance in failing to properly investigate and

4   defend against the rape charge.  *See Strickland*, 466 U.S. at 697; Doc. No. 29 at ¶ 455; *id.* at 195-

5   96.)

6          Accordingly, federal habeas relief will be denied as to petitioner's claim 16.

7                       CERTIFICATE OF APPEALABILTY

8          Pursuant to Rule 11(a) of the Federal Rules Governing Section 2254 Cases, the court

9   has considered whether to issue a certificate of appealability.  *See* Local Rule 191(j).  A habeas

10  petitioner may appeal only those claims for which a certificate of appealability is granted.  *See*

11  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b); *Rios v. Garcia*, 390 F.3d 1082, 1088 (9th Cir.

12  2004); *see also Miller–El v. Cockrell*, 537 U.S. 322, 335–36 (2003); *Slack v. McDaniel*, 529

13  U.S. 473, 484 (2000).

14         A certificate of appealability may issue "only if the applicant has made a substantial

15  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either

16  issue a certificate of appealability indicating which issues satisfy the required showing or state

17  the reasons why such a certificate should not issue.  Fed. R. App. P. 22(b).

18         Where constitutional claims are denied on the merits, the petitioner must show that

19  reasonable jurists would find the district court's assessment of the constitutional claims

20  debatable or wrong.  *Slack*, 529 U.S. at 484-85.  Where the petition is dismissed on procedural

21  grounds, a certificate of appealability should issue if the prisoner can show:  (1) that jurists of

22  reason would find it debatable whether the district court was correct in its procedural ruling;

23  and (2) that jurists of reason would find it debatable whether the petition states a valid claim of

24  the denial of a constitutional right.  *Id.*

25         In the present case, the court concludes that reasonable jurists would not find the court's

26  denial of claims 2, 3, 6, 8, 9 (portion), 10, 13 (portion), 15 and 16 on the merits, its decision not

27  to address the unresolved claims in the petition as moot, and its dismissal of claim 44 as

28  premature, to be debatable, wrong, or deserving of encouragement to proceed further.

CONCLUSION

Accordingly, and for the reasons explained above:

1.  Petitioner's application for a writ of habeas corpus is conditionally GRANTED as to claims 11, 12, 13 (portion), and 14, on grounds of petitioner's incompetence to stand trial, and ineffective assistance of trial counsel in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.

2.  Petitioner's guilty verdict shall be vacated unless the state commences a new trial within a reasonable time.

3.  Petitioner's application for relief from the guilty verdict returned and the special circumstances found true at the guilt phase of his trial is denied in all respects as to claims 2, 3, 6, 8, 9 (portion), 10, 13 (portion), 15, and 16.

4.  Petitioner's application for relief on grounds of execution incompetency as to claim 44 is dismissed without prejudice as premature.

5.  The court does not at this time render any opinion on the unresolved claims of constitutional error.

6.  The court declines issuance of a certificate of appealability under 28 U.S.C. §2253(c).

7.  The Clerk of the Court is directed to substitute warden Oak Smith as respondent and enter judgement.

IT IS SO ORDERED.

Dated:   **April 26, 2023**    _____

UNITED STATES DISTRICT JUDGE